**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENJOY TECHNOLOGY, INC., *et al.*,[1] | Case No. 22-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JOHN BOKEN IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John Boken, declare under penalty of perjury:

1.      I am a Managing Director at AlixPartners, LLP ("AlixPartners").  On April 29,

2022, Enjoy Technology, Inc. (the "Company"), a Delaware corporation, retained AlixPartners as

financial advisor to assist in evaluating potential restructuring alternatives.  I have nearly 30 years

of corporate restructuring experience and have led more than 75 restructuring projects in a wide

variety of industries, including: energy, logistics, homebuilding, industrial construction,

manufacturing, retail, healthcare, and agriculture.  I have held senior management roles in

numerous chapter 11 and out-of-court restructuring situations, most notably as Deputy Chief

Restructuring Officer (CRO) of PG&E, CFO of QBI Holdings (fka Quibi), CEO of SolarWorld

Americas, President and COO of NRG Energy, CEO of Entegra Power Group, CRO of Flying J,

CEO and CRO for TOUSA, and CRO for Collins & Aikman.

2.      I hold a Bachelor of Science degree in commerce-finance from the University of

Santa Clara. I am a Certified Public Accountant (inactive) and a Certified Insolvency and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230).  The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

Restructuring Advisor. I am a member of the Association of Insolvency and Restructuring Advisors, the American Bankruptcy Institute and the Turnaround Management Association. I am a frequent speaker at seminars and conferences on issues relating to financially distressed companies.

3.     On the date hereof (the "Petition Date"), each of the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), filed a voluntary petition (collectively, the "Petitions") with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), as well as a number of motions requesting various forms of "first day" relief (collectively, the "First Day Motions").

4.     I submit this Declaration in support of the Petitions and First Day Motions.  The relief requested in each of the First Day Motions is necessary to maximize the value of the Debtors' estates and allow the Debtors to sustain their current operations in chapter 11.

5.     I am familiar with the contents of each First Day Motion (including the exhibits and other attachments to such pleadings) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Motion: (i) will enable the Debtors to sustain their current level of operations while in chapter 11; (ii) is critical to the Debtors' ability to maximize the value of their business; and (iii) best serves the interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above.[2]

6.     I am familiar with the Debtors' day-to-day operations, assets, financial condition, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this

---

[2]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

271254577 v5
RLF1 27565988v.1

Declaration are based upon: (i) my personal knowledge; (ii) information supplied to me by members of management, professionals, or employees; (iii) my review of relevant documents; and/or (iv) my opinion based upon my experience and knowledge of the Debtors' assets, liabilities, and financials.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

7.      The Debtors provide a revolutionary commerce-at-home experience for consumers through the Debtors' network of mobile retail stores.  The Debtors experienced significant growth after they were founded in 2014. In 2021, the Company became publicly-traded through a special purpose acquisition company transaction that enabled them to access the equity capital markets. Although the Debtors were on a revenue growth trajectory, a variety of factors have constrained their ability to raise the capital necessary to fund their operations, including tightening capital markets and other contributing macroeconomic factors.  Since going public, the Debtors have been unable to achieve profitability due to the ongoing operating costs associated with the development and growth of their platform.

8.      In April 2022, the Debtors determined that strategic alternatives were necessary to preserve their liquidity and maintain ongoing operations.  Starting in May 2022, the Debtors ran a targeted marketing process for a sale of substantially all of their assets. As the marketing process was underway, the Company's chief executive officer, Ron Johnson, provided the Debtors with $10 million under a secured promissory note to extend the Debtors' liquidity runway to execute a transaction.

9.      The Debtors contacted approximately twenty-three (23) prospective buyers, executed non-disclosure agreements with five (5) parties, and received two (2) letters of intent, from Asurion, LLC ("Asurion") and one other counterparty.  On June 13, 2022, the Debtors

3

executed a letter of intent with the non-Asurion counterparty to complete an out-of-court transaction that, if consummated, would have provided the Debtors with significant liquidity, avoided the need for a bankruptcy filing, transitioned the business to a licensing model where the counterparty owned and controlled the Debtors' key assets, and preserved the Company's status as a public corporation.  However, on June 17, 2022, the counterparty informed the Debtors that it would not proceed with the transaction and withdrew its offer.  The Debtors then pivoted to a proposal received from Asurion for a sale of substantially all of the Debtors' U.S. assets through a chapter 11 proceeding, and signed a letter of intent with Asurion (the "Asurion LOI") on June 19, 2022.  The Debtors believed that the sale terms in the Asurion LOI represented a fair and compelling offer because, among other things, (1) Asurion intended to continue operating the Debtors' core U.S. business as a going concern, retaining many of the Debtors' employees, and (2) Asurion's proposed purchase price would provide sufficient consideration to the Debtors to potentially pay the Debtors' creditors in full and preserve some value for equity holders.

10.    As negotiations and diligence progressed with respect to the transaction contemplated under the Asurion LOI, the Debtors and Asurion ultimately agreed to complete the funding necessary to bridge the Debtors' operations through an organized bankruptcy sale process through a chapter 11 filing and debtor-in-possession facility ("DIP"). However, in order to allow the Debtors to cover necessary payments to protect their employees in advance of the Petition Date, Asurion agreed to provide a small prepetition short-term bridge loan of $2.5 million.

11.    Notwithstanding the bridge loan from Asurion, the Debtors face a rapidly declining cash position that has rendered them unable to pay necessary operating expenses, including payroll.  Accordingly, the Debtors commenced these cases and are seeking immediate approval of a DIP to be provided from Asurion, subject to the roll-up of the obligations under the bridge loan

4

into the DIP, to fund the Debtors' operating expenses and consummate an organized and value-maximizing sale process.  The Debtors intend to expeditiously file a motion to approve bidding procedures and designate Asurion as the stalking-horse bidder for the sale of substantially all of their U.S. assets, and conduct a sale process that builds upon the prepetition marketing process overseen by Centerview (as defined below).  Pending the approval of a sale, the Debtors will continue to operate in the ordinary course of business and provide uninterrupted service.

12.     This Declaration is divided into three parts.  Part I sets forth a summary of the Debtors' business, corporate structure, and prepetition indebtedness.  Part II discusses the circumstances surrounding the commencement of these chapter 11 cases and the Debtors' plans for the path forward.  Part III sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## I.     <u>The Debtors' Business</u>

### A.     <u>Background</u>

13.     The Debtors' business launched in 2014 and sought to reinvent the retail experience and commerce-at-home through the "Mobile Store," a new channel that pairs the convenience of online shopping with the personal touch of an in-store retail experience in the comfort of the end customers' (the "<u>Consumer</u>") homes.  Over the last two decades, ecommerce has upended the traditional physical retail model, shifting commerce from stores to commerce-at-home.  Digital channels brought the shopping experience to the Consumer's doorstep, enabling customers to buy and receive their purchases without ever having to leave the home. Fulfillment to the door has been made easier and faster than ever with technology companies achieving a high degree of success through last-mile innovations. However, the current ecommerce experience has one fundamental limitation: it ends with a package at the door. Brands lose the personal connection to their

5

customers, their ability to provide in-person advice and support, and their ability to upsell products and services as online retail continues to gain share.

14.    It is against this backdrop that the Debtors created the Mobile Store, which provides the experience of a traditional physical store, but with greater convenience to the customer. The Debtors' mobile retail sales team ("Experts"), led by their managers, provide everything that is provided in a store environment in the comfort of a home, including set-up, activation, and demonstration of products. The Experts assist Consumers in evaluating and selecting a wide range of accessories, media subscriptions, device protection, broadband, and other services. They also assist in the trade-in and upgrade of products.  The relationship formed between Consumers and Experts is not limited to this first visit. For some relationships, the Debtors offer the opportunity for the same Expert to follow up with the Consumer and return for a second visit. This allows space for final decisions on products or the presence of another person to help finalize a sale that might have been lost in a traditional retail space, or could have been lost in a traditional online shopping environment.

15.    In addition, in the last quarter of 2021, the Debtors launched Smart Last Mile™ in North America, which combines local warehousing, mobile stores, full-time employees and proprietary software to deliver products or experiences with incredible speed, in most cases within the same or next day.  Smart Last Mile™ provides the Debtors' business partners with an omni-channel solution to enable trusted at-home retail experiences and to-the-door deliveries and address a larger share of Customer demand.

B.    **The Debtors' Employees and Business Partners**

16.    The Company operates out of a headquarters located in Palo Alto, California.  As of the Petition Date, the Debtors employ approximately 1,720 individuals, none of whom are subject to a collective-bargaining agreement.

17.    Historically, the Debtors have operated pursuant to contractual partnerships, commercial relationships and/or authorized dealer agreements with leading telecommunications and technology companies including AT&T in the United States, BT-EE (British Telecom) in the United Kingdom, Rogers in Canada, and Apple in select US cities.

C.    **2021 Holding Company Reorganization**

18.    In January 2021, the Company filed documents with the Delaware Secretary of State to effectuate a holding company reorganization (the "2021 Reorganization"), which resulted in a newly formed Delaware corporation, Enjoy Technology Holding Company ("Enjoy Holdings"), owning all the capital stock of Enjoy Technology, Inc.  Enjoy Holdings was initially a direct, wholly owned subsidiary of Enjoy Technology, Inc. Pursuant to the 2021 Reorganization, the newly formed entity, a direct, wholly owned subsidiary of Enjoy Holdings and an indirect, wholly owned subsidiary of Enjoy Technology, Inc., merged with and into Enjoy Technology, Inc., with Enjoy Technology, Inc., surviving as a direct, wholly owned subsidiary of Enjoy Holdings.

19.    Each share of each class of Enjoy Technology, Inc. stock issued and outstanding immediately prior to the 2021 Reorganization was automatically converted into an equivalent corresponding share of Enjoy Holdings stock.  Upon consummation of the 2021 Reorganization, Enjoy Technology, Inc.'s current stockholders became stockholders of Enjoy Holdings. Enjoy

271254577 v5
RLF1 27565988v.1

Technology, Inc. changed its name to Enjoy Technology LLC and Enjoy Holdings changed its name to Enjoy Technology Inc.

        D.    **Special Purpose Acquisition Company Transaction**

       20.    In April 2021, the Company announced plans to become a publicly-traded corporation through a merger (the "Merger Transaction") with a special purpose acquisition company. Marquee Raine Acquisition Corp. ("MRAC"), Enjoy Technology, Inc.'s predecessor, entered into an Agreement and Plan of Merger, dated as of April 28, 2021 and amended on July 23, 2021 and September 13, 2021 (the "Merger Agreement"), by and among MRAC, MRAC Merger Sub Corp., a Delaware corporation and a direct wholly owned subsidiary of MRAC ("Merger Sub"), and Enjoy Technology Inc. (n/k/a Enjoy Technology Operating Corp.) ("Legacy Enjoy"), a Delaware corporation.

       21.    On October 14, 2021, as contemplated by the Merger Agreement, MRAC filed a notice of deregistration with the Cayman Islands Registrar of Companies, together with the necessary accompanying documents, and filed a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, under which MRAC was domesticated and continues as a Delaware corporation, changing its name to "Enjoy Technology, Inc." On October 15, 2021, Legacy Enjoy consummated the transactions with MRAC as contemplated by the Merger Agreement, and MRAC common stock and warrants began trading on the Nasdaq under the ticker symbols "ENJY" and ENJYW," respectively.

       22.    As a result of the Merger Transaction, the Company raised net proceeds of $112.6 million after repayment of certain loans and transaction costs.

271254577 v5
RLF1 27565988v.1

E.     **Organizational Structure**

23.     Enjoy Technology, Inc. is the direct or indirect parent of multiple domestic and foreign subsidiaries.  The Debtors' primary operating subsidiaries are as follows:

- Enjoy Technology LLC:  Enjoy Technology LLC is a Delaware limited liability company that serves as the Debtors' U.S. operating company and handles all U.S. operations, employees, and contracts.

- Enjoy Technology Operating Corp.: Enjoy Technology Operating Corp. is a Delaware corporation that was created in January 2021 for the purpose of raising external capital.  It is a dormant entity with no ongoing operations, employees or contracts.

- Enjoy (UK) Limited:  Enjoy (UK) Limited is a limited company organized under the laws of the United Kingdom that serves as the Debtors' United Kingdom operating company and handles all United Kingdom operations, employees, and contracts.  Enjoy (UK) Limited is not a debtor and will be wound down in a liquidation proceeding in the United Kingdom.

- Enjoy Technology Canada Ltd.: Enjoy Technology Canada Ltd. Is a limited company organized under the laws of the province of British Columbia, Canada that serves as the Debtors' Canadian operating company and handles all Canadian operations, employees, and contracts.  Enjoy Technology Canada Ltd. is not a debtor and will be wound down in a liquidation proceeding in Canada pursuant to the Bankruptcy and Insolvency Act.

A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

24.     Historically, the Company's U.S. debtor and foreign non-debtor subsidiaries have engaged in a broad array of intercompany transactions in the ordinary course of their operations in accordance with the terms of a comprehensive suite of services agreements, license agreements, and related intercompany agreements.

9

**F.**     **Prepetition Indebtedness**

**i.**     **Senior Secured Credit, Guaranty and Security Agreement**

25.     On June 29, 2022, the Debtors, as borrowers, and Asurion, as lender, entered into a Senior Secured Credit, Guaranty and Security Agreement (together with all amendments and other documents ancillary thereto, the "Senior Secured Credit Agreement").  The Senior Secured Credit Agreement provides for commitments of $2.5 million, with a maturity date of July 8, 2022. The proceeds of the Senior Secured Credit Agreement were used to fund the Debtors' imminent cash needs prior to the filing of a chapter 11 case.

26.     The obligations under the Senior Secured Credit Agreement are secured by a first-priority lien on substantially all the assets of the Company (including, without limitation, intellectual property).  As of the Petition Date, approximately $2.5 million remains outstanding under the Senior Secured Credit Agreement.

**ii.**     **Other Secured Indebtedness**

27.     As of the Petition Date, the Debtors had stand-by letters of credit totaling approximately $2.5 million.

**iii.**     **Unsecured Indebtedness**

**a.**     **Amended and Restated Promissory Note**

28.     Pursuant to a Secured Promissory Note (together with all amendments and other documents ancillary thereto, the "Former Secured Promissory Note"), dated as of May 11, 2022, by and between Enjoy Technology, Inc., as borrower, and the Company's chief executive officer, Ron Johnson, as holder (the "Holder"), the Holder made certain advances of money and extended certain financial accommodations to the Company.  The Company's obligations under the Former Secured Promissory Note matured on November 11, 2022, were previously secured by a first-

271254577 v5
RLF1 27565988v.1

priority lien on substantially all the assets of the Company (including, without limitation, intellectual property), and contained no financial covenants. Proceeds from the Former Secured Promissory Note were used to enhance the Debtors' liquidity and fund operations, which provided the Debtors with additional time to consummate a transaction.

29.    On June 29, 2022, the Holder entered into a Termination and Release Agreement whereby the Holder agreed to terminate the security agreement under the Former Secured Promissory Note and release all security interests granted to the Holder by the Company. On the same day, the Company and the Holder entered into an unsecured Amended and Restated Promissory Note (together with all amendments and other documents ancillary thereto, the "Unsecured Promissory Note") that matures on December 29, 2022, and otherwise contains terms consistent with the Former Secured Promissory Note.

30.    As of the Petition Date, the Debtors' obligations under the Unsecured Promissory Note totaled not less than $10 million, plus accrued interest and expenses.

>    **b.    Trade Debt**

31.    In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers, and services providers, among others. As of the Petition Date, the Debtors' estimated outstanding trade payables are approximately $11 million.

>    **G.    The Debtors' Equity Holders**

32.    The Company is publicly-traded and its common stock is quoted on the NASDAQ Global Market Tier. As of June 29, 2022 there were approximately 2,000 record holders and 122,422,579 outstanding shares of the Company's common stock.

271254577 v5
RLF1 27565988v.1

II.    **Circumstances Giving Rise to These Chapter 11 Cases**

A.    **The Debtors' Declining Liquidity**

33.    Since their inception, the Debtors have incurred losses and cash outflows from their operations.  The Debtors have therefore been dependent on their ability to raise additional capital to develop their technology, achieve their business objectives, and maintain operations and liquidity.  The Debtors historically financed their operations through the issuance and sale of redeemable convertible preferred stock, issuance of debt, and issuance of common stock in connection with the Merger Transaction.  The Debtors' ability to raise the necessary capital to fund their operations has become constrained due to a number of factors, including larger-than-expected redemptions under the Merger Transaction that reduced the Debtors' net proceeds from that transaction, and a tightening of public equities markets.

34.    The Debtors' business has also been negatively impacted by the supply chain crisis and an inability to retain sufficient personnel.  As economies around the world continue to recover, shortages in raw materials and inventory have become more widespread. During the second half of fiscal year 2021, the Debtors experienced shortages in their inventory of recently launched smartphones. Inventory shortages, and shortages of the raw materials used in the products that the Debtors sell, have contributed to delays in the supply chain. The Debtors and their business partners continue to experience logistic, supply chain, and manufacturing challenges that have continued during 2022.  The Debtors have also had difficulty recruiting and retaining Experts as a result of macroeconomic factors.  These issues had and continue to have a negative impact on the Debtors' revenue.

271254577 v5
RLF1 27565988v.1

35.     In April 2022, the Debtors concluded that they lacked sufficient capital to satisfy their ongoing expenses and that restructuring initiatives were necessary to preserve their liquidity and maintain operations.

**B.     The Debtors' Prepetition Restructuring Initiatives**

36.     In response to their deteriorating cash position, the Debtors took several affirmative steps to extend their liquidity runway.  First, the Debtors formulated an operational restructuring plan.

37.     Second, in late April 2022, the Debtors engaged AlixPartners to advise them with respect to cash flow management, liquidity forecasting, and various strategic alternatives. The Debtors engaged Centerview Partners, LLC ("Centerview") on May 7, 2022, to serve as their investment banker in connection with various strategic alternatives.  In May 2022, the Debtors also obtained additional liquidity from the Former Secured Promissory Note and a $3.6 million customer prepayment for future services.

**C.     The Debtors' Strategic Review Committee**

38.     In connection with the Debtors' restructuring efforts, on May 20, 2022, the Board of Directors (the "Board") of the Company appointed two independent directors with significant restructuring experience, Alan Carr and William Transier.  On May 20, 2022, the Company established a special Strategic Review Committee of its Board comprised solely of independent directors who were authorized to manage and coordinate the Debtors' various restructuring activities.  On May 20, 2022, the Board also established a special Investigation Subcommittee of the Strategic Review Committee (the "Investigation Subcommittee"), composed of Mr. Carr and Mr. Transier, to conduct an independent investigation into any claims or causes of action that the Company may have with respect to any transactions or acts or omissions involving affiliates or

13

insiders prior to May 20, 2022.  On May 27, 2022, the Investigation Subcommittee retained Ropes & Gray LLP ("Ropes") as independent counsel to the Investigation Subcommittee.  I believe that the Investigation Subcommittee, with the assistance of Ropes, has worked diligently on their investigation since being appointed, and I understand that their investigation remains ongoing as of the Petition Date.

### D.     The Debtors' Prepetition Marketing Efforts

39.     The Debtors remained hopeful that their strategic initiatives would allow them to achieve an out-of-court solution to their deteriorating liquidity position, including through a sale of substantially all of their assets.  Prior to filing these cases, the Debtors conducted a marketing effort to explore the potential sale of their assets.  With the assistance of Centerview, the Debtors prepared a list of approximately twenty-three (23) potential acquirers that were considered the most likely participants in a sale process.  Following the initial outreach to the identified twenty-three (23) parties, the Debtors provided certain information to these parties in order to gauge their interest prior to executing a non-disclosure agreement.  Five (5) total parties entered into confidentiality agreements with the Debtors. Those parties requested additional information and received access to a virtual data room containing due-diligence materials and/or conducted meetings with the Debtors' management and multiple telephonic diligence meetings with Centerview and management.

40.     While the sale process was underway, the Debtors evaluated whether prepetition secured financing (and potentially DIP financing) was available from third-party capital providers. The Debtors and their advisors concluded that financing from third-party capital providers was not available based upon the significant operating costs associated with the Debtors' historical and future operations, the lack of traditional collateral to secure a loan, and the uncertainty of the

14

outcome of the sale process in early June 2022.  As a result, the Debtors instead focused on

obtaining prepetition secured and DIP financing from prospective buyers.

41.     Ultimately, the Debtors received letters of intent from two (2) parties, Asurion and

one other counterparty.  On June 13, 2022, the Debtors executed a letter of intent with the non-

Asurion counterparty that contemplated a transaction whereby that party would make a significant

debt and convertible debt investment in the Debtors' business.  The transaction, if consummated,

would have provided the Debtors with liquidity, avoided the need for a bankruptcy filing, and

preserved the Company as a public corporation.  It also would have resulted in the transition to a

business model where the Debtors were technology licensors, with the counterparty owning and

controlling the Debtors' key assets, including key customer contracts and relationships.

42.     Unfortunately, on June 17, 2022, the counterparty informed the Debtors that it

would not proceed with a transaction and withdrew its offer.  In response, the Debtors immediately

refocused their efforts on consummating a transaction with Asurion, who had also previously

submitted a letter of intent for the acquisition of substantially all of the Debtors' U.S. assets and

operations.

**E.     The Debtors Enter Into a Letter of Intent with Asurion**

43.     On June 19, 2022, the Debtors executed the Asurion LOI which, among other

conditions, requires the Debtors to commence these cases as a precondition to an asset sale.  The

Asurion LOI originally contemplated that Asurion would provide the Debtors with a substantial

prepetition loan to provide liquidity for the Debtors' ongoing operations and potentially provide a

longer runway to commence a chapter 11 case.  The Debtors intended to negotiate the terms of an

asset purchase agreement and DIP financing with Asurion during that period, such that when the

Debtors filed chapter 11, Asurion would serve as both a DIP lender and stalking-horse purchaser.

44. However, Asurion subsequently determined that it was only willing to fund the Debtors' operations through a DIP in a chapter 11 case. In connection with this chapter 11 case, Asurion has agreed to provide a $55 million DIP facility, which includes approximately $52.5 million of new money and a roll-up of a $2.5 million bridge loan provided by Asurion on the day prior to the Petition Date. Through this bridge loan the Debtors were able to fund their imminent cash needs prior to the filing of these chapter 11 cases. Notwithstanding the $2.5 million bridge loan funded under the Senior Secured Credit Agreement, the Debtors were faced with an inability to satisfy accruing employee and other obligations without immediate access to a DIP, which Asurion has agreed to provide in these cases, subject to the roll-up of the obligations under the Senior Secured Credit Agreement into the DIP.

45. The Debtors have an imminent need for the DIP given their declining cash position. As of the date hereof, the Debtors have approximately $523,000 of cash on hand, which is insufficient to fund their critical expenses, including their next biweekly payroll.

46. The Debtors' objectives in these chapter 11 cases are to use the proceeds of the DIP to make necessary payments, continue operations in the ordinary course of business, and consummate a sale of substantially all of their U.S. assets to Asurion or the highest bidder. The Debtors anticipate that the proposed purchase price to be received from Asurion will be sufficient to satisfy all secured and unsecured claims in full. I believe that, by moving expeditiously toward a sale of assets to Asurion or another bidder, the Debtors have an opportunity to preserve and maximize value for the Debtors' creditors, equity holders, and employees that would otherwise be lost.

271254577 v5
RLF1 27565988v.1

### III.     Summary of First Day Motions

47.     To minimize the adverse effects of the commencement of these chapter 11 cases,

the Debtors have requested a variety of relief in the First Day Motions filed concurrently herewith.

Specifically, the Debtors are seeking approval of the following First Day Motions:

- **Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.**

- **Motion of Debtors for Entry of Order Authorizing Debtors to (I) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (II) Prepare a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (III) Redact Certain Personally Identifiable Information for Individual Creditors, (IV) Waive the Requirement to File a List of Equity Security Holders of Enjoy Technology, Inc. and Modify Notice Thereto, and (V) Granting Related Relief.**

- **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs. (II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations, and (III) Granting Related Relief.**

- **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms, (C) Continue to Use the Corporate Credit Card Program, (D) Perform Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Status for Postpetition Intercompany Claims, and (II) Granting Related Relief.**

- **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.**

- **Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder, and (B) Renew, Revise, Extend, Supplement or Enter Into New Insurance Policies, and (II) Granting Related Relief.**

- **Motion of Debtors for Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting**

**Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief.**

- **Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Senior Secured Lender, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief.**

- **Application of Debtors For Appointment of Stretto as Claims and Noticing Agent.**

48.     I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information, and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and to therefore preserve and maximize the value of the Debtors' estates for the benefit of the Debtors' stakeholders. The relief requested in connection with the First Day Motions is also narrowly tailored so as to only seek such relief as the Debtors believe is necessary to avoid immediate and irreparable harm to the Debtors' estates.

49.     Furthermore, I believe that with respect to the First Day Motions requesting the authority, but not direction, to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to allowing the Debtors to continue the essential operations that are necessary to maximizing value for the Debtors' sale process.  Granting the interim relief described therein is necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers, vendors, creditors, equity holders, and other stakeholders.  I believe that these continued minimal operations are necessary to enable the Debtors to run a value-maximizing sale process, including by paying their employees in the ordinary course of business.

[Signature page follows]

## <u>CONCLUSION</u>

50.     The Debtors' ultimate goal in these chapter 11 cases is to consummate a value-maximizing transaction for the benefit of all of their constituents.  In the near term, however, to minimize any loss of value of their business or assets during their restructuring, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the pendency of these chapter 11 cases with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving the Debtors' objectives will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of June, 2022.

By:  */s/ John Boken*
     John Boken

271254577 v5
RLF1 27565988v.1

**Exhibit A**

# Simplified Post-Closing Structure



[1] Public Company

[2] Note that this is the former private company "Enjoy Technology Inc." which has been renamed, as shown above.

3 Note that this is the former Enjoy Technology, Inc. which was converted into an LLC and renamed in January 2021.