## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENJOY TECHNOLOGY, INC., *et al.*,[1] | ) Case No. 22-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE SENIOR SECURED LENDER, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The debtors and debtors-in-possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an interim order on an expedited basis (the "Interim Order")[2] substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court, entry of a final order (the "Final Order" and, with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230).  The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

Rules"), authorizing the Debtors, among other things, to obtain senior secured postpetition financing and use cash collateral on an interim and final basis pursuant to the terms and conditions of that certain *Superpriority Secured Debtor-In-Possession Credit Facility Term Sheet* (the "DIP Term Sheet"), by and among Enjoy Technology, Inc. ("Enjoy"), Enjoy Technology Operating Corp. ("Enjoy Operating"), and Enjoy Technology LLC ("Enjoy LLC"), collectively as Borrower, Enjoy Operating and Enjoy LLC, each as Guarantor, Asurion, LLC, either directly or through one or more of its US affiliates, as DIP Lender, (the "DIP Lender"), substantially in the form attached hereto as **Exhibit B** (the "DIP Term Sheet").

In support of the Motion, the Debtors rely on the (a) *Declaration of John Boken in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and (b) *Declaration of Marc D. Puntus In Support of Debtors' Motion Seeking Entry of Interim and Final Orders (i) Authorizing Debtors To Obtain Postpetition Financing, (ii) Authorizing the Debtors to Use Cash Collateral, (iii) Granting Liens And Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection to the Prepetition Senior Secured Lender, (v) Modifying Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief* (the "Puntus Declaration"), filed concurrently herewith. In further support of the Motion, the Debtors respectfully represent as follows:

**OVERVIEW**

1. By this Motion, the Debtors seek entry of the DIP Orders, and initially the Interim Order:

    a. authorizing the Debtors to obtain senior secured, superpriority postpetition financing on a superpriority basis consisting of a senior secured superpriority asset based credit facility (the "DIP Facility") and all amounts extended under the DIP Facility, consisting of $55.0 million in the aggregate principal amount of loans and commitments, by and among the Borrower, the Guarantors, and the DIP Lender, substantially in the form attached hereto as **Exhibit B**;

2

b.  authorizing the Debtors to execute and deliver the DIP Term Sheet, a DIP Credit Agreement[3] and any other agreements, instruments, pledge agreements, guarantees, control agreements and other DIP Loan Documents (as defined in the DIP Term Sheet) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Credit Agreement and DIP Term Sheet, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c.  granting to the DIP Lender, on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as described in the DIP Term Sheet, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined in the Interim Order), subject only to the Carve Out (as defined below);

d.  granting to the DIP Lender (as defined in the DIP Term Sheet) under the DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), which liens shall be senior to those held by the Prepetition Lender pursuant to the Prepetition Facility, including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

e.  authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

f.  authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral, including the Cash Collateral of the Prepetition Lender (as defined herein);

g.  providing adequate protection to the Prepetition Lender for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral,

---

[3] For the avoidance of doubt, the Debtors anticipate accessing the DIP Facility upon the Court's entry of the Interim Order as set forth herein, and as further described in the DIP Term Sheet. The Debtors and DIP Lender intend to promptly enter into the DIP Credit Agreement which shall be consistent with the DIP Term Sheet.

and the priming of their respective interests in the Prepetition Collateral, including Cash Collateral (including by the Carve Out) ("Diminution in Value");

h.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

i.      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion, on a final basis, and approving the form of notice with respect to the Final Hearing; and

j.      granting related relief.

## JURISDICTION

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their

businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that these Cases be jointly administered.

6.      No creditors' committee has been appointed in these Cases by the United States Trustee. No trustee or examiner has been appointed in any of these Cases.

7.      The Debtors commenced these Chapter 11 Cases due to a rapidly declining cash position that has rendered them unable to pay operating expenses, including payroll. The Debtors are seeking immediate approval of a debtor-in-possession financing facility to be provided from Asurion, LLC ("Asurion") to fund the Debtors' operating expenses and the consummation of a sale of substantially all of their U.S. assets. The Debtors intend to expeditiously file a motion to approve bidding procedures and designate Asurion as the stalking-horse bidder for the sale of substantially all of their U.S. assets. Pending the approval of the sale, the Debtors will continue to operate in the ordinary course of business and provide uninterrupted, top-quality service. A detailed description of the Debtors, including their business operations, their corporate and capital structure, the events leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting this Motion, are set forth in greater detail in the First Day Declaration and incorporated by reference herein.

8.      Toward that end, the Debtors have entered into the DIP Facility, pursuant to which, and subject to Court approval, the Debtors will receive a senior secured debtor-in-possession credit facility that is designed to provide them with sufficient runway to fund that sale process and an orderly wind-down of its remaining affairs through the chapter 11 process. The relief sought in this Motion is intended to preserve and maximize value and facilitate the Debtors' operations through these Cases.

271243081 v5
RLF1 27566205v.1

## I.  Prepetition Capital Structure and Secured Indebtedness

### A.  $2.5 Million Senior Secured Credit Agreement

9.  On June 29, 2022, the Debtors, as borrowers, and Asurion, as lender, entered into a Senior Secured Credit, Guaranty and Security Agreement (together with all amendments and other documents ancillary thereto, the "Senior Secured Credit Agreement").  The Senior Secured Credit Agreement provides for commitments of $2.5 million, with a maturity date of July 8, 2022. The proceeds of the Senior Secured Credit Agreement (the "Bridge Loan") were used to fund the Debtors' imminent cash needs prior to the filing of the chapter 11 cases.  The DIP Documents will provide for a roll-up of the Bridge Loan in the aggregate amount of approximately $2.5 million ("Roll-up Loan").

10.  The obligations under the Senior Secured Credit Agreement are secured by a first-priority lien on substantially all the assets of the Company (including, without limitation, intellectual property).  As of the Petition Date, approximately $2.5 million remains outstanding under the Senior Secured Credit Agreement.

### B.  $10 Million Unsecured Promissory Note

11.  The Debtors previously had approximately $10 million of funded indebtedness related to a Former Secured Promissory Note, which was secured by a first priority lien on substantially all the assets of Enjoy Technology, Inc. (including, without limitation, intellectual property).  However, on June 29, 2022, Ron Johnson, as holder of the Former Secured Promissory Note (the "Holder"), entered into a Termination and Release Agreement whereby the Holder agreed to terminate the security agreement under the Former Secured Promissory Note and release all security interests granted to the Holder by the Company.  On the same day, the Company and the Holder entered into an unsecured Amended and Restated Promissory Note (together with all amendments and other documents ancillary thereto, the "Unsecured Promissory Note") that

6

matures on December 29, 2022, and otherwise contains terms consistent with the Former Secured Promissory Note. As of the Petition Date, the Debtors' obligations under the Unsecured Promissory Note totaled not less than $10 million, plus accrued interest and expenses

**B.      Other Debt**

12.      The Debtors also have approximately $2.5 million in stand-by letters of credit and, as of the Petition Date, the Debtors have approximately $11 million in outstanding unsecured trade obligations.

**II.      Events Leading Up to the DIP Facility and Negotiation of the DIP Facility**

13.      In the months leading up to the filing of these cases, the Debtors conducted a marketing effort to explore the potential sale of their assets. With the assistance of Centerview, the Debtors prepared a list of approximately twenty-three (23) potential acquirers that were considered the most likely participants in a sale process. Following the initial outreach to the identified twenty-three (23) parties, certain information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement. Five (5) total parties entered into confidentiality agreements with the Debtors. Those parties requested additional information and received access to a virtual data room containing due-diligence materials and conducted meetings with the Debtors' management and multiple telephonic diligence meetings with Centerview and management.

14.      On June 19, 2022, the Debtors entered into a letter of intent (the "Asurion LOI") with Asurion, which, among other conditions, requires the Debtors to commence these cases as a precondition to a sale. The DIP Lender indicated a willingness to negotiate terms of a postpetition financing facility on the terms described herein. As set forth in the Puntus Declaration, the Debtors, with the assistance of their advisors, reached out to a number of potential acquirers that were considered the most likely participants in a sale process and who might potentially provide

271243081 v5
RLF1 27566205v.1

prepetition or postpetition financing in connection with their acquisition efforts. As no third-party financing on better terms was reasonably available, the Debtors looked to the DIP Lender as the potential acquiror to provide financing on a postpetition basis.

15.     The Debtors (with the assistance of their advisors) and the DIP Lender engaged in extensive, arm's length negotiations with respect to the terms and conditions of the DIP Facility, which was the only proposal the Debtors received for postpetition financing. The material terms and conditions of the DIP Facility are summarized below. The Debtors and the DIP Lender have agreed upon an initial budget, which is attached hereto as **Exhibit C,** projecting cash flow for the first 10 weeks of these cases (as it may be updated in accordance with the DIP Term Sheet and DIP Orders, the "Budget"). The DIP Term Sheet permits the Debtors to draw on the DIP Facility to make any disbursement specifically provided for in the Budget (subject to certain permitted variances).

## III.     **Need for the DIP Facility and Continued Use of Cash Collateral**

16.     The Debtors have an urgent and immediate need to obtain postpetition financing. The Debtors do not have sufficient funds on hand or generated from their business to fund operations. Without the postpetition financing and the use of cash collateral that will be provided under the DIP Term Sheet and the proposed DIP Orders, the Debtors will not be able to fund operations, pay employees, or facilitate a sale of the business.

17.     Without the proposed DIP Facility and access to cash collateral, the Debtors will not have any liquidity, among other things, to operate their business, fund their ordinary course expenditures, including paying their employees, or to pay the expenses necessary to administer these Chapter 11 Cases. Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Term Sheet and the use of cash collateral on the terms set forth in the proposed DIP Orders.

271243081 v5
RLF1 27566205v.1

## CONCISE STATEMENT OF RELIEF REQUESTED

18.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the DIP Term Sheet and Interim Order:[4]

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Borrower**<br><br>**Guarantors**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankr. R. 4001-2(a)(i)(J)* | Enjoy Technology, Inc., Enjoy Technology Operating Corp. ("Enjoy Operating"), and Enjoy Technology LLC ("Enjoy LLC"),<br><br>Each of Enjoy's direct or indirect wholly owned US subsidiaries not otherwise Borrowers (collectively, the "Guarantors") | DIP Term Sheet, Page 1 |
| **DIP Lender**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Asurion, LLC | DIP Term Sheet, Page 1 |
| **Type of Amount of DIP Facility/ Roll-Up**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E)* | The DIP Facility shall consist of a $55 million senior secured superpriority priming debtor-in-possession non-amortizing facility (the obligations thereunder, the "DIP Commitments"), which shall be made available to the Debtors (a) in a roll up (the "DIP Roll-Up Loans") of the approximately $2.5 million in outstanding Prepetition Obligations (defined below) in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, (b) in a single new money draw in the initial amount of up to $22.5 million  minus the aggregate amount of the Roll-Up Loans (the "Initial DIP Loan") in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, and (c) in a single new money draw of the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Loan Documents (defined below) upon entry of the Final Order (such loans described in subsection (c) together with the Initial DIP Loan, the "DIP New Money Loans"), and such DIP New Money Loans and the DIP Roll-Up Loans, the "DIP Loans") to be funded by Asurion, LLC (the "DIP Lender"). | DIP Term Sheet, Page 2 |

---

[4] This summary is intended solely for informational purposes and is qualified in its entirety by the DIP Term Sheet and the Interim Order. In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects. Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP Term Sheet and the Interim Order, as applicable.

271243081 v5
RLF1 27566205v.1

| | | |
|---|---|---|
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans will bear interest at a fixed rate per annum equal to 12.00%, accruing monthly, payable in arrears and payable in kind.<br><br>Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum*. | DIP Term Sheet, Page 5 |
| **Other Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Closing Fee: 2.0% of the entire DIP Commitments, which shall be payable in kind on the Closing Date to the DIP Lender.<br><br>Termination Fee: 4.0% of the Repaid Amount. | DIP Term Sheet, Pages 3 & 6 |
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The "Budget" shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to the DIP Lender (such Budget shall be supplemented in the manner required pursuant to the "Financial Reporting Requirements" section below). | DIP Term Sheet, Page 3 |
| **Closing Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The date of the satisfaction or waiver by the DIP Lender of the relevant "Conditions Precedent to the Closing of the DIP Facility" set forth in the DIP Term Sheet | DIP Term Sheet, Page 2 |
| **Conditions Precedent to Borrowing DIP Loans**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | In addition to (and subject to) the satisfaction of the conditions on the Closing Date, the DIP Documents will contain the following conditions precedent to borrowings on the date of any Extension of Credit, which conditions precedent apply to any funding of the DIP Facility under the DIP Term Sheet:<br><br>• The DIP Lender shall have received a borrowing notice from the Borrower at least one (1) business day prior to the anticipated date of the initial Extension of Credit and at least two (2) business days prior to the anticipated date of the second Extension of Credit.<br><br>• No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the | DIP Term Sheet, Pages 12-13 |

271243081 v5<br>RLF1 27566205v.1

funding of the DIP Loans or would result from such borrowing of the DIP Loans.

- The representations and warranties of each Borrower and each Guarantor set forth in the DIP Documents shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the Closing Date or on and as of the date of any Extension of Credit thereafter, as applicable, in each case immediately after giving effect to the funding of any DIP Loans and to the application of the proceeds therefrom as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date).

- The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

- The making of the DIP Loans shall be authorized pursuant to the Interim Order or the Final DIP Order, as applicable.

- Other than the Final DIP Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits or restricts the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the DIP Collateral.

- The entry of the Interim Order or Final DIP Order, as the case may be, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender, which Interim Order or Final DIP Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

- Other than the Known Events, since the Petition Date, there shall not have been a Material Adverse Change.

- Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lender prior to the Petition Date on a schedule to the DIP Credit Agreement, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the

transactions contemplated thereby.

- The Loan Parties shall be in compliance with (i) the Interim Order or the Final DIP Order, as the case may be, and (ii) the Budget (subject to Permitted Variances).

- With respect to the second drawing of DIP Loans, the Bankruptcy Court shall have entered the Final DIP Order within twenty-one (21) calendar days following the Petition Date in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender, which Final DIP Order shall include, an updated Budget (as necessary) as an exhibit thereto(i) authorizing and approving, on a final basis, the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing, on a final basis, the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the DIP Lender to exercise its rights and remedies, with respect to the DIP Facility; (iii) authorizing, on a final basis, the use of cash collateral; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Lender and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

| **Maturity** <br><br> *Bankruptcy Rule 4001(c)(1)(B)* | The DIP Obligations, accrued or otherwise, shall be due and payable in full on the earliest to occur of (i) September 30, 2022 (ii) if the Final DIP Order has not been entered, twenty-one (21) calendar days after the Petition Date, (iii) the acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an event referred to in the DIP Term Sheet under "Termination", (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Borrowers' and its subsidiaries assets and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "<u>DIP Termination Date</u>"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Lender under the DIP Facility shall be payable on the DIP Termination Date (the "<u>Repaid Amount</u>"). | DIP Term Sheet, Page 3 |

| | | |
|---|---|---|
| **Priority and Security under DIP Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | All obligations of the Borrower and the Guarantors to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of the Borrower or any Guarantor under the DIP Facility (collectively, the "<u>DIP Obligations</u>"), shall be secured by the following liens and security interests (the "<u>DIP Liens</u>"):<br><br>(a)     subject to the Carve Out and subject only to existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Lender under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (collectively, the "<u>Permitted Liens</u>"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in substantially all of the assets of the Borrowers and Guarantors, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;<br><br>(b)     subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "<u>Unencumbered Property</u>");<br><br>(c)     subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and<br><br>(d)     subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts.<br>The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "<u>DIP Collateral</u>" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrower and the Guarantors, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including upon entry of the Final DIP | DIP Term Sheet, Page 6-7 |

Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the Interim Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements. However, the DIP Lender may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets scheduled and held by the Debtors in trust (but only for so long as such assets are held in trust).

271243081 v5
RLF1 27566205v.1

| | | |
|---|---|---|
| **Superpriority DIP Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out.<br><br>The DIP Claims will, at all times during the period that the DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, including any claims allowed pursuant to the obligations under the Prepetition Loan Documents, subject only to the Carve Out. | DIP Term Sheet, Page 7 |
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Voluntary prepayments of the DIP Loans shall be permitted at any time, without premium or penalty; provided that any DIP Obligations that are voluntarily prepaid will be subject to the Termination Fee.<br><br>The DIP Credit Agreement will contain customary mandatory prepayment events for financings of this type consistent with the Documentation Principles and others agreed to by the DIP Lender and the Borrowers ("Mandatory Prepayments"), including, without limitation, prepayments from proceeds of (i) insurance and condemnation proceeds, (ii) equity or debt issuances, (iii) extraordinary receipts, (iv) any cash or cash equivalents cash collateralizing any letter of credit that is returned to the Borrower or any Guarantor for its own account and (v) any cash or cash equivalents returned to the Borrower or any Guarantor from rent reserves or security deposits returned to the Borrower or any Guarantor upon the assignment of a lease or otherwise, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed. Mandatory Prepayments will result in a permanent reduction of the DIP Facility. | DIP Term Sheet, Page 6 |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Credit Agreement will include the following milestones related to the Debtors' Chapter 11 Cases (the "Milestones"):<br><br>• No later than one calendar day after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.<br><br>• No later than 3 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion") for approval of bid procedures consistent with the Bid Procedures Order (the "Bid Procedures") in form and substance acceptable to the DIP Lender and the Debtors. The Bid Procedures will include, among other things, the Termination Fee and the expense reimbursement as described in the Term Sheet.<br><br>• No later than 14 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a stalking horse asset purchase agreement for the Acquired Assets with the DIP Lender consistent | DIP Term Sheet, Pages 18-19 |

| | | |
|---|---|---|
| | with the proposed Bid Procedures (the "<u>Asset Purchase Agreement</u>"), pursuant to which the DIP Lender will agree to credit bid its DIP Loans pursuant to Section 363(k) of the Bankruptcy Code. | |
| | • No later than 17 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order; | |
| | • No later than twenty-one (21) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order | |
| | • No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more final, non-appealable sale order(s) (which shall be in form and substance reasonably acceptable to the DIP Lender) approving each of the winning bid(s) resulting from the auction (the "<u>Sale Order</u>"); and | |
| | • No later than sixty (60) calendar days after the Petition Date, the Asset Sale Effective Date (as defined in the Bid Procedures Order) shall have occurred. | |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar debtor-in-possession financings and other events of default deemed by the DIP Lender appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "<u>Event of Default</u>"), including, without limitation:<br><br>• failure to make payments when due;<br><br>• noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);<br><br>• breaches of representations and warranties in any material respect, in either case, under the DIP Credit Agreement;<br><br>• failure to satisfy or stay execution of judgments in excess of specified amounts;<br><br>• the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the DIP Credit Agreement, and customary ERISA and similar foreign plan events;<br><br>• occurrence of a Material Adverse Change;<br><br>• invalidity of the DIP Loan Documents;<br><br>• change in control;<br><br>• termination of the Asset Purchase Agreement due to a breach | DIP Term Sheet, Pages 19-21 |

271243081 v5
RLF1 27566205v.1

thereunder by the Debtors;

- filing of a plan of reorganization or plan of liquidation by the Debtors that does not propose to indefeasibly repay the DIP Obligations in full in cash on the plan effective date, unless otherwise consented to by the DIP Lender;

- any of the Debtors shall file a pleading seeking to vacate or modify the Interim Order or the Final DIP Order over the objection of the DIP Lender;

- entry of an order without the prior written consent of the DIP Lender amending, supplementing or otherwise modifying the Interim Order or the Final DIP Order;

- reversal, vacatur or stay of the effectiveness of the Interim Order or the Final DIP Order except to the extent reversed within five (5) Business Days;

- any violation of any material term of the Interim Order or the Final DIP Order by the Debtors;

- dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;

- appointment of a Chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

- any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Lender;

- granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any Guarantor, in each case, with a fair market value in excess of $50,000;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the DIP Lender: (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal

271243081 v5
RLF1 27566205v.1

or superior to the DIP Claims (other than the Carve Out) or (ii) granting or permitted granting of a lien that is equal in priority or senior to the DIP Liens (other than the Carve Out);

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the DIP Lender;

- the Debtors shall assert in any pleading filed in any court that the guarantee contained in the DIP Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than pursuant to the terms hereof or thereof;

- expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets unless such expiration or termination was sought by the DIP Lender;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the DIP Lender;

- any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $50,000 unless stayed;

- any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated;

- subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender;

- the commencement of a suit or action against any DIP Lender and, as to any suit or action brought by any person other than any Debtor or an officer or employee of any Debtor, the continuation thereof without dismissal for thirty (30) days after service thereof on the DIP Lender, that asserts or seeks by or on behalf of the Debtors, any Committee or any other party in interest in any of the Bankruptcy Cases, a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the DIP Obligations or DIP Liens of the DIP Lender under the DIP Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of the DIP Lender under any DIP Loan Document or the collectability of all or any portion of the DIP Obligations;

271243081 v5
RLF1 27566205v.1

| | | |
|---|---|---|
| | • the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Credit Agreement or the other DIP Loan Documents;<br><br>• an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of the DIP Lender to credit bid for any or all of the Debtors' assets; and<br><br>• the payment of any prepetition claim other than (i) as consented to by the DIP Lender, (ii) as authorized by the Budget, (iii) permitted under the terms of the DIP Credit Agreement or (iv) as authorized by the Bankruptcy Court pursuant to the "first day" or "second day" orders or the Interim Order or the Final DIP Order and reflected in the Budget. | |
| **Parties with an Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The DIP Lender and the Prepetition Lender | |
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv); 4001(c)(1)(B)(ii)* | Subject only to the Carve Out and the terms of this Interim Order, the Prepetition Secured Lender shall receive Adequate Protection Liens and Adequate Protection Claims as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for the aggregate postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and/or any other reason for which adequate protection may be granted under the Bankruptcy Code,<br><br>The Prepetition Secured Lender shall only be entitled to an Adequate Protection Claim or Adequate Protection Lien in the event of a timely and successful Challenge to (i) that portion of the Prepetition Obligations underlying the DIP Roll-Up Loans or (ii) the Prepetition Liens securing that portion of the Prepetition Obligations. | Proposed Interim Order, ¶ 14 |
| **Carve out**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | "<u>Carve Out</u>" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); and (iii) to the extent allowed by the Bankruptcy Court | DIP Term Sheet, Pages 7-8 |

271243081 v5<br>RLF1 27566205v.1

at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

| | | |
|---|---|---|
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay shall be modified as necessary to effectuate all of the terms and provisions of the DIP Orders including, without limitation, to permit the Debtors to grant the DIP Lender liens in connection with the DIP Loan. | DIP Term Sheet, Pages 21-22 |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and each of its affiliates and each of their respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any | DIP Term Sheet, Page 23 |

271243081 v5
RLF1 27566205v.1

| | investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages. | |
|---|---|---|
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Local Bankr. R. 4001-2(a)(i)(L)* | The DIP Loans shall be used solely in accordance with the Budget (including Permitted Variances (as defined below)) and the terms and conditions of the DIP Credit Agreement, the Interim Order, and the Final DIP Order, including (but subject to the Budget) to (i) upon the entry of the Interim Order, conversion of the Prepetition Obligations into DIP Obligations, (ii) provide working capital and for other general corporate purposes of the Debtors, (iii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the section 363 sale processes, and (iv) fund interest, fees, and other payments contemplated in respect of the DIP Facility. | DIP Term Sheet, Pages 3-4 |
| **Lien on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | The obligations of the Debtors under the DIP Loan shall, subject to the Carve-Out, at all times pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected, first priority security interest and lien on the proceeds of Avoidance Actions (it being understood that such lien on the proceeds of Avoidance Actions whether by judgment, settlement, or otherwise, shall attach upon entry of the Final Order). | DIP Term Sheet, Pages 6-7 |

271243081 v5
RLF1 27566205v.1

| | | |
|---|---|---|
| **Marshalling and Waiver of 506(c) and 552(b) Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)*<br><br>*Local Rule 4001-2(a)(i)(C)* | Effective upon entry of the Final DIP Order, the DIP Lender, in each case shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.<br><br>Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral and (ii) the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral. | DIP Term Sheet, Pages 22-23 |
| **Deadline for Pursuit of Claims / Stipulations / Releases**:<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(viii)*<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(Q)* | Without in any way limiting the foregoing, no DIP Collateral (as defined herein), DIP Proceeds, any portion of the Carve Out (as defined herein) or any other amounts may be used directly or indirectly by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "Committee"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or pari passu with, the DIP Liens (as defined below) (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Lender, the Prepetition Lender and their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Prepetition Obligations, the DIP Obligations, the DIP Claims or the DIP Liens; (iv) any action seeking to | DIP Term Sheet, Pages 3-4; 8-9 |

271243081 v5<br>RLF1 27566205v.1

invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender hereunder or under any of the DIP Loan Documents; or (vi) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined herein) has occurred; provided, however, that no more than $50,000 in the aggregate of the DIP Collateral, the Carve Out, cash collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Lender under the Prepetition Loan Documents.

The Committee (to the extent appointed), and any other party in interest with standing, shall have the lesser of (x) sixty (60) calendar days following the date of entry of the Interim Order or (y) two business days prior to the sale hearing approving the sale of the Acquired Assets (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the Interim Order and the Final DIP Order, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Lender arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise. The Investigation Period may only be extended with the prior written consent of the Prepetition Lender, or pursuant to an order of the Bankruptcy Court. Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim Order and Final DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition

| | Obligations. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Interim Order and the Final DIP Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, the Interim Order and the Final DIP Order shall include language that the investigation rights afforded to the Committee will not constitute the Debtors', the Prepetition Lender's or DIP Lender's recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action. | |

## REQUIRED DISCLOSURES

19.     The required disclosures under Local Rule 4001-2(a)(i) are limited to seeking approval of (i) priming of the Prepetition Secured Obligations; (ii) the waivers of Section 506(c) and the "equities of the case" exception under section 552(b) of the Bankruptcy Code (disclosure required under Bankr. L.R. 4001-2(a)(i)(H)), and (iii) liens on certain of the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (disclosure required under Bankr. L.R. 4001-2(a)(i)(D)).

20.     As set forth in more detail below, while the Motion seeks to prime the Prepetition Secured Lender, the Debtors have obtained the Lender's consent and its interests are adequately protected by Adequate Protection Liens and Claims.

21.     While the Motion also seeks to waive any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code and grant liens in certain avoidance actions, such relief is only being requested pursuant to the Final Order. Similarly, the waiver of the "equities of the case" exception is only being requested pursuant to the Final Order.

22.     In addition, the Motion seeks relief pursuant to the Final Order to grant DIP Liens on and DIP Superpriority Claims payable from, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions (as defined in the Interim Order,

"Avoidance Proceeds.") *See* Interim Order ¶ 4, 5.

23. These terms are justified because the Debtors are in immediate and critical need of the DIP Facility and the use of cash collateral. As discussed in the Declarations, the Debtors were unable to obtain financing from any other source. The only acceptable proposal that would provide the critical liquidity to the Debtors was provided after extensive negotiations with the DIP Lender on the terms set forth in the DIP Term Sheet and the proposed DIP Orders. Without this financing, the Debtors would not be able to pay their employees or vendors, or continue to operate as a going concern, which would doom the Debtors' sale process and any attempt to maximize value in these Cases.

## BASIS FOR RELIEF

### I. The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and (d) of the Bankruptcy Code

24. Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense . . . ." 11 U.S.C. § 364(c).

25. Section 364(d) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis senior or equal in priority to existing secured debt cannot "obtain such credit otherwise . . . . [and] there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

26. In evaluating proposed postpetition financing under section 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a. unencumbered credit or alternative financing without superpriority status is available to the debtor;

b. the credit transactions are necessary to preserve assets of the estate;

c. the terms of the credit agreement are fair, reasonable, and adequate;

d. the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e. the proposed financing agreement adequately protects the prepetition secured creditor.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

27. For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing under section 364(c) and (d) of the Bankruptcy Code.

## II. The Debtors Were Unable to Obtain Financing on More Favorable Terms

28. Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every

possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

29.     Here, as detailed above, despite their efforts, the Debtors have been unable to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Only the DIP Lender was willing to provide postpetition financing to fund the Debtors' urgent liquidity needs.

30.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfies the standards required under section 364(c) and (d) of the Bankruptcy Code. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

III.     **The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates**

31.     As described above, the Debtors intend to operate their business in the ordinary course while they attempt to sell substantially all their U.S. assets to the highest bidder and proceed with the orderly wind down of their remaining affairs. The Debtors require the proposed financing and use of cash collateral to provide the necessary capital with which to operate their business, including funding the Debtors' obligations to employees, and to preserve their business for the benefit of their estates and creditors pending a sale process in these Chapter 11 Cases.

32.     Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing. The Debtors' ability to maintain their business pending a sale process in these Cases is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for postpetition rent, payroll, goods, services and other operating expenses. The DIP Facility is thus essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business.

33.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require postpetition financing and the use of cash collateral under the terms of the DIP Term Sheet and proposed DIP Orders to continue their operations pending the sale of the Debtors' business.

## IV.     **The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate**

34.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

35.     The terms of the DIP Term Sheet and the proposed DIP Orders were extensively negotiated between the Debtors and the DIP Lender (including their respective counsel and other advisors), resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through an orderly sale process. The DIP Facility will provide

critically needed liquidity to the Debtors in order to run a process that the Debtors and their advisors believe will maximize value and is on terms and conditions that are fair and reasonable and consistent with the market given the circumstances of these cases.

36.     The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender in connection with the DIP Facility.  The fees payable to the DIP Lender and other obligations under the DIP Documents are reasonable and appropriate and give the Debtors access to DIP financing on the most favorable terms on which the DIP Lender would agree to make the DIP Facility available.  The Debtors considered these fees when determining in the exercise of their sound business judgment that the DIP Facility constitutes the best terms on which the Debtors could obtain postpetition financing necessary to continue operating their business in these chapter 11 cases.  Consequently, paying these fees to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.

37.     As further described above, the DIP Term Sheet also contains certain case milestones and other bankruptcy-related terms, and the Debtors believe that these terms provide sufficient flexibility for the Debtors to maximize the value of their operations and assets.  The terms of the DIP Documents are fair, reasonable and appropriate under the circumstances, and should be approved.

## V.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment

38.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit

29

reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39. Here, the Debtors' sound business judgment supports the Debtors' entry into the DIP Credit Facility to gain access to needed funding and maximize value for all constituents. While the parties continue to work towards finalizing the terms of the DIP Credit Agreement, the Debtors' request that this Court approve the relief requested herein on the terms provided in the DIP Term Sheet. Courts in this jurisdiction have regularly approved similar relief upon submission of a term sheet. *See, e.g., In re Ver Technologies Holdco LLC, et al.,* No. 18-10834 (KG) (Bankr. D. Del. Apr. 6, 2018); *In re Nine Point Energy Holdings, Inc., et al.*, No. 21-10570 (MFW) (Bankr. D. Del. March 17, 2021); *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) (Bankr. D. Del. March 3, 2017); *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Jan. 31, 2019).

## VI.     The DIP Lender Is Extending Credit in Good Faith

40. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

30

11 U.S.C. § 364(e).

41.     As set forth in the Declarations, the Debtors and the DIP Lender negotiated the DIP

Term Sheet and Interim Order at arm's length and good faith. The terms and conditions of the DIP

Facility are not only fair and reasonable, but the proceeds of the DIP Facility will be used only for

purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that

the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy

Code and are entitled to all of the protections afforded by that section.

## VII.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral

42.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor-in-possession may

not use cash collateral unless (i) each entity that has an interest in such cash collateral provides

consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11

U.S.C. § 363(c).

43.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

has an interest in property used . . . or proposed to be used . . . by the [debtor-in-possession], the

court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of

such interest." 11 U.S.C. § 363(e).

44.     Section 361 of the Bankruptcy Code provides that:

> When adequate protection is required under section 362,
> 363, or 364 of this title of an interest of an entity in
> property, such adequate protection may be provided by—
>
> > 1.   requiring the [debtor-in-possession] to make
> >       a cash payment or periodic cash payments to
> >       such entity, to the extent that the stay under
> >       section 362 of this title, use, sale, or lease
> >       under section 363 of this title, or any grant of
> >       a lien under section 364 of this title results in
> >       a decrease in the value of such entity's
> >       interest in such property;

271243081 v5
RLF1 27566205v.1

2. providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

3. granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a factspecific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

45. Additionally, courts have found a secured creditor to be adequately protected where either a sufficient equity cushion in the collateral exists, or the level of collateral was not decreasing over time. *See In re May*, 169 B.R. 462 (Bankr. S.D. Ga. 1994); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.J. 1993); *In re S.W. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

46. Here, the Prepetition Secured Lender consents to the Debtors' use or property, including cash collateral, on the terms of the DIP Term Sheet and Proposed DIP Orders. Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth herein be approved as a sound and reasonable exercise of the Debtors' business judgment.

**VIII. Priming Liens and Adequate Protection Under Section 364(d) of the Bankruptcy Code Should Be Approved**

47.     If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." *See* 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code provides that a court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien if: (i) the trustee is unable to obtain such credit otherwise; and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. See 11 U.S.C. § 364(d)(1).  The Debtors satisfy both of these requirements.

48.     As discussed, the Debtors concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the DIP Lender under the DIP Facility is not obtainable.  And as set forth *supra* in in the Concise Statement of Relief Requested, the Prepetition Lender is adequately protected through adequate protection liens, superpriority administrative expense claims, and milestones for a sale process designed to maximize the value of their collateral.  As a result, the Debtors have satisfied the requirements of section 364(d) and the Court should authorize the priming of the Senior Secured Lenders' liens by the DIP Liens in connection with the DIP Facility.

**IX. The Section 506(c) and "Equities of the Case" Waivers are Appropriate**

49.     Secured parties commonly request a waiver of (i) section 506(c) of the Bankruptcy Code, which permits the Debtors to surcharge collateral and (ii) the "equities of the case" exception from the general rule of section 552 of the Bankruptcy Code that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds.

271243081 v5
RLF1 27566205v.1

50.     Subject to entry of a Final Order, the DIP Lender is entitled to a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and to a waiver of the provisions of section 506(c) of the Bankruptcy Code in light of (i) the DIP Lender's agreement that their liens and superpriority claims shall be subject the Carve Out, and (ii) the payment of expenses set forth in the Budget in accordance with and subject to the terms and conditions of the Interim Order and the DIP Documents.

## X.      The Automatic Stay Should be Vacated or Modified to the Extent Necessary

51.     The DIP Documents and the Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, but subject to any applicable notice requirements in the Interim DIP Order, all rights and remedies provided for in the DIP Documents, without further order of or application to the Court.

52.     Stay modification provisions of this sort are ordinary features of debtor-in-possession financing and, in the Debtors' sound business judgment, are reasonable under the circumstances. *See, e.g., In re Hoyos Integrity Corp.*, Case No. 22-10365 (MFW) (Bankr. D. Del. Jun. 24, 2022); *In re Gulf Coast Health Care LLC*, Case No. 21-11336 (KBO) (Bankr. D. Del. Dec. 2, 2021); *In re Agspring Mississippi Region, LLC*, Case No. 21-11238 (CTG) (Bankr. D. Del. Nov. 4, 2021); *In re Alpha Latam Mgmt., LLC*, Case No. 21-11109 (JKS) (Bankr. D. Del. Sept. 13, 2021); *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. Jun. 19, 2020).

## INTERIM ORDER AND FINAL HEARING

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing with respect to the relief requested herein approximately 21 days from the Petition Date, and fix the time and date prior to the Final Hearing for parties to file

objections to the Motion.

54.     The urgent need to preserve the Debtors' business, and thereby avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain postpetition financing and use cash collateral as soon as possible, pending the Final Hearing. Without the ability to obtain access to such funding and use cash collateral, the Debtors would be unable to meet their postpetition obligations, including payroll obligations, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' efforts to maintain operations through an orderly sale process.

55.     Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY

56.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF ANY APPLICABLE STAY

57.     The Debtors also request that the Court waive any applicable stay of the DIP Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.

271243081 v5
RLF1 27566205v.1

The exigent nature of the relief sought herein justifies immediate relief.[5]

## NOTICE

58.     The Debtors have provided notice of this motion to the following parties or their respective counsel: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) Gibson Dunn & Crutcher LLP and Pachulski Stang Ziehl & Jones LLP, as counsel to the DIP Lender; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) the United States Attorney's Office for the District of Delaware and all other states in which the Debtors operate; (vii) the Banks; and (viii) all other parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein and in the Puntus Declaration, the Debtors request entry of the DIP Orders granting the relief requested herein and such other relief the Court deems just and proper.

---

[5] The Debtors also seek waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent applicable.

271243081 v5
RLF1 27566205v.1

Dated: June 30, 2022
Wilmington, Delaware

Respectfully submitted,

_/s/ Daniel J. DeFranceschi_
Daniel J. DeFranceschi, Esq. (No. 2732)
Paul N. Heath, Esq. (No. 3704)
Brendan J. Schlauch, Esq. (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:   defranceschi@rlf.com
         heath@rlf.com
         schlauch@rlf.com

-and-

Cullen Drescher Speckhart, Esq.
Weiru Fang, Esq.
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone:  (202) 842-7800
Facsimile:  (202) 842-7899
Email:  cspeckhart@cooley.com
         wfang@cooley.com

-and-

Michael A. Klein, Esq.
Evan Lazerowitz, Esq.
Joseph W. Brown Esq.
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile:  (212) 479-6275
Email: mklein@cooley.com
         elazerowitz@cooley.com
         jbrown@cooley.com

_Proposed Counsel for the Debtors_

37

**Exhibit A**

**Proposed Interim Order**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENJOY TECHNOLOGY, INC., *et al.*,[1] | ) | Case No. 22-[•] ([•]) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. [•]** |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (D) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION LENDER, AND (E) MODIFYING
THE AUTOMATIC STAY, AND (F) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in these chapter 11 cases (the "<u>Cases</u>") and pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Bankruptcy Rules</u>"), seeking entry of this interim order (this "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>") among other things:

    (i)      authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured facility (the "<u>DIP Facility</u>"), which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $55

---

[1]    The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Enjoy Technology, Inc. (6891), Enjoy Technology Operating Corp. (4543), and Enjoy Technology LLC (0230). The Debtors' headquarters are located at 3240 Hillview Avenue, Palo Alto, CA 94304.

[2]    Capitalized terms used herein and not herein defined shall have the meanings ascribed to such terms in the Motion.

million, which shall be made available to the Debtors (a) in a roll up (the "DIP Roll-Up Loans") of the approximately $2.5 million in outstanding Prepetition Obligations (defined below) in accordance with the terms substantially set forth in the *Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet* attached hereto as **Exhibit 1** (the "DIP Term Sheet") upon entry of this Interim Order, (b) in a single new money draw in the initial amount of up to $22.5 million minus the aggregate amount of the Roll-Up Loans (the "Initial DIP Loan") in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, and (c) in a single new money draw of the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Loan Documents (defined below) upon entry of the Final Order (such loans described in subsection (c) together with the Initial DIP Loan, the "DIP New Money Loans"), and such DIP New Money Loans and the DIP Roll-Up Loans, the "DIP Loans") to be funded by Asurion, LLC (the "DIP Lender");

(ii) authorizing the Debtors to (i) enter into a secured superpriority debtor-in-possession credit, guaranty and security agreement, by and among the Debtors and the DIP Lender (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Loan Agreement"), and all agreements, documents, and instruments delivered or executed in connection the DIP Loan Agreement (collectively, including the DIP Term Sheet, the "DIP Loan Documents"), in each case in form and substance satisfactory to the DIP Lender in its sole discretion, and (ii) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents;

(iii) authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral (defined below), in accordance with the terms hereof, as further described herein, to pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases;

(iv) granting adequate protection, with respect to each of the Debtors, to the Prepetition Lender (defined below) under the Prepetition Loan and Security Agreement (defined below);

(v) authorizing, on the terms set forth herein, the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such become earned, due and payable, including, without limitation, the Closing Fee (defined below), the Termination Fee (defined below), agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Loan Documents;

(vi) granting valid, enforceable, non-avoidable and fully perfected liens and security interests pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code on the DIP

Collateral and all proceeds thereof, including, any (upon entry of the Final Order) Avoidance Proceeds (defined below) subject only to the Carve Out (defined below) and the Permitted Liens (defined below), if any, in each case on the terms and conditions set forth herein and in the DIP Loan Documents, to secure principal of, and accrued interest on, the DIP Loans, and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other DIP Obligations (as defined in the DIP Term Sheet) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Facility (collectively, the "<u>DIP Obligations</u>");

(vii)   granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lender, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(viii)  subject to and upon entry of a Final Order, a waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral or DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, effective as of the Petition Date;

(ix)    authorizing the DIP Lender to exercise remedies under the DIP Loan Documents on the terms described herein upon the occurrence and during the continuation of a DIP Termination Event (defined below);

(x)     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xi)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

This Court having considered the relief requested in the Motion, the DIP Declaration, the First Day Declaration and the arguments of counsel made at the Hearing; and notice of the Motion and the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Local Bankruptcy Rules; and the Hearing to consider the relief requested in the Motion having been held and concluded; and all objections and reservations of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled on the merits by this Court; and it appearing that approval of the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is

necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.     <u>Petition Date</u>.  On June 30, 2022 (the "<u>Petition Date</u>"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").

C.     <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed in any of the Cases.

D.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Court's

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6004 and 9014 and the Local Bankruptcy Rules.

E. <u>Notice</u>. Upon the record presented to this Court at the Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1), which notice was appropriate under the circumstances and sufficient for the Motion No other or further notice of the Motion or entry of this Interim Order is required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

F. <u>Final Hearing</u>. At the Final Hearing, the Debtors will seek approval of the Final Order, which shall be subject to the terms and conditions of the DIP Loan Documents. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

G. <u>Prepetition Secured Debt</u>. Without prejudice to the rights of any party, but subject to the limitations thereon contained in paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

(i) <u>Prepetition Loans</u>. Pursuant to that certain Senior Secured Credit, Guaranty and Security Agreement dated as of June 29, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>Prepetition Loan and Security Agreement</u>"), among Enjoy Technology, Inc., Enjoy Technology Operating Corp., and

Enjoy Technology LLC, as borrowers (together in such capacity, the "Prepetition Borrowers"), and Asurion, LLC, as lender (in such capacity, the "Prepetition Lender"), the Prepetition Lender provided a senior secured loan to the Prepetition Borrowers (the "Prepetition Facility").

        (ii)    Prepetition Obligations. As of the Petition Date, the Prepetition Borrowers, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition Lender under the Prepetition Loan and Security Agreement in the aggregate amount of not less than $2,500,000, which consists of the principal amount of loans advanced under the Prepetition Loan and Security Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date (the "Prepetition Obligations Amount"), plus (in each case, to the extent constituting allowable claims under the Bankruptcy Code) all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other Obligations (as defined in the Prepetition Loan and Security Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Loan and Security Agreement (collectively, including the Prepetition Obligations Amount, the "Prepetition Obligations"). The Prepetition Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Loan and Security Agreement is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action

or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(iii)     <u>Prepetition Liens</u>.  Pursuant to Prepetition Loan and Security Agreement, prior to the Petition Date, the Debtors party to such Prepetition Loan and Security Agreement, in their capacity as Prepetition Borrowers, granted to the Prepetition Lender valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition Liens</u>") the Collateral (as defined in the Prepetition Loan and Security Agreement, the "<u>Prepetition Collateral</u>"), including Cash Collateral (defined below).  As of the Petition Date:  (a) the Prepetition Liens were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain senior liens permitted by the Prepetition Loan And Security Agreement and the other Loan Documents (as defined in the Prepetition Loan And Security Agreement, the "<u>Prepetition Loan Documents</u>") (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date); (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lender or any of

7

its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Facility; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens securing the Prepetition Obligations.

(iv)    <u>No Control</u>.  The Prepetition Lender does not control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Facility or the Prepetition Loan and Security Agreement.

(v)    In light of the Stipulations in this paragraph (G), the Prepetition Lender shall not be required to file proofs of claim in these Cases in order to maintain any claims for payment of the Prepetition Obligations.

H.    <u>Credit Bidding</u>.  The Prepetition Lender, or certain affiliates thereof, as well as the DIP Lender, or certain affiliates thereof, intend to enter into a stalking horse purchase agreement for certain of the Debtors' assets (as amended, restated, modified, restated, modified, or supplemented, from time to time, the "<u>Stalking Horse Agreement</u>").  No Debtor or Debtor's affiliate shall object to any DIP Lender's or Prepetition Lender's right to credit bid up to the full amount of its DIP Obligations and/or Prepetition Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

I.     Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)     Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Loan Documents and to use of any cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"). At the Final Hearing, the Debtors will seek approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed Final Order.  Notice of the Final Hearing and the Final Order will be provided in accordance with this Interim Order.

(ii)     As set forth in the DIP Declaration, and the First Day Declaration, the Debtors have an ongoing and immediate need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Facility, among other things:   (a) permit the orderly continuation of their respective businesses; (b) maintain business relationships with their vendors, suppliers, customers, and other parties; (c) make investments, capital expenditures, and pay ongoing costs of operations; (d) pay fees and expenses associated with the sale of the Debtors' assets; and (e) pay the costs of administration of the Cases and satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' businesses.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout the Cases without the DIP Facility and authorized use of Cash Collateral.

(iii)     As set forth in the DIP Declaration and the First Day Declaration, the Debtors are unable to obtain financing and other financial accommodations on more favorable terms from sources other than from the DIP Lender under the DIP Loan Documents and are unable

to obtain satisfactory unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents and the consensual use of Cash Collateral on more favorable terms without the Debtors granting to the DIP Lender, subject to the Carve Out as provided for herein and any other valid and preexisting liens but solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date ("Permitted Liens") (if any), the DIP Liens (defined below) and the DIP Superpriority Claims (defined below), under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iv)     Upon entry of this Interim Order, without any further action by the Debtors or any other party, the Prepetition Loan shall be converted into DIP Obligations as DIP Roll-Up Loans. Such conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Lender, which is also the DIP Lender, to fund the DIP New Money Loans and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations. The DIP Lender would not be willing to provide the DIP New Money Loans or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Loans in the DIP Obligations.

(v)     Based on the Motion, the First Day Declaration and the DIP Declaration, and the record presented to the Court at the Hearing, the extensions of credit under the terms and conditions of the DIP Facility and the terms of the adequate protection granted to the Prepetition Lender as provided in this Interim Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(vi)     The DIP Facility and the use of Cash Collateral have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lender, and the Prepetition Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents, and any DIP Obligations shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and its successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise, unless the authorization and incurring of debt under this Interim Order, or the granting of priority or lien under this Interim Order, is stayed pending appeal.

(vii)     The Prepetition Lender has acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral).  The granting of Adequate Protection Liens (defined below) in accordance with the terms hereof, and the Adequate Protection Claims (defined below), security interests and liens, and other rights, benefits and protections granted to the Prepetition Lender (and their successors and assigns) pursuant to this Interim Order and the DIP Loan Documents shall be deemed to have been agreed to by the Prepetition Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the Prepetition Lender (and its successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise, unless the authorization

and incurring of debt under this Interim Order, or the granting of priority or lien under this Interim Order, is stayed pending appeal.

J.      Permitted Liens.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not limited to, any of the Debtors, the DIP Lender, or the Prepetition Lender to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Lien or security interest.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Lien and is expressly subject to the DIP Liens.

K.      Sections 506(c) and 552(b).  The Debtors have agreed as a condition to obtaining financing under the DIP Facility that as a material inducement to the DIP Lender to agree to provide the DIP Facility, and in exchange for (a) the DIP Lender's willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Lender's agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral consistent with the DIP Budget and the terms of this Interim Order, and subject to entry of the Final Order, each of  the DIP Lender and the Prepetition Lender has negotiated for, and the Debtors intend to seek (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

L.      Immediate Entry.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Consummation of the DIP Facility and the use of Cash Collateral, in accordance with this Interim Order and the DIP Loan

Documents, is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.    <u>Motion Granted</u>.  The interim relief sought in the Motion is granted to the extent set forth herein, the financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection on an interim basis is authorized, in each case subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents.  Any and all objections to this Interim Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2.    <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The Debtors are hereby expressly authorized to execute and deliver, and, on such execution and delivery, directed to perform under the DIP Loan Documents, including the DIP Term Sheet, which is hereby approved and incorporated herein by reference.  To the extent not entered into as of the date hereof, the Debtors shall negotiate the DIP Loan Documents in good faith and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Lender.  Upon entry of this Interim Order and until execution and delivery of the DIP Loan Agreement and other DIP Loan Documents required or requested by the DIP Lender, the Debtors shall be bound by (x) the terms and conditions and other provisions set forth in the DIP Term Sheet, with the same force and effect as if duly executed and delivered to the DIP Lender, and (y) this Interim Order, and this Interim Order and the DIP

Term Sheet shall govern and control the DIP Facility. Upon execution and delivery of the DIP Loan Agreement and other DIP Loan Documents, (a) the DIP Term Sheet shall be superseded by the DIP Loan Agreement and other DIP Loan Documents, and (b) this Interim Order, the DIP Loan Agreement, and other DIP Loan Documents shall govern and control the DIP Facility. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Motion, the DIP Loan Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control. To the extent there is a conflict between the terms and conditions of the DIP Motion and the DIP Loan Documents, the terms and conditions of the DIP Loan Documents shall govern.

(b) Upon entry of this Interim Order, the Debtors are hereby immediately authorized, subject to the terms and conditions of the DIP Term Sheet, to (i) borrow up to an aggregate principal amount of $22.5 million minus the amount of the DIP Roll-Up Loans (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Term Sheet) under the Interim DIP Loan, (ii) incur the DIP Roll-Up Loans and, without any further action by the Debtors or any other party, and as a condition to providing the DIP Loans, the DIP Roll-Up Loans shall be included in the DIP Obligations, and upon entry of the Final Order, to borrow up to an aggregate principal amount of $55 million (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Loan Documents), in each case subject to any limitations on availability or borrowing under the DIP Loan Documents, which shall be used for all purposes permitted under the DIP Loan Documents, including, without limitation, to provide working and investment capital for the Debtors and to pay interest, fees, and expenses, and other payments in accordance with this Interim Order and the other DIP Loan Documents, as

set forth in the DIP Loan Documents. Notwithstanding anything in this Interim Order to the contrary, the authorization herein to incur the DIP Roll-Up Loans is subject to any timely and successful Challenge (defined below) to (x) that portion of the Prepetition Obligations underlying such DIP Roll-Up Loans or (y) the Prepetition Liens securing that portion of the Prepetition Obligations.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all reasonable and actual fees and expenses in connection with or that may be reasonably required, appropriate or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     subject to the terms of this Interim Order, the execution and delivery of, and performance under, each of the DIP Loan Documents, including, without limitation, the DIP Loan Agreement and any collateral documents contemplated thereby;

(ii)     subject to the terms of this Interim Order, the execution and delivery of, and performance under, one or more non-material amendments, waivers, consents or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the DIP Loan Documents and in such form as the Debtors and DIP Lender may agree), it being understood that no further approval of this Court shall be required for any non-material authorizations, amendments, waivers, consents or other non-material modifications to and under the DIP Loan Documents, as well as any fees and other expenses (including reasonable and

documented attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in connection therewith;

(iii)    the non-refundable and irrevocable payment to DIP Lender, as the case may be, of all reasonable and documented fees and expenses (which fees and expenses, in each case, were and were deemed to have been approved upon entry of this Interim Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Term Sheet and other DIP Loan Documents, including (i) a closing fee of 2.00% of the total aggregate commitments in respect of the DIP Facility, which is deemed earned upon entry of this Interim Order, (the "Commitment Fee"), which Commitment Fee shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes and accrue interest in accordance with the DIP Loan Documents, (ii) a termination fee of 4.0% of the Repaid Amount (as defined in the DIP Term Sheet) upon the DIP Termination Date (as defined in the DIP Term Sheet) (the "Termination Fee"), and (iii) all reasonable and documented costs and expenses as may become due from time to time under the DIP Loan Documents and this Interim Order, including, without limitation, fees and expenses of counsel, financial advisors, and other professionals retained by the DIP Lender, as provided for in the DIP Loan Documents and this Interim Order;

(iv)    and, the performance of all other acts necessary, appropriate, or desirable under or in connection with the DIP Loan Documents.

3.     <u>DIP Obligations</u>.  The DIP Term Sheet shall, and upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall, constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order and the other DIP Loan Documents, against each Debtor and their estates and any successors thereto, including any trustee appointed in the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim Order, the Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date or the occurrence of any event or condition set forth in paragraphs 18 and 19 of this Interim Order.  Except as permitted by this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.

4.     <u>DIP Liens</u>.  Subject to the below, effective immediately upon entry of this Interim Order, and without any further action under state law, the DIP Obligations shall be secured by

valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "<u>DIP Liens</u>"), all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Debtors wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Debtors and the proceeds thereof, investment property, instruments, chattel paper, goods, real estate, leasehold rights and leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), but notwithstanding anything herein to the contrary, excluding any investment property, partnership, membership or other equity or similar interests in Enjoy (UK) Limited and Enjoy Technology Canada Ltd. (the "<u>Non-Debtor Foreign Subsidiaries</u>"), whether existing as of the Petition Date or after acquired, and all products and proceeds thereof, excluding Avoidance Actions, but subject to entry of the Final Order, including the Avoidance Proceeds (all such property, the "<u>DIP Collateral</u>") as follows:

(a)     Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to any existing liens that under applicable law, are senior to, and have not been subordinated to, the DIP Liens, subject only to Permitted Liens and payment of the Carve Out;

(b)     Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully perfected first priority priming

security interest and lien (the "Priming Liens") on all prepetition and postpetition property of the Debtors whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, but excluding any investment property, partnership, membership or other equity or similar interests in the Non-Debtor Foreign Subsidiaries, subject only to the Carve Out and any Permitted Liens. The Priming Liens shall also be senior to the Adequate Protection Liens; and

(c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest and lien on all prepetition and postpetition property of the Debtors to the extent that such assets are subject to any Permitted Liens, which liens shall be junior and subordinate to any such Permitted Liens; provided that nothing in the foregoing shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent any such liens are not permitted thereunder.

5.     DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and

which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions") but including, subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise (collectively, the "Avoidance Proceeds") in accordance with the other DIP Loan Documents, subject only to payment of the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, unless the authorization and incurring of debt under this Interim Order, or the granting of priority or lien under this Interim Order, is stayed pending appeal.

6. <u>Reporting Requirements/Access to Records</u>. The Debtors shall provide the DIP Lender with all reporting and other information required to be provided under the DIP Loan Documents. In addition to, and without limiting, whatever rights to access the DIP Lender has under the DIP Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender to: (i) have access to and inspect the Debtors' book and records; and (ii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, attorneys and financial advisors.

7. <u>Carve Out</u>.

(a) <u>Carve Out</u>. As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to

the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); and (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by any official committee of unsecured creditors pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee of unsecured creditors appointed in the Cases, which notice may be delivered following the

occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Lender to the Debtors with a copy to any official committee of unsecured creditors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund an amount sufficient to pay the Allowed Professional Fees (whether or not such Allowed Professional Fees have been allowed by this Court prior to the Termination Declaration Date) and hold such amounts in a segregated account at the DIP Lender in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Interim Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Lender in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP

Lender. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the DIP Lender. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, to the extent such residual interest constitutes DIP Collateral, respectively, with any excess paid to the DIP Lender for application in accordance with the DIP Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Debtors. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations; provided, however, the DIP Obligations shall be increased to the extent new DIP Loans are funded and used to fund the Carve Out, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves

or any of the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors, nor as a cap or limitation on the fees set forth in clause (i) of the definition of Carve Out set forth above, and (iv) only professional fees and expenses that constitute Allowed Professional Fees may be paid from the Carve Out Reserves. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Notwithstanding anything set forth herein, any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees (regardless of the date such Allowed Professional Fees are allowed by this Court) shall not reduce the Carve Out.

(d)     <u>No Direct Obligation to Pay Allowed Professional Fees</u>. Neither the DIP Lender nor the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals incurred in connection with the Cases or any Successor Cases. Nothing in this Interim Order shall be construed to obligate the DIP Lender or the Prepetition Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any indefeasible payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve

Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

8.  <u>Limitation on Charging Expenses against Collateral</u>. Upon entry of the Final Order and effective as of the Petition Date, in light of the agreement of the DIP Lender and the Prepetition Lender to allow (i) the Debtors to use Cash Collateral as provided for herein, and (ii) the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Prepetition Lender , and no such consent shall be implied from any other action, inaction, or acquiescence.

9.  <u>No Marshaling/Application of Proceeds</u>. Upon entry of the Final Order and effective as of the Petition Date, the DIP Lender shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of the Final Order and the DIP Loan Documents, as applicable, and in no event shall the DIP Lender or the Prepetition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

10. <u>Equities of the Case</u>. Upon entry of the Final Order and effective as of the Petition Date, in light of, among other things, the agreement of the DIP Lender and the Prepetition Lender to allow the Debtors to use Cash Collateral on the terms set forth herein (i) the DIP Lender and the Prepetition Lender shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy

Code, if any, and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable

11. <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order and any other DIP Loan Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of the Debtors.

12. <u>Use of Cash Collateral</u>. The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order and the DIP Loan Documents, to the extent set forth in the DIP Budget, including, for the avoidance of doubt, for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases. Except on the terms and conditions of this Interim Order, or as otherwise agreed to by the DIP Lender, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13. <u>Prepetition Secured Lender Liens/Claims</u>. Upon entry of this Interim Order, (a) all liens and security interests granted pursuant to that *Security Agreement*, dated as of May 11, 2022, by and between Enjoy Technology, Inc., as grantor, and Ron Johnson, as secured party (the "<u>Johnson Security Agreement</u>"), unless previously terminated or released, are hereby, without further action, terminated, released, null and void, and (b) all rights to receive any payments under that *Secured Promissory Note*, dated as of May 11, 202, by and between Enjoy Technology, Inc., as borrower, and Ron Johnson, as holder (the "<u>Johnson Note</u>," and together with the Johnson

Security Agreement, the "Johnson Loan Documents") and the Johnson Security Agreement, including but not limited to payment of principal, interest, fees, expenses, or other obligations thereunder, are hereby subordinated to the DIP Obligations and the Prepetition Obligations. The Debtors are hereby authorized to file or record any termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice the liens and security interests granted pursuant to the Johnson Security Agreement. Ron Johnson shall enter into a subordination agreement or amendment to the Johnson Loan Documents, in the discretion of the DIP Lender and in form and substance satisfactory to the DIP Lender, subordinating in right of payment all principal, interest, fees, expenses, or other obligations owing under the Johnson Loan Documents in favor of the DIP Lender or the Prepetition Lender, as applicable.

14. <u>Adequate Protection for the Prepetition Lender</u>. Subject only to the Carve Out and the terms of this Interim Order, and specifically subject to paragraph 26 of this Interim Order and paragraph 14(c) below, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for the aggregate postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Lender, is hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a) <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable,

effective and automatically perfected postpetition security interests in, and liens on, (the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all prepetition and postpetition property of the Debtors, including, for the avoidance of doubt, the DIP Collateral, whether existing on the Petition Date or thereafter created, acquired or arising, and wherever located, including, without limitation, property that (x) is of the same nature, scope, and type as the Prepetition Collateral that is subject to any of the Prepetition Liens securing the Prepetition Obligations, and (y) on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds). The Adequate Protection Liens shall be subject and junior to the DIP Liens (including any liens to which the DIP Liens are junior) and the Carve Out, and otherwise be senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral, including the Prepetition Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(b)     Adequate Protection Claims.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in the Cases of each of the Debtors to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such cases, except the Carve Out and the DIP Superpriority Claims (the "Adequate Protection Claims").  The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but,

subject to entry of the Final Order, including the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Claims will not be junior or *pari passu* to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.  The Prepetition Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Loan Documents.

(c)     Limitation on Adequate Protection Claims and Liens.  Notwithstanding anything hereinto the contrary, the Prepetition Secured Lender shall only be entitled to an Adequate Protection Claim or Adequate Protection Lien in the event of a timely and successful Challenge to (i) that portion of the Prepetition Obligations underlying the DIP Roll-Up Loans or (ii) the Prepetition Liens securing that portion of the Prepetition Obligations.

15.     Perfection of DIP Liens and Adequate Protection Liens.

(a)     The DIP Lender and the Prepetition Lender are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Lender or the Prepetition Lender shall, in their sole discretion, choose to file such financing statements, intellectual property filings,

mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of this Interim Order; provided that the liens and security interests granted hereunder to the Prepetition Lender shall be subject to paragraph 26 of this Interim Order. Upon the request of the DIP Lender or the Prepetition Lender, each of the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments to enable the DIP Lender or the Prepetition Lender to further validate, perfect, preserve and enforce the DIP Liens or the applicable Adequate Protection Liens, respectively. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A copy of this Interim Order may, in the discretion of the DIP Lender or the Prepetition Lender, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Subject to a Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto in connection with the granting of the DIP Liens and the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any

30

assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Loan Documents or this Interim Order.

16. <u>DIP Budget</u>.

(a) Attached to this Interim Order as **<u>Exhibit 2</u>** is a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Cases (including professional fees), and working capital and other general corporate needs (the "<u>Initial DIP Budget</u>"). By not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date (defined in the DIP Term Sheet) and by not later than 5:00 p.m. Eastern Time on the third business day of each week thereafter following the end of each Testing Period, an updated budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent with the form of the Initial DIP Budget, and such updated budget shall become the "Budget" (collectively with the Interim Budget, the "<u>DIP Budget</u>") for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated budget is substantially in the form of the DIP Budget and in substance satisfactory to the DIP Lender (provided, that, until a new budget has been approved by the DIP Lender, the most recently approved DIP Budget shall govern).

(b) <u>Budget Reporting</u>. Beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business

day of each week thereafter following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "Variance Report") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and cumulative rolling 2 and 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors). The Debtors will promptly provide notice to the DIP Lender of any Material Adverse Change (as defined in the DIP Term Sheet).

(c)     Permitted Variances. The term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than (x) the Applicable Variance (defined below) for actual receipts under that contract between AT&T and the Debtors, (y) the Applicable Variance for actual operating disbursements (on an aggregate basis) or (z) 20% for actual professional fee disbursements (on an aggregate basis), in each case as compared to the budgeted receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; provided, further, that any disbursements in any Testing Period made from proceeds of favorable variances with respect to receipts in any Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances; notwithstanding the foregoing, the Carve Out shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect

to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "Applicable Rolling Period" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks. "Applicable Variance" means, (i) for the first full week after the Closing Date, 30%, (ii) for the second full week after the Closing Date, 25%, (iii) for the third full week after the Closing Date, 20% and (iv) thereafter, 15%.

17. <u>Section 507(b) Reservation</u>. Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Lender is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Lender against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18. <u>DIP Termination Event</u>. Subject to paragraph 19, the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments (as defined in the DIP Term Sheet) shall terminate, in each case, without further notice or action by the Court following

the earliest to occur of any of the following (each a "DIP Termination Event"): (i) the occurrence of any Event of Default (as defined in the DIP Term Sheet), which Events of Default are explicitly incorporated by reference into this Interim Order; (ii) the Debtors' failure to comply with any material provision of this Interim Order (provided that such failure is not the result of any action or inaction of the DIP Lender); (iii) the occurrence of the DIP Termination Date (as defined in the DIP Term Sheet); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lender on a non-consensual basis or financing under Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Loans or the filing by the Debtors of a motion seeking such authority; (v) dismissal or conversion of the Cases; (vi) any suit, indictment, or similar action by the Department of Justice or a regulatory agency (or entry of any order granting relief from the automatic stay related to the foregoing) against or with respect to any Debtor, the business, operations or assets of any Debtor or any current or former employee of any Debtor, that the DIP Lender determines (in its sole discretion) may be adverse in any material respect to the value of the business, operations or assets of any Debtor; provided, that the filing of a proof of claim on the Cases shall not constitute a DIP Termination Event; (vii) termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order); (viii) failure to satisfy any of the Milestones (as defined in the DIP Term Shet) on the applicable date of such Milestone (subject to cure and grace periods set forth in the DIP Loan Documents); and (ix) the filing of a plan or disclosure statement that has not been approved by the DIP Lender which does not provide for the payment in full, in cash of the DIP Loans.

19. <u>Remedies Upon a DIP Termination Event</u>. The Debtors shall as soon as reasonably practicable provide notice to counsel to the DIP Lender and the Prepetition Lender of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event

(regardless of whether the Debtors have given the notice described in the previous sentence) and following the giving of not less than five (5) business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, counsel to any official committee of unsecured creditors (the "Notice Period"), (i) the DIP Lender may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Loan Documents and applicable non-bankruptcy law, and the DIP Lender may exercise such other rights available to them under the DIP Loan Documents or this Interim Order, as applicable, and (ii) the commitment of each DIP Lender to make DIP Loans will be terminated to the extent any such commitment remains under the DIP Facilities. The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated with respect to the DIP Lender at the end of the Notice Period, without further notice or order of the Court, unless the DIP Lender elects otherwise in a written notice to the Debtors, which may be by email. Upon termination of the automatic stay, the DIP Lender shall be permitted to exercise all rights and remedies set forth herein or in the DIP Loan Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Lender pursuant to the DIP Loan Documents; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a DIP Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Loan Documents and (ii) to fund the Carve Out Reserves; provided, further that during the Notice Period the Debtors and the DIP

Lender consent to a hearing on an expedited basis at which the Debtors, any official committee of unsecured creditors, or any other party may be heard with respect to the Enforcement Notice.

20.  <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

21.  <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Lender to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

22.  <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)  Subject to the Carve Out, other than as set forth in this Interim Order, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and the DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)  In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Lender or the DIP Lender hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Lender and the DIP Lender shall be entitled to the protections afforded in Bankruptcy Code section 364(e) to the extent provided therein with respect to all uses of the Prepetition Collateral or DIP Collateral (including Cash Collateral), subject to paragraph 26 of this Interim Order.

RLF1 27566206v.1

(c)     Subject to the Carve Out, unless and until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (i) except as permitted under the DIP Loan Documents or with the prior written consent of the DIP Lender (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Claims (or the liens and security interests secured such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens or the Adequate Protection Liens; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; or (iv) subject to entry of the Final Order, (a) an order converting or dismissing any of the Cases; (b) an order appointing a chapter 11 trustee in any of the Cases; or (c) an order appointing an examiner with expanded powers in any of the Cases.

(d)     Notwithstanding any order dismissing the Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority

Claims, Adequate Protection Liens, Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order, shall notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

        (e)      Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to Bankruptcy Code section 363(b), or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in the Cases, in any Successor Cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash or otherwise satisfied in a manner

agreed to by the DIP Lender or the Prepetition Lender, respectively. Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, nothing in this Interim Order or the DIP Loan Documents shall affect any right of any DIP Lender to object to any sale of the Debtors' assets or chapter 11 plan that does not pay the DIP Obligations and DIP Superpriority Claims in full, and all such rights are expressly preserved.

23. <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Interim Order</u>. The DIP Lender and the Prepetition Lender have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e). Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Lender and the Prepetition Lender are entitled to the protections provided in Bankruptcy Code section 364(e). Any such modification, amendment or vacate shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

24. <u>Expenses and Indemnification</u>.

(a) The Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses incurred by professionals or consultants retained by the DIP Lender, including Gibson, Dunn & Crutcher LLP, Pachulski Stang Ziehl & Jones LLP, Bass, Berry & Sims PLC, and Evercore Group L.L.C. (collectively, the "<u>DIP Professionals</u>"), whether incurred before or after the Petition Date or in connection with the Cases (in any capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Lender,

for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby (collectively, the "DIP Professional Fees"). The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees, provided, however that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Fee Notice Parties. If no objection to payment of the requested DIP Professional Fees and expenses is made, in writing, by any of the Fee Notice Parties within the Fee Objection Period, then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional and files with the Court a written objection to such invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period. Subject to the terms hereof, the Debtors are authorized, without further notice or hearing, to pay all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP to the extent otherwise payable

in accordance with the terms of the DIP Loan Documents and/or this Interim Order; provided, however that parties shall not have to comply with the fee review provisions set forth above with respect to any fees or expenses incurred prior to the entry of this Interim Order.

(b)     As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lender and its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Loan Agreement and other DIP Loan Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Term Sheet or DIP Loan Agreement, as applicable; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's actual fraud, gross negligence, or willful misconduct.

25.     Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral. Except as provided herein, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, or the proceeds thereof, including Cash Collateral, or the Carve Out may be used:  (i) to investigate,

initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against the DIP Lender or the Prepetition Lender (each in its capacity as such) under the DIP Loan Documents, this Interim Order, or the Prepetition Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender or the Prepetition Lender to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against the DIP Lender or the Prepetition Lender related to the DIP Obligations or the Prepetition Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Lender's liens or security interests in the DIP Collateral or the Prepetition Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against the DIP Lender or the Prepetition Lender (each in its capacity as such), or its liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of the DIP Lender or the Prepetition Lender to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or Prepetition Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Lender related to the Prepetition Obligations or held by or on behalf of the DIP Lender related to

the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Obligations, or the Prepetition Liens; and (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of the Prepetition Lender related to the Prepetition Obligations or the Prepetition Liens; provided that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any official committee of unsecured creditors or chapter 7 or 11 trustee to investigate the foregoing matters within the Challenge Period.

26. <u>Effect of Stipulations on Third Parties</u>.

(a) The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successor and assigns. The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including any official committee of unsecured creditors, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of

action, objections, contests, or defenses (each such proceeding or contested matter, a "Challenge")

against the Prepetition Lender in connection with any matter related to the Prepetition Collateral,

the Prepetition Liens or the Prepetition Obligations by no later than the lesser of (x) sixty (60)

calendar days following the date of entry of this Interim Order, and (y) two business days prior to

a sale hearing approving the sale of the Acquired Assets (as defined in the DIP Term Sheet), subject

to further extension by (i) written agreement of the Debtors and the Prepetition Lender or (ii) an

order of this Court obtained on notice and after a hearing, such time, the "Challenge Period");

provided that in the event that, prior to the expiration of the Challenge Period, (x) the Cases are

converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed

in the Cases, then in each such case, the Challenge Period shall be extended for a period of 15 days

solely with respect to any Trustee, commencing on the occurrence of either of the events described

in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction

and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or

claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed

prior to the expiration of the Challenge Period, without further order of this Court:  (x) the

Prepetition Obligations shall constitute allowed claims, not subject to any Challenge (whether

characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance,

contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery,

disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment,

subordination (whether equitable, contractual or otherwise), or other challenge of any kind

pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Cases

and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been,

as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraph F,

not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Lender (in its capacity as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed as provided above prior to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on any official committee of unsecured creditors and any other party in the Cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (ii) any Challenge not brought in such adversary proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Subject to paragraph 26(a), nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any official committee of unsecured creditors, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Loan and Security Agreement or the Prepetition Obligations

27.     <u>Release</u>.  Effective upon entry of this Interim Order and without prejudice to the rights of third parties under paragraph 26, each of the Debtors and the Debtors' estates, on its own

behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Lender, the Prepetition Lender, and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Facility, the Prepetition Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order.

28.     <u>Insurance</u>.  At all times the Debtors shall maintain casualty and loss insurance coverage for the DIP Collateral on substantially the same basis as maintained prior to the Petition

Date.  Upon entry of this Interim Order, the DIP Lender is, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

29.     Credit Bidding.  The DIP Lender, or any assignee or designee of the DIP Lender, shall have the right, subject to Bankruptcy Code section 363(k), to credit bid up to the full amount of any DIP Obligations in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.  The DIP Lender shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Lender, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

30.     No Obligation to Extend Credit.  The DIP Lender shall have no obligation to make any loan or advance under the relevant DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lender and in accordance with the terms of the relevant DIP Loan Documents.

31.     No Duty to Monitor Collateral.  Neither the DIP Lender nor the Prepetition Lender shall not have any obligation or responsibility to monitor any Debtors' use of DIP Collateral, Prepetition Collateral, or Cash Collateral, and the DIP Lender and the Prepetition Lender may rely upon each Debtors' representations that the use of the proceeds of the DIP Facility and the use of Cash Collateral is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

RLF1 27566206v.1

32.     No Waiver by Failure to Seek Relief.  The failure of the DIP Lender or the Prepetition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

33.     Binding Effect; Successors and Assigns.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Lender, the Prepetition Lender, and any official committee of unsecured creditors, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Prepetition Lender, provided that, except to the extent expressly set forth in this Interim Order, neither the Prepetition Lender nor the DIP Lender shall have any obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

34.     Limitation of Liability.  Solely in determining to make any loan under the DIP Loan Documents or permitting the use of Cash Collateral pursuant to this Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents, the DIP Lender and the Prepetition Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the

Debtors. Furthermore, nothing in this Interim Order, DIP Loan Documents, or the Prepetition Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

35. _Necessary Action_. The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

36. _Effectiveness_. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(g), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37. _Interim Order Governs_. In the event of any inconsistency between the provisions of the DIP Loan Documents and this Interim Order, the provisions of this Interim Order shall govern.

38. _Final Hearing_. The Final Hearing on the Motion shall be held on [•], 2022, at [•], prevailing Eastern Time; provided that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the DIP Lender. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court. Any objections or responses to entry of the Final Order shall be filed on or before [•], prevailing Eastern Time, on [•], 2022.

39.     <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Interim Order and to enforce the same.

## Exhibit B

## DIP Term Sheet

> **Asurion, LLC**
> **140 11ᵗʰ Ave. N**
> **Nashville, TN 37203**

June 29, 2022

<u>CONFIDENTIAL</u>

Enjoy Technology, Inc.
3240 Hillview Avenue
Palo Alto, CA 94304
Attn: Chief Legal Officer

Enjoy Technology, Inc.
DIP Facility
<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised Asurion, LLC ("<u>Asurion</u>"), in its capacity as the lender of the DIP Facility (collectively, the "<u>Commitment Party</u>", "<u>us</u>" or "<u>we</u>"), that Enjoy Technology, Inc., a Delaware corporation (the "<u>Company</u>"), and certain of its domestic affiliates and subsidiaries are considering filing voluntary petitions for relief (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware. In connection therewith, you have advised Asurion that you are seeking a secured superpriority priming debtor-in-possession non-amortizing facility in an amount equal to $55,000,000, with $22,500,000 in the aggregate available (in the form of Roll-Up Loans and the Initial New Money DIP Loans) upon entry of the Interim DIP Order (the "<u>DIP Facility</u>"), which shall be used as set forth in the DIP Term Sheet (as defined below). Capitalized terms used herein but not defined shall have the meanings assigned to them in the indicative summary of terms attached hereto as <u>Exhibit A</u> (the "<u>DIP Term Sheet</u>"; the DIP Term Sheet, together with this letter, the "<u>Commitment Letter</u>").

1.    <u>Commitments</u>

In connection with the Chapter 11 Cases, the Commitment Party (in its capacity as an initial lender, the "<u>Initial Lender</u>") is pleased to advise you of its commitment to provide 100% of the principal amount of the DIP Facility upon the terms set forth in this Commitment Letter and the DIP Term Sheet and subject to the satisfaction of the "Conditions Precedent to Borrowing DIP Loans" (which for the avoidance of doubt includes the Conditions Precedent to the Closing of the DIP Facility) set forth in the DIP Term Sheet. Upon the satisfaction (or waiver) of such conditions, the initial funding of the DIP Facility shall occur.

2.    <u>Information</u>

You hereby represent and covenant that to the best of your knowledge, all written information and data prepared by you and delivered after the date hereof, concerning the Borrowers or the Chapter 11 Cases (the "Information") which is made available in writing to the Commitment Party by any Borrower or any authorized representative of the Borrowers in connection with the transactions contemplated hereby (as subsequently updated or corrected), and (b) any projections (the "Projections") that will be made available to us by or on behalf of you after the date hereof in connection with the transactions contemplated hereby, in each case, have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Party. In connection with the transactions contemplated hereby, the Commitment Party will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

3.      Fees

As consideration for the commitments and agreements of the Commitment Party hereunder, you agree to pay or cause to be paid the compensation described in this Commitment Letter and in the DIP Term Sheet on the terms and subject to the conditions expressly set forth herein.

4.      Conditions

Notwithstanding anything in this Commitment Letter, the DIP Loan Documents or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, (a) the commitments of the Initial Lender hereunder to perform the services described herein are subject to the Conditions Precedent to Borrowing DIP Loans and (b) the only conditions (express or implied) to the availability of the  DIP Facility on the Closing Date are the Conditions Precedent to Borrowing DIP Loans.

5.      Indemnification and Expenses

The Borrowers, jointly and severally, agree (a) to indemnify and hold harmless the Commitment Party and its affiliates and controlling persons and their affiliates and controlling persons and the respective directors, officers, managers, members, employees, partners, advisors, attorneys, agents and other representatives and the successors of each of the foregoing and their respective successors (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities (including, fees and disbursements of counsel (limited as set forth below)) and reasonable out of pocket and documented expenses, joint or several, to which any such Indemnified Party may become subject arising out of, resulting from, or in connection with this Commitment Letter (including the DIP Term Sheet) or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any Indemnified Party is a party hereto or thereto, whether or not such Proceedings are brought by you or your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Party within thirty (30) days of written demand (together with reasonable backup summary documentation) for any reasonable and documented out-of-pocket legal fees and expenses of counsel (limited as set forth below) or other reasonable out of pocket fees and expenses incurred

in connection with investigating, responding to, or defending any of the foregoing (but limited, in the case of legal fees and expenses, to one counsel to such Indemnified Party taken as a whole and, in the case of a conflict of interest, one additional counsel to the affected Indemnified Parties taken as a whole, and, if reasonably necessary, one local counsel to the Commitment Party in each applicable jurisdiction, in each case, excluding allocated costs of in-house counsel); provided that, the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they arise from (i) the willful misconduct, bad faith, material breach of this Commitment Letter or gross negligence of such Indemnified Party (or its affiliates and controlling persons and the respective directors, officers, employees, partners, advisors, attorneys, agents and other representatives) (as determined in a final non-appealable judgment of a court of competent jurisdiction) or (ii) any disputes solely among Indemnified Parties other than claims arising out of any act or omission of Borrower or any of your subsidiaries or affiliates, and (b) to reimburse the Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, but not limited to, due diligence, investigation, consultants' fees, structuring, transportation, duplication, messenger and travel expenses, and reasonable and documented fees), incurred by such Commitment Party in connection herewith as well as charges and disbursements of both primary counsels to the Commitment Party and, if reasonably necessary, one local counsel to the Commitment Party in each applicable jurisdiction incurred in connection with the DIP Facility and any related documentation (including this Commitment Letter and the DIP Loan Documents) or the administration, amendment, modification or waiver of any of the foregoing) within thirty (30) days of written demand (including summary documentation reasonably supporting such request) (other than with respect to such fees and expenses paid on the Closing Date if it occurs for which written demand including summary documentation reasonably supporting such request is provided within one (1) business day prior to the Closing Date); provided that, such fees and expenses (i) in the case of legal counsel, shall be limited to the reasonable and documented fees and expenses of counsel described in this clause (b) which, in any event, shall exclude allocated costs of in-house counsel and (ii) in the case of any other advisors and consultants, shall be limited solely to advisors and consultants approved by you. None of the Indemnified Parties or you or any of your affiliates or the respective directors, officers, employees, advisors, attorneys and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facility or the transactions contemplated hereby; provided that, nothing contained in this sentence shall limit your indemnification and reimbursement obligations to the extent expressly set forth herein or in the DIP Loan Documents.

You shall not be liable for any settlement of any Proceeding (or expenses related thereto) effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent, or if there is a final and non-appealable judgment against an Indemnified Party in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Party to the extent and in the manner set forth above. You shall not, without the prior written consent of an Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceeding against an Indemnified Party in respect of which indemnity could have been sought hereunder by such Indemnified Party unless (a) such settlement includes an unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability or claims that are the subject matter of such Proceeding and (b) such settlement does not include any statement

as to any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any Indemnified Party.

In case any Proceeding is instituted involving any Indemnified Party for which indemnification is to be sought hereunder by such Indemnified Party, then such Indemnified Party will promptly notify you of the commencement of any Proceeding; provided, however, that the failure so to notify you will not relieve you from any liability that you may have to such Indemnified Party pursuant to this Section 5.

Notwithstanding anything to the contrary contained herein, upon the execution and effectiveness of the DIP Loan Documents, (a) the relevant provisions of such definitive documentation shall supersede the provisions of the preceding paragraphs and (b) you shall be released from this provision of the Commitment Letter and shall have no further liability or obligation pursuant to this Commitment Letter to reimburse of an Indemnified Party for losses, claims, damages, liabilities, expenses, fees or any such indemnifies obligations or any other expense reimbursement (other than with respect to provisions therein that expressly survive termination).

6.      Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities


You acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Party or its affiliates have advised or are advising you on other matters, (b) the Commitment Party, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Party (and you hereby agree not to assert, to the fullest extent permitted by law, any claims that you may have against the Commitment Party and its affiliates with respect to any breach or alleged breach of fiduciary duty and agree that the Commitment Party shall not have any liability (whether direct or indirect) to you in respect of such fiduciary duty claim or to any person asserting a fiduciary duty on behalf of or in right of you, including your equity holders, employees or creditors, in each case in connection with the transactions contemplated hereby), (c) in connection therewith and with the process leading to the Chapter 11 Cases, the Commitment Party and its affiliates (as the case may be) are acting solely as a principal and not as agents or fiduciaries of you, (d) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (e) you have consulted legal and financial advisors to the extent you deemed appropriate and (f) you have been advised that the Commitment Party and its affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that they have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship.

7.      Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of their terms shall be disclosed to any other person, except (a) your officers, directors, employees, affiliates, members, partners, stockholders, co-investors, attorneys,

accountants, agents and advisors, in each case, on a confidential and "need- to-know" basis, (b) as used for customary accounting purposes, including accounting for deferred accounting costs or as part of projections, pro forma information and a generic disclosure of aggregate sources and uses, in each case, on a confidential and "need-to- know" basis, (c) in any legal, regulatory, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation or as requested by a governmental authority, including any public filing as may be required under the Securities Exchange Act of 1934 (in which case you agree, to the extent permitted by law, rule or regulation, to inform us promptly thereof), (d) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter, (e) to the extent any such information becomes publicly available other than by reason of disclosure by you, your subsidiaries or your representatives in violation of this Commitment Letter, (f) to the extent required by the Bankruptcy Court; and (g) with the Commitment Party's consent. Your obligations under this paragraph shall remain in effect until the date that is two years from the date hereof, regardless of whether the DIP Loan Documents shall have been executed and delivered by the parties hereto.

8.    Miscellaneous

        This  Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other parties hereto (and any purported assignment without such consent shall be null and void), and is intended to be solely for the benefit of the parties hereto and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on the electronic platform DocuSign, digital copies of a signatory's manual signature, and deliveries or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to principles of conflicts of law, to the extent that the same are not mandatorily applicable by statute and would require or permit the application of the law of another jurisdiction. Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein, including an agreement to negotiate in good faith the DIP Loan Documents by the parties hereto in a manner consistent with this Commitment Letter and notwithstanding that the funding of the DIP Facility is subject to certain conditions, including the execution and delivery of the DIP Loan Documents.  The parties hereto shall proceed with the negotiation in good faith of the DIP Loan Documents for the purpose of executing and delivering the DIP Loan Documents substantially simultaneously with the commencement of the Chapter 11 Cases.  Section headings

used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

Each of the parties hereto irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any stated court located in the City and County of New York and the Bankruptcy Court, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder or for recognition or enforcement of any judgment and agrees that all claims in respect of any such action or proceeding shall be heard and determined in the aforesaid courts; provided, however, that the Commitment Party shall be entitled to assert jurisdiction over you and your property in any court in which jurisdiction may be held over you or your property, and (b) agrees that a final and non- appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. You and we agree that service of any process, summons, notice or document by registered mail addressed to any of the parties hereto at the applicable addresses above shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive, to the fullest extent you and we may legally and effectively do so, any objection to the laying of venue of any such suit, action or proceeding brought in any court in accordance with clause (a) of the first sentence of this paragraph and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. YOU AND WE HEREBY IRREVOCABLY WAIVE (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE DIP FACILITY CONTEMPLATED HEREUNDER, THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "PATRIOT Act"), it is required to obtain, verify and record information that identifies Borrower and each DIP Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow the Commitment Party or such DIP Lender to identify Borrower and each DIP Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and each DIP Lender.

The fees, indemnification, expense reimbursement, absence of fiduciary duty, jurisdiction, waiver of jury trial, service of process, venue, governing law, and confidentiality provisions contained herein shall remain in full force and effect regardless of whether the DIP Loan Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that, your obligations under this Commitment Letter shall automatically terminate and be superseded by the provisions of the DIP Loan Documents upon the execution and effectiveness thereof and you shall automatically be released from all liability in connection therewith at such time.  You may terminate the

Commitment Party's commitments hereunder at any time subject to the provisions of the preceding sentence.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than 5:00 p.m., New York City time, on June 29, 2022. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence, unless we shall, in our sole discretion, agree in writing to an extension. Unless we shall, in our sole discretion, agree to an extension, this Commitment Letter and the commitments hereunder shall automatically terminate on the first to occur of (a) the initial borrowing under the DIP Facility does not occur on or before 11:59 p.m., New York City time, on the date that is two (2) calendar days following the Petition Date, (b) the Petition Date has not occurred on or before 11:59 p.m. New York City time on June 30, 2022 and (c) execution and delivery of the DIP Loan Documents with respect to the DIP Facility and initial funding of the DIP Facility.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

Asurion, LLC,
as Commitment Party

By: _John Storey_

John Storey (Jun 29, 2022 08:54 PDT)

Name: John Storey
Title: Senior Vice President and Chief Financial Officer

Accepted and agreed to as of
the date first above written:

ENJOY TECHNOLOGY, INC.
ENJOY TECHNOLOGY OPERATING CORP.
ENJOY TECHNOLOGY LLC

By: _____
Name: Ron Johnson
Title:   Chief Executive Officer

## EXHIBIT A

DIP Term Sheet

[Attached]

**ENJOY TECHNOLOGY, INC.**

**SUPERPRIORITY SECURED
DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

This Summary of Terms and Conditions (this "<u>DIP Term Sheet</u>") outlines certain terms of the DIP Facility (as defined herein) to be provided by the DIP Lender (as defined herein) subject to the conditions herein and as set forth more fully below. The Loan Parties are not authorized to disclose the terms contained herein to any person other than their professional advisors, who shall agree to maintain its confidentiality.

| | |
|---|---|
| **Borrower:** | Enjoy Technology, Inc., a Delaware corporation ("<u>Enjoy</u>"), Enjoy Technology Operating Corp., a Delaware corporation ("<u>Enjoy Operating</u>"), and Enjoy Technology LLC, a Delaware limited liability company ("<u>Enjoy LLC</u>" and together with Enjoy, Enjoy Operating, each a "<u>Borrower</u>" and together the "<u>Borrowers</u>" or "<u>you</u>"), each in their capacity as a debtor and debtor-in-possession in a case (together with the cases of its affiliated debtors and debtors-in-possession, the "<u>Chapter 11 Cases</u>") to be filed under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). This DIP Term Sheet assumes that the Borrowers and each of the Guarantors (as defined herein) will file voluntary proceedings simultaneously under the Bankruptcy Code in the Bankruptcy Court and will request joint administration of the Chapter 11 Cases (collectively, the "<u>Bankruptcy Cases</u>").[1] |
| **Guarantors:** | Each of Enjoy's direct or indirect wholly owned US subsidiaries that are not otherwise Borrowers (collectively, the "<u>Guarantors</u>"), in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases, on a joint and several basis (the "<u>Guarantors</u>" and, together with the Borrower, each individually a "<u>Loan Party</u>" and a "<u>Debtor</u>", and collectively, the "<u>Loan Parties</u>" and the "<u>Debtors</u>"). |
| **DIP Lender:** | Asurion, LLC, a Delaware Limited Liability Company will, either directly or through one or more US affiliates (collectively, the "<u>DIP Lender</u>"), finance the DIP Facility (as defined below) and provide the DIP Commitments (as defined herein). The DIP Lender will be identified as the "Stalking Horse Bidder" in the proposed order (the "<u>Bid Procedures Order</u>") approving the bidding procedures in connection with the proposed sale of the assets identified as the "Acquired Assets" in that certain non-binding letter of intent from the DIP Lender to you dated June 19, 2022 (the "<u>Acquired Assets</u>"). |

---

[1]     Reference is hereby made to that certain Credit Agreement dated as of June 29, 2022 (the "<u>Prepetition Credit Agreement</u>" and, together with all related loan documents, the "<u>Prepetition Loan Documents</u>"), among the Borrowers and Asurion, LLC (in such capacity, the "<u>Prepetition Lender</u>"); the outstanding principal amount and all obligations thereunder, the "<u>Prepetition Obligations</u>".

| | |
|---|---|
| **Type and Amount of the DIP Facility:** | A secured superpriority priming debtor-in-possession non-amortizing facility comprised of: a multi-draw credit facility in an aggregate principal amount of $55.0 million (the "<u>DIP Facility</u>"; the DIP Lender's commitments under the DIP Facility, the "<u>DIP Commitments</u>"; the loans under the DIP Facility, the "<u>DIP Loans</u>"; the DIP Lender's claim under the DIP Facility, a "<u>DIP Claim</u>"; and collectively, the "<u>DIP Claims</u>"; and proceeds received by the Borrowers from the DIP Loans, the "<u>DIP Proceeds</u>"). |

The DIP Claims shall be *pari passu* in right of payment and collateral priority, and shall be treated the same in all other respects unless expressly specified herein or in the DIP Loan Documents (as defined below).

Following the Closing Date (as defined below), the DIP Loans may be incurred during the Availability Period (as defined below) and subject to the applicable conditions set forth herein and the limitations set forth under the heading "Availability Period": (x) upon entry of an interim order of the Bankruptcy Court authorizing and approving the DIP Facility or the use of the Borrowers' cash collateral, as applicable (the "<u>Interim Order</u>") and (y) upon entry of a final order of the Bankruptcy Court authorizing and approving the DIP Facility (including the DIP Loans and all documents and lender fees related thereto) (such order to be acceptable in all respects to the DIP Lender, the "<u>Final DIP Order</u>") and in an aggregate amount not to exceed the DIP Commitments, in each case subject to the other terms and conditions provided herein (each an "<u>Extension of Credit</u>").

Once repaid, the DIP Loans incurred under the DIP Facility cannot be reborrowed. For the avoidance of doubt, the DIP Commitments will permanently be reduced by the amount of DIP Loans made on the date of each Extension of Credit.

| | |
|---|---|
| **Credit Bidding:** | The Interim Order, the Final DIP Order, and the DIP Loan Documents shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, the DIP Lender shall have the right to credit bid all amounts outstanding under the DIP Facility (including any accrued interest and fees) or the Prepetition Obligations (as applicable), in each case, in accordance with Section 363(k) of the Bankruptcy Code. |
| **Closing Date:** | The date of the satisfaction or waiver by the DIP Lender of the relevant "Conditions Precedent to the Closing of the DIP Facility" set forth below (the "<u>Closing Date</u>"). |
| **Availability Period:** | Approximately $2.5 million in outstanding Prepetition Obligations (the "<u>Roll-Up Loans</u>") shall convert into DIP Obligations upon the entry of the Interim Order, and $22.5 million minus the aggregate amount of the Roll-Up Loans (or such lesser amount as is designated by the Borrower in the borrowing notice) (the "<u>Initial New Money DIP Loans</u>") may be drawn in a single drawing upon entry of the Interim Order, with the remaining balance (i.e., $55.0 million less the Initial New Money DIP Loans and the Roll-Up Loans) available to be drawn in a single new money drawing upon entry of |

the Final DIP Order if entered up to, but excluding, the DIP Termination Date (as defined below) (such period, the "<u>Availability Period</u>"). The DIP Commitments will expire on the DIP Termination Date. The DIP Commitments shall be permanently reduced on the date of each Extension of Credit by the aggregate principal amount of the DIP Loans made on the date of such Extension of Credit.

**Maturity:** All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lender on the earliest of (i) September 30, 2022, (ii) if the Final DIP Order has not been entered, twenty-one (21) calendar days after the Petition Date, (iii) the acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an event referred to below under "Termination", (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Borrowers' and its subsidiaries assets and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "<u>DIP Termination Date</u>"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Lender under the DIP Facility shall be payable on the DIP Termination Date (the "<u>Repaid Amount</u>"). In addition, on the DIP Termination Date the Debtors will pay a termination fee equal to 4.0% of the Repaid Amount (the "<u>Termination Fee</u>").

**Budget:** The "<u>Budget</u>" shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to the DIP Lender (such Budget shall be supplemented in the manner required pursuant to the "Financial Reporting Requirements" section below).

**Use of Proceeds:** The DIP Loans shall be used solely in accordance with the Budget (including Permitted Variances (as defined below)) and the terms and conditions of the DIP Credit Agreement, the Interim Order, and the Final DIP Order, including (but subject to the Budget) to (i) upon the entry of the Interim Order, conversion of the Prepetition Obligations into DIP Obligations, (ii) provide working capital and for other general corporate purposes of the Debtors, (iii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the section 363 sale processes, and (iv) fund interest, fees, and other payments contemplated in respect of the DIP Facility.

Without in any way limiting the foregoing, no DIP Collateral (as defined herein), DIP Proceeds, any portion of the Carve Out (as defined herein) or

any other amounts may be used directly or indirectly by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "<u>Committee</u>"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or *pari passu* with, the DIP Liens (as defined below) (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Lender, the Prepetition Lender and their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "<u>Released Parties</u>"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Prepetition Obligations, the DIP Obligations, the DIP Claims or the DIP Liens; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender hereunder or under any of the DIP Loan Documents; or (vi) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined herein) has occurred; <u>provided</u>, <u>however</u>, that no more than $50,000 in the aggregate of the DIP Collateral, the Carve Out, cash collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Lender under the Prepetition Loan Documents.

**Documentation:**      At the Borrowers' request and with the consent of the DIP Lender, the DIP Facility initially will be provided pursuant to the terms of this DIP Term Sheet and the Interim Order and Final DIP Order. The DIP Facility otherwise will be evidenced by a credit agreement (the "<u>DIP Credit Agreement</u>") based upon the Prepetition Credit Agreement and otherwise in form and substance satisfactory to the DIP Lender with such modifications as are necessary to reflect the terms set forth in this DIP Term Sheet and the nature of the DIP Facility as a debtor-in-possession facility, including appropriate qualifications to reflect the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in the industry in which the Borrowers operate in as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings, and to reflect operational matters reasonably acceptable to the DIP Lender and the Debtors and other terms as may be reasonably agreed between DIP Lender and the Debtors, (the

"Documentation Principles"), security documents, guarantees and other legal documentation (collectively, together with the DIP Credit Agreement, the "DIP Loan Documents"), which DIP Loan Documents shall be in form and substance consistent with the Documentation Principles, this DIP Term Sheet and otherwise satisfactory to the DIP Lender.

**Controlled Accounts:**   The Debtors shall maintain all existing deposit accounts (other than excluded accounts to be agreed) and each such deposit account shall remain or become subject to a perfected lien and control pursuant to the terms of the Interim Order and the Final DIP Order or, as may be requested by the DIP Lender, an enforceable control agreement in favor of the DIP Lender (any such account, a "Controlled Account").  The DIP Credit Agreement, the Interim Order (as applicable), and the Final DIP Order shall require the Debtors to maintain the DIP Proceeds in the Controlled Accounts except as permitted to be used in accordance with the Budget and shall prohibit the Debtors from withdrawing funds from the Controlled Accounts after the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement.

**Interest:**   The DIP Loans will bear interest at a fixed rate per annum equal to 12.00%, accruing monthly, payable in arrears and payable in kind.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

**Default Interest:**   Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum*.

**Fees:**    A closing fee equal to 2.0% (the "Closing Fee") on the entire DIP Commitments, which shall be earned upon entry of the Interim Order. The Closing Fee shall be payable in kind on the Closing Date to the DIP Lender.

**Voluntary Prepayments:**    Voluntary prepayments of the DIP Loans shall be permitted at any time, without premium or penalty; provided that any DIP Obligations that are voluntarily prepaid will be subject to the Termination Fee.

**Mandatory Prepayments:**    The DIP Credit Agreement will contain customary mandatory prepayment events for financings of this type consistent with the Documentation Principles and others agreed to by the DIP Lender and the Borrowers ("Mandatory Prepayments"), including, without limitation, prepayments from proceeds of (i) insurance and condemnation proceeds, (ii) equity or debt issuances, (iii) extraordinary receipts, (iv) any cash or cash equivalents cash collateralizing any letter of credit that is returned to the Borrower or any Guarantor for its own account and (v) any cash or cash equivalents returned to the Borrower or any Guarantor from rent reserves or security deposits returned to the Borrower or any Guarantor upon the assignment of a lease or otherwise, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed. Mandatory Prepayments will result in a permanent reduction of the DIP Facility.

**Priority and Security under DIP Facility:**    All obligations of the Borrower and the Guarantors to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of the Borrower or any Guarantor under the DIP Facility (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"):

(a)    subject to the Carve Out and subject only to existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Lender under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (collectively, the "Permitted Liens"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in substantially all of the assets of the Borrowers and Guarantors, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;

(b)    subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "Unencumbered Property");

(c)    subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is

subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and

(d)      subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts.

The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "<u>DIP Collateral</u>" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrower and the Guarantors, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including upon entry of the Final DIP Order, avoidance actions and proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the Interim Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements.  However, the DIP Lender may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets scheduled and held by the Debtors in trust (but only for so long as such assets are held in trust).

| | |
|---|---|
| **Superpriority DIP Claims:** | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out. |

The DIP Claims will, at all times during the period that the DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, including any claims allowed pursuant to the obligations under the Prepetition Loan Documents, subject only to the Carve Out.

| | |
|---|---|
| **Carve Out:** | "<u>Carve Out</u>" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); and (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim |

order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

**Investigation Rights:** The Committee (to the extent appointed), and any other party in interest with standing, shall have the lesser of (x) sixty (60) calendar days following the date of entry of the Interim Order or (y) two business days prior to the sale hearing approving the sale of the Acquired Assets (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the Interim Order and the Final DIP Order, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Lender arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise. The Investigation Period may only be extended with the prior written consent of the Prepetition Lender, or pursuant to an order of the Bankruptcy Court. Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any

and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim Order and Final DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Interim Order and the Final DIP Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, the Interim Order and the Final DIP Order shall include language that the investigation rights afforded to the Committee will not constitute the Debtors', the Prepetition Lender's or DIP Lender's recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action.

| | |
|---|---|
| **Conditions Precedent to the Closing of the DIP Facility:** | The DIP Credit Agreement will contain customary conditions precedent to closing mutually acceptable to the Debtors and the DIP Lender, including but not limited to the following conditions precedent, each of which shall be subject to waiver with the consent of the Debtors and the DIP Lender, which conditions precedent apply to any funding of the DIP Facility under this DIP Term Sheet: |

- Subject to the Documentation Principles, all documentation relating to the DIP Facility shall be in form and substance satisfactory to the DIP Lender, and shall have been duly executed and delivered by all parties thereto.

- All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of (i) the DIP Lender (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's outside counsel, Gibson, Dunn & Crutcher LLP and Bass, Berry & Sims PLC, and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in connection with the Debtors' Chapter 11 Cases) and (ii) any other professional advisors retained by the DIP Lender in its reasonable discretion, shall have been paid in full in cash (which payment may be made from DIP Proceeds), in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtors no later than two (2) Business Days prior to the Closing Date.

- The DIP Lender shall have received a Budget in form and substance satisfactory to the DIP Lender.

- All first day motions, including those related to the DIP Facility, filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Lender.

- Other than the Interim Order and the Final DIP Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the DIP Collateral.

- Other than, in each case, as a result of the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in the industry in which the Borrower operates in as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings reviewed by the DIP Lender (collectively, the "Known Events"), since the Petition Date there shall have occurred no event, circumstance or condition which has resulted, or could reasonably be expected to result, in a material adverse change in (i) the business, operations, properties or financial condition of the Debtors and their subsidiaries, collectively, (ii) the legality, validity or enforceability of any DIP Loan Documents, the Interim Order or the Final DIP Order, (iii) the ability of the Borrower or the Guarantors, taken as a whole, to perform their payment obligations under the DIP Loan Documents, (iv) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents, the Interim Order or the Final DIP Order, or (v) the rights and remedies of the DIP Lender under the DIP Loan Documents taken as a whole (any of the foregoing being a "Material Adverse Change").

- Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lender prior to the Petition Date on a schedule to the DIP Credit Agreement, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.

- Other than as a result of or in connection with the Chapter 11 Cases, all governmental and third party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Lender) or permitted via the Interim Order or the Final DIP Order, as applicable, and

shall remain in effect.

- Subject to the entry of the Interim Order, the DIP Lender, for its benefit, shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein.

- The Debtors seek authorization and use of the DIP Loans on an interim basis, the Bankruptcy Court shall have entered the Interim Order within two (2) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender, which Interim Order shall include, without limitation, copies of the DIP Facility and the initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the DIP Lender and otherwise required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, (i) authorizing and approving, on an interim basis, the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing, on an interim basis, the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the DIP Lender to exercise its rights and remedies, with respect to the DIP Facility; (iii) authorizing, on an interim basis, the use of cash collateral; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Lender and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

- Receipt of evidence that the liens on assets securing the secured promissory note entered into among Ron Johnson and the Borrowers on May 11, 2022 as further described in Enjoy's Form 10-Q filed with the SEC for the quarter ended March 31, 2022 (the "Promissory Note"), have been released, and the subordination agreement entered into by Ron Johnson subordinating in right of payment the Promissory Note to the DIP Obligations shall be in full force and effect.

- Receipt of customary closing items, including (i) a secretary's certificate containing customary exhibits, and (ii) UCC-1 financing statements and intellectual property security agreements.

- DIP Lender shall have completed and be reasonably satisfied with the results of its due diligence investigation of Borrowers and their subsidiaries.

- Debtors shall have paid all reasonable and documented out-of-pocket fees and expenses required to be paid to the DIP Lender as set forth herein.

**Conditions Precedent to Borrowing DIP Loans:** In addition to (and subject to) the satisfaction of the conditions on the Closing Date, the DIP Credit Agreement will contain the following conditions precedent to borrowings on the date of any Extension of Credit, which conditions precedent apply to any funding of the DIP Facility under this DIP Term Sheet:

- The DIP Lender shall have received a borrowing notice from the Borrower at least one (1) business day prior to the anticipated date of the initial Extension of Credit and at least two (2) business days prior to the anticipated date of the second Extension of Credit.

- No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans.

- The representations and warranties of each Borrower and each Guarantor set forth in the DIP Credit Agreement shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the Closing Date or on and as of the date of any Extension of Credit thereafter, as applicable, in each case immediately after giving effect to the funding of any DIP Loans and to the application of the proceeds therefrom as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date).

- The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

- The making of the DIP Loans shall be authorized pursuant to the Interim Order or the Final DIP Order, as applicable.

- Other than the Final DIP Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits or restricts the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the DIP Collateral.

- The entry of the Interim Order or Final DIP Order, as the case may be, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender, which Interim Order or Final DIP Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

- Other than the Known Events, since the Petition Date, there shall not have

been a Material Adverse Change.

- Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lender prior to the Petition Date on a schedule to the DIP Credit Agreement, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.

- The Loan Parties shall be in compliance with (i) the Interim Order or the Final DIP Order, as the case may be, and (ii) the Budget (subject to Permitted Variances).

- With respect to the second drawing of DIP Loans, the Bankruptcy Court shall have entered the Final DIP Order within twenty-one (21) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender, which Final DIP Order shall include, an updated Budget (as necessary) as an exhibit thereto, entered on notice to such parties as may be satisfactory to the DIP Lender and otherwise as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, (i) authorizing and approving, on a final basis, the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing, on a final basis, the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the DIP Lender to exercise its rights and remedies, with respect to the DIP Facility; (iii) authorizing, on a final basis, the use of cash collateral; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Lender and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

**Representations and Warranties:**

- The DIP Credit Agreement will contain representations and warranties (which will be applicable to each Debtor and its subsidiaries) consistent with the Documentation Principles and to be made as of (x) the date the Borrower and the Guarantors execute the DIP Loan Documents, (y) the Closing Date (including under this DIP Term Sheet), and (z) the date of any Extension of Credit thereafter, including without limitation the following: representations and warranties regarding valid existence, requisite power, due authorization, no conflict with the Interim Order or the Final DIP Order (as applicable) or applicable law, governmental

consent, enforceability of DIP Loan Documents, Budget, accuracy of financial statements and all other non-forward looking information provided, compliance with law, absence of Material Adverse Change, no default under the DIP Loan Documents, taxes, subsidiaries, litigation, labor matters, ERISA, pension and benefit plans, leases and real property, material contracts, bankruptcy matters, environmental, ownership of properties and necessary rights to intellectual property, insurance, inapplicability of Investment Company Act, compliance with OFAC, money laundering, PATRIOT Act and other anti-terrorism laws and anti-corruption laws, continued accuracy of representations and continued effectiveness of the Interim Order or Final DIP Order (as applicable) and each other order of the Bankruptcy Court with respect to the DIP Facility.

**Affirmative and Negative Covenants:**

The DIP Credit Agreement will contain customary affirmative and negative covenants to be consistent with the Documentation Principles, including without limitation, the following:

- Deliver to the DIP Lender and its counsels for review and comment, as soon as commercially reasonable, and in any event not less than three (3) Business Days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), all pleadings, motions and other documents material to the DIP Lender (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court.

- Promptly deliver in accordance with the Bid Procedures, to the DIP Lender copies of any term sheets, proposals, presentations, amendments to the Asset Purchase Agreement (as defined below) or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors. Notwithstanding the foregoing, the Debtors will not provide copies of any term sheets, proposals, presentations, amendments to the Asset Purchase Agreement, bids or other confidential information to the DIP Lender if the DIP Lender is an active bidder or involved in the bidding process as to the relevant Asset(s) at the applicable time.

- Comply with laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, PATRIOT Act and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records, in each case, subject to materiality qualifiers consistent with the Documentation Principles.

- Limitations against all transactions with affiliates of the Debtors (other than ordinary course transactions consistent with past practice among or between any Debtors and their respective subsidiaries), including, without limitation, restrictions on payment of any management fees to affiliates.

- Maintain a cash management system as required by the Interim Order and the Final DIP Order.

- Not make or commit to make payments to critical vendors in respect of prepetition amounts.

- Use commercially reasonable efforts to facilitate meaningful discussions between the DIP Lender and appropriately senior executives and employees of AT&T with respect to the agreement referred to by the parties hereto as the "AT&T Contract" and its renewal.

- Delivery of the Budget, updated every four weeks (and calculated cumulatively for each 4-week Budget period) and adherence to the Budget, subject to Permitted Variances.

- (i) Aggregate disbursements shall not exceed the aggregate amount of disbursements in the Budget for the applicable period by more than the Permitted Variance and (ii) actual aggregate cash receipts (excluding DIP Proceeds that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Budget for such period by more than the Permitted Variances.

- For purposes hereof, the term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (as defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than (x) the Applicable Variance (as defined below) for actual receipts under the AT&T Contract, (y) the Applicable Variance for actual operating disbursements (on an aggregate basis) or (z) 20% for actual professional fee disbursements (on an aggregate basis), in each case as compared to the budgeted receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; provided, further, that any disbursements in any Testing Period made from proceeds of favorable variances with respect to receipts in any Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances; notwithstanding the foregoing, the Carve Out shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "Applicable Rolling Period" means, (i) for

the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks. "Applicable Variance" means, (i) for the first full week after the Closing Date, 30%, (ii) for the second full week after the Closing Date, 25%, (iii) for the third full week after the Closing Date, 20% and (iv) thereafter, 15%.

- Consistent with the Documentation Principles and subject to the Budget, not incur or assume any additional debt (including intercompany funding) or contingent obligations in respect of debt, give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Lender; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower; in each case, subject to customary exceptions or baskets as may be agreed.

- Other than the DIP Obligations or as otherwise set forth in the Interim Order or the Final DIP Order, not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by any Debtor or its subsidiaries.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries (other than among the Debtors) or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions (other than among the Debtors, from Debtors to non-Debtor affiliates in the ordinary course, among non-Debtors, and from non-Debtors to Debtors).

- Not (i) make, commit to make, or permit to be made any bonus payments (including retention and incentive bonuses) to any employees of the Debtors and their subsidiaries in excess of the amounts set forth in the Budget (on an aggregate basis) and (ii) terminate any executive officers or other key employees of the Debtors and their subsidiaries without the DIP Lender's prior written consent.

- Not permit any change in ownership or control of any Debtor or any

subsidiary or any change in accounting treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the DIP Credit Agreement.

- Solely after entry of the Interim Order, maintain in Controlled Accounts an amount of unrestricted cash and cash equivalents (tested at the close of business on each Business Day) equal to no less than $7,500,000.

- Without the prior written consent of the DIP Lender, not make or permit to be made any change to the Interim Order or the Final DIP Order with respect to the DIP Facility.

- Not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lender entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lender's section 364(c)(1) claim, except for the Carve Out.

- The Debtors shall comply with the Milestones (as defined herein).

**Financial Reporting Requirements:**

The Borrowers shall provide to the DIP Lender (hereinafter the "Financial Reporting Requirements"): (i) monthly operating reports of the Debtors and their subsidiaries, within thirty (30) calendar days of month end, certified by the Debtors' chief financial officer; (ii) quarterly consolidated financial statements of the Debtors and their subsidiaries within forty-five (45) calendar days of fiscal quarter end, certified by the Borrower's chief financial officer; (iii) following delivery of the Budget on the Closing Date, by not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third business day of each week thereafter following the end of each Testing Period, an updated Budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent with the form of the Budget, and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated Budget is substantially in the form of the Budget and in substance satisfactory to the DIP Lender (provided, that, until a new Budget has been approved by the DIP Lender, the most recently approved Budget shall govern); and (iv) beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business day of each week thereafter following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "Variance Report") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and cumulative rolling 2 and 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors). The Borrowers will promptly provide notice to the DIP Lender of any Material Adverse Change.

All deliveries required pursuant to this section shall be subject to the confidentiality provision to be negotiated in the DIP Credit Agreement.

On each Monday (or, in the event that such day is not a Business Day then on the Business Day immediately following) during the Chapter 11 Cases, the Borrowers' senior management and professionals shall host a telephonic meeting for the DIP Lender and their professionals at which the Borrower's senior management and professionals shall provide an update to the DIP Lender (and make themselves available for questions) with respect to the financial and operating performance of the Loan Parties and their estates, including, but not limited to, the Variance Report.

**Other Reporting Requirements:**
The DIP Credit Agreement will contain other customary reporting requirements for similar debtor-in-possession financings and others determined by the DIP Lender in its reasonable discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events and consistent with the Documentation Principles (collectively with the financial reporting information described above, the "Information").

**Chapter 11 Cases Milestones:**
The DIP Credit Agreement will include the following milestones related to the Debtors' Chapter 11 Cases (the "Milestones"):

- No later than one calendar day after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

- No later than 3 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion") for approval of bid procedures consistent with the Bid Procedures Order (the "Bid Procedures") in form and substance acceptable to the DIP Lender and the Debtors. The Bid Procedures will include, among other things, the Termination Fee and the expense reimbursement as described in this Term Sheet.

- No later than 14 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a stalking horse asset purchase agreement for the Acquired Assets with the DIP Lender consistent with the proposed Bid Procedures (the "Asset Purchase Agreement"), pursuant to which the DIP Lender will agree to credit bid its DIP Loans pursuant to Section 363(k) of the Bankruptcy Code.

- No later than 17 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order;

- No later than twenty-one (21) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more final, non-appealable sale order(s) (which shall be in form and substance reasonably acceptable to the DIP Lender) approving each of the

winning bid(s) resulting from the auction (the "<u>Sale Order</u>"); and

- No later than sixty (60) calendar days after the Petition Date, the Asset Sale Effective Date (as defined in the Bid Procedures Order) shall have occurred.

**Events of Default:**

The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar debtor-in-possession financings and other events of default deemed by the DIP Lender appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "<u>Event of Default</u>"), including, without limitation:

- failure to make payments when due;

- noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);

- breaches of representations and warranties in any material respect, in either case, under the DIP Credit Agreement;

- failure to satisfy or stay execution of judgments in excess of specified amounts;

- the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the DIP Credit Agreement, and customary ERISA and similar foreign plan events;

- occurrence of a Material Adverse Change;

- invalidity of the DIP Loan Documents;

- change in control;

- termination of the Asset Purchase Agreement due to a breach thereunder by the Debtors;

- filing of a plan of reorganization or plan of liquidation by the Debtors that does not propose to indefeasibly repay the DIP Obligations in full in cash on the plan effective date, unless otherwise consented to by the DIP Lender;

- any of the Debtors shall file a pleading seeking to vacate or modify the Interim Order or the Final DIP Order over the objection of the DIP Lender;

- entry of an order without the prior written consent of the DIP Lender amending, supplementing or otherwise modifying the Interim Order or the Final DIP Order;

- reversal, vacatur or stay of the effectiveness of the Interim Order or the Final DIP Order except to the extent reversed within five (5) Business Days;

- any violation of any material term of the Interim Order or the Final DIP Order by the Debtors;

- dismissal of the Chapter 11 Case of a Debtor with material assets or

conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;

- appointment of a Chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

- any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Lender;

- granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any Guarantor, in each case, with a fair market value in excess of $50,000;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the DIP Lender: (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the DIP Claims (other than the Carve Out) or (ii) granting or permitted grant of a lien that is equal in priority or senior to the DIP Liens (other than the Carve Out);

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the DIP Lender;

- the Debtors shall assert in any pleading filed in any court that the guarantee contained in the DIP Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than pursuant to the terms hereof or thereof;

- expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets unless such expiration or termination was sought by the DIP Lender;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the DIP Lender;

- any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $50,000

unless stayed;

- any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated;

- subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender;

- the commencement of a suit or action against any DIP Lender and, as to any suit or action brought by any person other than any Debtor or an officer or employee of any Debtor, the continuation thereof without dismissal for thirty (30) days after service thereof on the DIP Lender, that asserts or seeks by or on behalf of the Debtors, any Committee or any other party in interest in any of the Bankruptcy Cases, a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the DIP Obligations or DIP Liens of the DIP Lender under the DIP Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of the DIP Lender under any DIP Loan Document or the collectability of all or any portion of the DIP Obligations;

- the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Credit Agreement or the other DIP Loan Documents;

- an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of the DIP Lender to credit bid for any or all of the Debtors' assets; and

- the payment of any prepetition claim other than (i) as consented to by the DIP Lender, (ii) as authorized by the Budget, (iii) permitted under the terms of the DIP Credit Agreement or (iv) as authorized by the Bankruptcy Court pursuant to the "first day" or "second day" orders or the Interim Order or the Final DIP Order and reflected in the Budget.

**Termination:**

Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall, by written notice to Enjoy, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents, the Interim Order, and the Final DIP Order.

**Remedies:**

The DIP Lender shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:

Without further order from the Bankruptcy Court, and subject to the terms of

the Interim Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender must provide the Debtors with three (3) business days' written notice (which may be by email) before exercising any enforcement rights or remedies; provided, further, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim Order and the Final DIP Order and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents. The Debtors shall cooperate fully with the DIP Lender in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the Interim Order and the Final DIP Order and in the DIP Loan Documents.

| **Marshalling and Waiver of 506(c) and 552(b) Claims:** | Effective upon entry of the Interim Order the Prepetition Lender, and effective upon entry of the Final DIP Order, the DIP Lender, in each case shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary. |
| --- | --- |

Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral

and (ii) the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

**Indemnification:**   The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and each of its affiliates and each of their respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses:**   The Borrowers and each Guarantor shall jointly and severally pay (i) (x) all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's counsels, GDC and BBS, and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in connection with the Debtors' Chapter 11 Cases, and any successor counsel to each), in each case in connection with the negotiations, preparation, execution and delivery of the DIP Loan

Documents and the funding of all DIP Loans under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsels and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of GDC and BBS (and any successor counsel) as outside counsels to the DIP Lender (and any successor counsel), and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel, in each case in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the the DIP Obligations, the Liens securing the DIP Obligations, or any transaction related to or arising in connection with the the DIP Credit Agreement or the other DIP Loan Documents.

| | |
|---|---|
| **Assignments and Participations:** | No consent of the Borrowers shall be required for any assignments to a US subsidiary of the DIP Lender. |
| **Miscellaneous:** | The DIP Credit Agreement will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, payments free and clear of withholding taxes and customary EU bail-in provisions). |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the law of the State of New York. |
| **Counsels to the DIP Lender:** | Gibson, Dunn & Crutcher LLP and Bass, Berry & Sims PLC |
| **Local Counsel to the DIP Lender:** | Pachulski Stang Ziehl & Jones LLP |
| **Counsel to the Debtors:** | Cooley LLP |
| **Local Counsel to the Debtors:** | Richards, Layton & Finger PA |

## Exhibit C

## DIP Budget

**Enjoy Technology Inc**
Proposed DIP Budget
*Week Ending - July 1, 2022*

| (USD in Thousands) | *Filing* Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | *Closing* Fcst | |
| Act / Fcst Week-Ending | 7/1 | 7/8 | 7/15 | 7/22 | 7/29 | 8/5 | 8/12 | 8/19 | 8/26 | 9/2 | 10 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | |
| AT&T | – | 5,900 | – | – | – | 5,900 | – | – | – | – | 11,800 |
| Apple | – | – | – | – | – | – | – | – | – | – | – |
| **Total Receipts** | **–** | **5,900** | **–** | **–** | **–** | **5,900** | **–** | **–** | **–** | **–** | **11,800** |
| | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | |
| Payroll | (68) | (6,500) | (1,000) | (5,500) | (1,000) | (5,500) | (1,000) | (5,500) | (1,000) | (5,500) | (32,568) |
| Rent | – | – | (700) | – | – | (750) | – | – | – | – | (1,450) |
| Vehicle | (458) | – | (429) | (429) | (429) | (429) | (391) | (391) | (391) | (391) | (3,738) |
| Other Disbursements | (619) | – | (300) | (350) | (394) | (844) | (344) | (400) | (437) | (437) | (4,125) |
| Non-BAU: D&O Insurance | (4,915) | – | – | – | – | – | – | – | – | – | (4,915) |
| **Total Operating Disbursements** | **(6,060)** | **(6,500)** | **(2,429)** | **(6,279)** | **(1,822)** | **(7,522)** | **(1,735)** | **(6,291)** | **(1,829)** | **(6,329)** | **(46,795)** |
| | | | | | | | | | | | |
| **Non-Operating Activity** | | | | | | | | | | | |
| Net Debt Cash Flows | 22,500 | – | – | 32,500 | – | – | – | – | – | – | 55,000 |
| Restructuring Professionals | (3,308) | – | – | (420) | – | – | – | – | (3,733) | – | (7,461) |
| Canada I/C Funding | (618) | – | (1,400) | – | – | – | – | – | – | – | (2,018) |
| UK I/C Funding | (4,151) | – | – | – | – | – | – | – | – | – | (4,151) |
| **Total Disbursements and Non-Op Activity** | **8,363** | **(6,500)** | **(3,829)** | **25,801** | **(1,822)** | **(7,522)** | **(1,735)** | **(6,291)** | **(5,562)** | **(6,329)** | **(5,425)** |
| **Net Cash Flow** | **8,363** | **(600)** | **(3,829)** | **25,801** | **(1,822)** | **(1,622)** | **(1,735)** | **(6,291)** | **(5,562)** | **(6,329)** | **6,375** |
| | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | |
| Beginning Cash Balance (Note 1) | 12,012 | 20,375 | 19,775 | 15,946 | 41,748 | 39,926 | 38,303 | 36,568 | 30,277 | 24,715 | 12,012 |
| Net Cash Flow (Note 2) | 8,363 | (600) | (3,829) | 25,801 | (1,822) | (1,622) | (1,735) | (6,291) | (5,562) | (6,329) | 6,375 |
| **US Cash Balance** | **20,375** | **19,775** | **15,946** | **41,748** | **39,926** | **38,303** | **36,568** | **30,277** | **24,715** | **18,387** | **18,387** |
| **Minimum Operating Cash** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** | **(7,500)** |
| **Cash Balance (excl. Minimum Cash)** | **12,875** | **12,275** | **8,446** | **34,248** | **32,426** | **30,803** | **29,068** | **22,777** | **17,215** | **10,887** | **10,887** |

**Notes:**
[Note 1] Excludes $2.5M restricted cash and ~$160K outstanding checks