## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENJOY TECHNOLOGY, INC., *et al.*,[1] | Case No. 22-_____ (___) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No. 11** |

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE SENIOR SECURED LENDER, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Marc D. Puntus, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Partner and co-head of the Debt Advisory and Restructuring Group at Centerview Partners LLC ("Centerview"), investment banker to Enjoy Technology, Inc. and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2.      I am authorized to execute this declaration (this "Declaration") on behalf of Centerview.  The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' books and records, employees, advisors and their employees, or from other members of the Centerview team working

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230).  The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

under my supervision or direction.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

3.      I submit this declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Senior Secured Lender, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>"), which the Debtors filed contemporaneously herewith.[2]

4.      In particular, I submit this Declaration in support of my view that the DIP Facility (i) is the product of an arm's-length, good-faith negotiation process; (ii) is the best presently available postpetition financing option for the Debtors; (iii) contains reasonable and appropriate financial terms and conditions under the circumstances; and (iv) is necessary to prevent immediate and irreparable harm to the Debtors and their estates.[3]

## I.      <u>Background and Qualifications</u>

5.      I have over twenty-five years of experience advising corporations and other constituents in restructuring transactions and chapter 11 cases.  I also have considerable experience with mergers, acquisitions and financing transactions.  I have prepared various valuation reports and testified as a fact and expert witness on numerous occasions, including in connection with debtor-in-possession and chapter 11 exit financings.  Since May 7, 2022, I have been the senior contact at Centerview responsible for day-to-day discussions with the Debtors relating to general restructuring advice, financing efforts, and the asset sale process.

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion.

[3] The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion.  For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Term Sheet.

6.      Established in 2006, Centerview is a leading independent investment banking firm providing financial advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries, including consumer products and retail.  Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco, London, Palo Alto, and Paris.  Centerview's Debt Advisory and Restructuring Group was founded in 2011, and its professionals have extensive experience advising debtors, lenders, committees and acquirors in complex financial restructurings, both out-of-court and in chapter 11 cases.

7.      I joined Centerview in 2011 as a Partner and co-head and co-founder of the Debt Advisory and Restructuring Group.  Prior to joining Centerview, I was a Managing Director at Miller Buckfire & Co., where I was a founding member and partner for more than ten years.  Prior to Miller Buckfire, I was a member of the financial restructuring group at Dresdner Kleinwort Wasserstein, and prior to that, a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP, a leading global law firm.

8.      I have extensive experience in advising troubled companies and their stakeholders. My experience includes a wide range of advisory assignments, including mergers, acquisitions, financings and restructurings, for both public and private companies.  My company-side experience includes representing PlayAGS, MediaMath, Neovia Logistics, Westmoreland Coal, Catalina, Sears, Cloud Peak, Performance Sports Group, Patriot Coal, Residential Capital, JCPenney, Caesars Entertainment Corporation, CTI Foods, PHH Corporation, Clearwire, Mashantucket Pequot Tribal Nation/Foxwoods, MS Resort Holdings, OSI Restaurant Partners, BroderBros., Keystone Automotive, PlayPower, Carrix, Magna Entertainment Corp., Isola Group, Greatwide Logistics Services, Inc., Vonage Corporation, EaglePicher, Anchor Danly, Progressive Moulded Products, Dura Automotive Systems, Autocam Corporation, Pegasus Satellite

271271766 v5
RLF1 27566018v.1

Communications, Pegasus Broadcast, Gate Gourmet, Reichhold, Independence Air, Conversent Corporation, Acterna Corporation, Itronix Corporation, CTC Communications, Micro Warehouse, Women First HealthCare, PSINet Inc., SI Corporation, Sunbeam Corporation, Bruno's, Edison Brothers, Crystal Brands and Best Products.  I have also represented acquirors, secured lenders and committees in transactions involving, among other companies, Walter Investment Management, Intelsat, Seventy Seven Energy, Blackhawk Mining, Dendreon, Culligan, DS Waters, Station Casinos, Fairpoint Communications, Lehman Brothers, Shared Technologies, Ion Media Networks, EaglePicher, XO Communications, AT&T Latin America, SLI Inc., Grove Crane, Mariner Post-AcuteNetwork, Heilig-Meyers, Ionica, First Wave Marine, The Pittsburgh Penguins, RDM Sports Group, SafetyComponents, The Wiz and Global Broadcasting.

## II.   Centerview's Retention

9.    As further explained in the *Declaration of John Boken in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the Debtors engaged Centerview in May of 2022 to serve as their investment banker in connection with various strategic alternatives.  Since its engagement, Centerview has worked closely with the Debtors' management, financial staff and other professionals with respect to the Debtors' evaluation of strategic and restructuring alternatives, including, among other things, (i) analyzing the Debtors' liquidity and projected cash flows and evaluating the prospects for raising short-term prepetition or out-of-court financing, (ii) marketing the Debtors' assets to potential buyers and assessing proposals generated in connection with a potential sale, (iii) reviewing and analyzing potential debtor-in-possession financing arrangements, (iv) acquainting itself with the Debtors' business, operations, properties and finances, and (v) assisting the Debtors in connection with preparations for chapter 11 bankruptcy proceedings.

10.     Accordingly, I, along with the other members of the Centerview team, have developed extensive knowledge regarding the Debtors that allows us to provide an assessment of, and demonstrate the need for, the proposed DIP Facility.

### III.    The Debtors' Capital Structure

11.     The Debtors' prepetition capital structure is set forth in detail in the First Day Declaration.  On June 29, 2022, the Debtors, as borrowers, and Asurion, LLC ("Asurion"), as lender, entered into a Senior Secured Credit, Guaranty and Security Agreement (together with all amendments and other documents ancillary thereto, the "Senior Secured Credit Agreement").  The Senior Secured Credit Agreement provides for commitments of $2.5 million, with a maturity date of July 8, 2022.  The proceeds of the Senior Secured Credit Agreement were used to fund the Debtors' imminent cash needs prior to the filing of a chapter 11 case.  The obligations under the Senior Secured Credit Agreement are secured by a first-priority lien on substantially all the assets (including, without limitation, intellectual property) of Enjoy Technology, Inc. (the "Company").  As of the Petition Date, approximately $2.5 million remains outstanding under the Senior Secured Credit Agreement.

12.     As of the Petition Date, the Debtors also had stand-by letters of credit totaling approximately $2.5 million.

13.     Pursuant to a Secured Promissory Note (together with all amendments and other documents ancillary thereto, the "Former Secured Promissory Note"), dated as of May 11, 2022, by and between the Company, as borrower, and the Company's chief executive officer, Ron Johnson, as holder (the "Holder"), the Holder made certain advances of money and extended certain financial accommodations to the Company.  The Company's obligations under the Former Secured Promissory Note matured on November 11, 2022, were secured by a first-priority lien on

substantially all the assets of the Company (including, without limitation, intellectual property), and contained no financial covenants. Proceeds from the Former Secured Promissory Note were used to enhance the Debtors' liquidity and fund operations, which provided the Debtors with additional time to explore possible strategic transactions prior to the Petition Date.

14.     On June 29, 2022, the Holder entered into a Termination and Release Agreement whereby the Holder agreed to terminate the security agreement under the Former Secured Promissory Note and release all security interests granted to the Holder by the Company. On the same day, the Company and the Holder entered into an unsecured Amended and Restated Promissory Note (together with all amendments and other documents ancillary thereto, the "Unsecured Promissory Note") that matures on December 29, 2022, and otherwise contains terms consistent with the Former Secured Promissory Note. As of the Petition Date, the Debtors' obligations under the Unsecured Promissory Note totaled not less than $10 million, plus accrued interest and expenses.[4]

15.     In the ordinary course of business, the Debtors incur unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers, and services providers, among others. As of the Petition Date, the Debtors' estimated outstanding trade payables are approximately $11 million.

## IV.     The Debtors' Prepetition Sale Marketing Efforts

16.     In the months leading up to the filing of these cases, the Debtors conducted a marketing effort to explore the potential sale of their assets. With the assistance of Centerview, the Debtors prepared a list of approximately twenty-three (23) potential acquirers that were

---

[4] It is my understanding that the Holder under the Secured Promissory Note, in connection with entering into the Termination and Release Agreement, has consented to and is supportive of the Debtors' entry into the DIP Facility and acknowledges the priming nature of the DIP Facility vis-à-vis the Unsecured Promissory Note.

271271766 v5
RLF1 27566018v.1

considered the most likely participants in a sale process.  Following the initial outreach to the identified twenty-three (23) parties, certain information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement.  Five (5) total parties entered into confidentiality agreements with the Debtors.  Those parties requested additional information and received access to a virtual data room containing due-diligence materials and conducted meetings with the Debtors' management and multiple telephonic diligence meetings with Centerview and management.

17.     Ultimately, the Debtors received letters of intent from two (2) parties, Asurion and one other counterparty.  On June 13, 2022, the Debtors executed a letter of intent with the non-Asurion counterparty that contemplated a transaction whereby that party would make a significant debt and convertible debt investment in the Debtors' business.  The transaction, if consummated, would have provided the Debtors with liquidity, avoided the need for a bankruptcy filing, and preserved the Company as a public corporation.  It also would have resulted in the transition to a business model where the Debtors were technology licensors, with the counterparty owning and controlling the Debtors' key assets, including key customer contracts and relationships. Unfortunately, on June 17, 2022, the counterparty informed the Debtors that it would not proceed with the transaction and withdrew its offer.

18.     In response, the Debtors immediately refocused their efforts on consummating a transaction with Asurion, who had previously submitted a letter of intent for the acquisition of substantially all of the Debtors' U.S. assets and operations.  On June 19, 2022, the Debtors entered into a letter of intent (the "Asurion LOI") with Asurion, which, among other conditions, requires the Debtors to commence these cases as a precondition to a sale.

19.     The Asurion LOI originally contemplated that Asurion would provide the Debtors with a substantial prepetition loan to provide liquidity for the Debtors' ongoing operations and potentially provide a longer runway to commence a chapter 11 case.  As the parties continued to negotiate the terms of an asset purchase agreement pursuant to the Asurion LOI, the parties ultimately agreed to fund the Debtors' ongoing operations and an organized bankruptcy sale process through the filing of a chapter 11 case and debtor-in-possession financing, which Asurion was willing to provide.  Asurion also agreed to provide a small prepetition bridge loan of $2.5 million (the "Bridge Loan," and the Debtors' obligations thereunder, the "Prepetition Obligations"), pursuant to the terms and conditions in the Senior Secured Credit Agreement, to fund the Debtors' imminent cash needs and make necessary payments to protect their employees prior to the filing of a chapter 11 case.

20.     Notwithstanding Asurion's agreement to provide the Bridge Loan, the Debtors were faced with an inability to satisfy accruing employee and other obligations without immediate access to debtor-in-possession financing, which Asurion has agreed to provide subject to the roll-up of the Prepetition Obligations into the DIP Facility.  In my view, approval of the DIP Facility is critical to permit the Debtors to continue operating as a going concern, and to provide the necessary runway for a sale transaction that will maximize value for Asurion's creditors, employees, and equity holders.

## V.     The Debtors' DIP Sourcing and Terms

21.     From the outset of the Debtors' sale marketing process, it was clear, for several reasons, that any potential DIP Facility or third-party financing would need to originate from a party also interested in acquiring the Debtors' assets.  Due to the significant cash burn of the Debtors' historical and projected future operations, the lack of traditional collateral for a secured

8

loan, and uncertainty around the outcome of the sale process in early June, the Debtors and their advisors concluded that financing from a non-strategic third-party was not available.  To that end, the Debtors did not run a separate, stand-alone marketing process focused solely on alternative debtor-in-possession financing sources.  Such a process would have been futile, constituted an inefficient expenditure of the Debtors' limited time and resources, and would have provided no benefit to the Debtors.

22.    In the context of negotiating *combined* sale and postpetition financing arrangements, and with the assistance of other professionals retained by the Debtors, I have personally participated in the Debtors' negotiations with the DIP Lender.  I believe that the terms of the DIP Facility and the agreements related thereto were negotiated in good faith and at arms'-length between the Debtors and the DIP Lender and resulted in agreements designed to permit the Debtors to maximize the value of their assets under the circumstances.  The DIP Facility reflects the most favorable terms on which interested purchasers and lenders were willing to offer financing.  The DIP Facility is the only financing presently available to the Debtors.  The DIP Facility will provide critically needed liquidity to the Debtors in order to run a process that the Debtors and their advisors believe will maximize value and is on terms and conditions that, in my experience, are fair and reasonable and consistent with the market given the challenging circumstances of these cases.  The Debtors also believe that the proposed DIP Facility will allow them to continue their operations in the ordinary course, including maintaining sufficient cash balances and satisfying their liquidity needs during the pendency of the chapter 11 cases.

23.    I understand that the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender.  These fees were the subject of negotiation between the Debtors and the DIP Lender, and are an integral component of the overall terms of the DIP Facility, and were

271271766 v5
RLF1 27566018v.1

required by the DIP Lender as consideration for the extension of postpetition financing.  Under the circumstances, and in light of the significant challenges faced by the Debtors, I believe that the fees reflected in the DIP Term Sheet are appropriate.  In light of the sale marketing and negotiation process described herein, I believe that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.

24.     I also understand that the Debtors have agreed, subject to Court approval, to the conversion of the Prepetition Obligations under the Bridge Loan into postpetition obligations under the DIP Facility upon entry of an interim order approving the DIP Facility.  The DIP Facility and the Bridge Loan were negotiated in tandem: the Bridge Loan, which provided the Debtors with critical liquidity on the eve of bankruptcy, was extended on the express condition that it be rolled up into the DIP Facility upon a bankruptcy filing.  It is my belief that the roll-up of the Bridge Loan is integral to the provision of the DIP Facility, which is essential for the continued operations of the Debtors' businesses, and is in the best interest of the Debtors, the Debtors' estates, creditors, and other stakeholders.

## VI.     The Proposed DIP Financing and The Debtors' Need for Immediate Access to DIP Financing

25.     The Debtors have a critical and urgent need to access the funds provided for under the DIP Facility during the first week of the bankruptcy cases.  Without access to the DIP Facility, the Debtors would have insufficient cash to operate their businesses, resulting in irreparable harm to the estates, creditors, and stakeholders.  Given their immediate liquidity crisis, and without the new financing, the Debtors will not have the funds necessary to pay, among other things, employees, payroll taxes, inventory suppliers and other vendors, overhead, lease expenses, and other expenses necessary for the operation of their business.

271271766 v5
RLF1 27566018v.1

26.     In addition, absent sufficient funds to support the Debtors' operations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate any value-maximizing asset sale (whether to Asurion or any other purchaser) will be jeopardized, to the detriment of the Debtors' estates and stakeholders.  Indeed, the purposes of these chapter 11 cases are to facilitate an orderly sale of the Debtors' most valuable assets and to wind down the Debtors' remaining assets in an orderly fashion – goals that cannot be achieved if the DIP Facility is not timely approved.

27.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Facility on the terms set forth in the proposed DIP Orders.

## VII.   The Need for Immediate Interim Relief

28.     The Debtors seek approval of the DIP Facility on an interim basis.  Obtaining interim approval on the first day of these chapter 11 cases will allow the Debtors to communicate to their employees, vendors, regulators and customers, as well as potential bidders for the Debtors' assets, that the Debtors are entering chapter 11 on strong financial footing and will continue operating without interruption.  In particular, the Debtors need to draw funds provided for under the DIP Facility sufficiently in advance of close of business on July 1, 2022 in order to fund their biweekly payroll by July 6, 2022.  By approving the DIP Facility at the outset of these cases, the Debtors will be able to maintain the value of their business during the course of a sale process and fund these chapter 11 cases through the consummation of an asset sale, all while ensuring that the Debtors' payroll obligations are met.  Thus, I believe the Debtors would suffer immediate and irreparable harm to the value of their estates if the DIP Facility is not approved shortly after completion of the first day hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

June 30, 2022                     */s/ Marc D. Puntus*

Marc D. Puntus

*Partner and Co-Head of the Debt Advisory and Restructuring Group at Centerview Partners LLC*

271271766 v5
RLF1 27566018v.1