# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENExpandY TECHNOLOGY, INC., *et al.*,[1] | ) | Case No. 22-10580 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 11 & 12** |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, AND (E) MODIFYING THE AUTOMATIC STAY, AND (F) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in these chapter 11 cases (the "Cases") and pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking entry of this interim order (this "Interim Order") and a final order (the "Final Order") among other things:

  (i)   authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured facility (the "DIP Facility"), which consists

---

[1]   The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Enjoy Technology, Inc. (6891), Enjoy Technology Operating Corp. (4543), and Enjoy Technology LLC (0230). The Debtors' headquarters are located at 3240 Hillview Avenue, Palo Alto, CA 94304.

[2]   Capitalized terms used herein and not herein defined shall have the meanings ascribed to such terms in the Motion.

of a multi-draw credit loan facility in an aggregate principal amount of up to $55 million, which shall be made available to the Debtors (a) in a roll up (the "DIP Roll-Up Loans") of the approximately $2.5 million in outstanding Prepetition Obligations (defined below) in accordance with the terms substantially set forth in the *Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet* attached hereto as **Exhibit 1** (the "DIP Term Sheet") upon entry of this Interim Order, (b) in a single new money draw in the initial amount of up to $22.5 million minus the aggregate amount of the Roll-Up Loans (the "Initial DIP Loan") in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, and (c) in a single new money draw of the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Loan Documents (defined below) upon entry of the Final Order (such loans described in subsection (c) together with the Initial DIP Loan, the "DIP New Money Loans"), and such DIP New Money Loans and the DIP Roll-Up Loans, the "DIP Loans") to be funded by Asurion, LLC (the "DIP Lender");

(ii)  authorizing the Debtors to (i) enter into a secured superpriority debtor-in-possession credit, guaranty and security agreement, by and among the Debtors and the DIP Lender (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Loan Agreement"), and all agreements, documents, and instruments delivered or executed in connection the DIP Loan Agreement (collectively, including the DIP Term Sheet, the "DIP Loan Documents"), in each case in form and substance satisfactory to the DIP Lender in its sole discretion, and (ii) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents;

(iii)  authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral (defined below), in accordance with the terms hereof, as further described herein, to pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases;

(iv)  granting adequate protection, with respect to each of the Debtors, to the Prepetition Lender (defined below) under the Prepetition Loan and Security Agreement (defined below);

(v)  authorizing, on the terms set forth herein, the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such become earned, due and payable, including, without limitation, the Closing Fee (defined below), the Termination Fee (defined below), agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Loan Documents;

(vi)  granting valid, enforceable, non-avoidable and fully perfected liens and security interests pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and

priming liens pursuant to section 364(d)(1) of the Bankruptcy Code on the DIP Collateral and all proceeds thereof, including, any (upon entry of the Final Order) Avoidance Proceeds (defined below) subject only to the Carve Out (defined below) and the Permitted Liens (defined below), if any, in each case on the terms and conditions set forth herein and in the DIP Loan Documents, to secure principal of, and accrued interest on, the DIP Loans, and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other DIP Obligations (as defined in the DIP Term Sheet) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Facility (collectively, the "<u>DIP Obligations</u>");

(vii)    granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lender, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(viii)   subject to and upon entry of a Final Order, a waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral or DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, effective as of the Petition Date;

(ix)     authorizing the DIP Lender to exercise remedies under the DIP Loan Documents on the terms described herein upon the occurrence and during the continuation of a DIP Termination Event (defined below);

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xi)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

This Court having considered the relief requested in the Motion, the DIP Declaration, the First Day Declaration and the arguments of counsel made at the interim hearing on July 1, 2022 (the "<u>Hearing</u>"); and all objections and reservations of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled on the merits by this Court; and it appearing that approval of the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; and it appearing that the Debtors' entry

into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    <u>Petition Date</u>.  On June 30, 2022 (the "<u>Petition Date</u>"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").

C.    <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed in any of the Cases.

D.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6004 and 9014 and the Local Bankruptcy Rules.

E. <u>Notice</u>. Upon the record presented to this Court at the Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1), which notice was appropriate under the circumstances and sufficient for the Motion No other or further notice of the Motion or entry of this Interim Order is required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

F. <u>Final Hearing</u>. At the Final Hearing, the Debtors will seek approval of the Final Order, which shall be subject to the terms and conditions of the DIP Loan Documents. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

G. <u>Prepetition Secured Debt</u>. Without prejudice to the rights of any party, but subject to the limitations thereon contained in paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

(i) <u>Prepetition Loans</u>. Pursuant to that certain Senior Secured Credit, Guaranty and Security Agreement dated as of June 29, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>Prepetition Loan and Security Agreement</u>"), among Enjoy Technology, Inc., Enjoy Technology Operating Corp., and Enjoy Technology LLC, as borrowers (together in such capacity, the "<u>Prepetition Borrowers</u>"),

and Asurion, LLC, as lender (in such capacity, the "Prepetition Lender"), the Prepetition Lender provided a senior secured loan to the Prepetition Borrowers (the "Prepetition Facility").

(ii) Prepetition Obligations. As of the Petition Date, the Prepetition Borrowers, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition Lender under the Prepetition Loan and Security Agreement in the aggregate amount of not less than $2,500,000, which consists of the principal amount of loans advanced under the Prepetition Loan and Security Agreement, *plus* accrued and unpaid interest thereon as of the Petition Date (the "Prepetition Obligations Amount"), plus (in each case, to the extent constituting allowable claims under the Bankruptcy Code) all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other Obligations (as defined in the Prepetition Loan and Security Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Loan and Security Agreement (collectively, including the Prepetition Obligations Amount, the "Prepetition Obligations"). The Prepetition Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Loan and Security Agreement is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action

or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(iii) <u>Prepetition Liens</u>. Pursuant to Prepetition Loan and Security Agreement, prior to the Petition Date, the Debtors party to such Prepetition Loan and Security Agreement, in their capacity as Prepetition Borrowers, granted to the Prepetition Lender valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition Liens</u>") the Collateral (as defined in the Prepetition Loan and Security Agreement, the "<u>Prepetition Collateral</u>"), including Cash Collateral (defined below). As of the Petition Date: (a) the Prepetition Liens were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain senior liens permitted by the Prepetition Loan And Security Agreement and the other Loan Documents (as defined in the Prepetition Loan And Security Agreement, the "<u>Prepetition Loan Documents</u>") (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date); (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lender or any of

its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Facility; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens securing the Prepetition Obligations.

(iv)    No Control.  The Prepetition Lender does not control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Facility or the Prepetition Loan and Security Agreement.

(v)    In light of the Stipulations in this paragraph (G), the Prepetition Lender shall not be required to file proofs of claim in these Cases in order to maintain any claims for payment of the Prepetition Obligations.

H.    Credit Bidding.  The Prepetition Lender, or certain affiliates thereof, as well as the DIP Lender, or certain affiliates thereof, intend to enter into a stalking horse purchase agreement for certain of the Debtors' assets (as amended, restated, modified, restated, modified, or supplemented, from time to time, the "Stalking Horse Agreement").  No Debtor or Debtor's affiliate shall object to any DIP Lender's or Prepetition Lender's right to credit bid up to the full amount of its DIP Obligations and/or Prepetition Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

I.    Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Term Sheet and to use of any cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"). At the Final Hearing, the Debtors will seek approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed Final Order. Notice of the Final Hearing and the Final Order will be provided in accordance with this Interim Order.

(ii)    As set forth in the DIP Declaration and the First Day Declaration, the Debtors have an ongoing and immediate need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Facility, among other things: (a) permit the orderly continuation of their respective businesses; (b) maintain business relationships with their vendors, suppliers, customers, and other parties; (c) make investments, capital expenditures, and pay ongoing costs of operations; (d) pay fees and expenses associated with the sale of the Debtors' assets; and (e) pay the costs of administration of the Cases and satisfy other working capital and general corporate purposes of the Debtors. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' businesses. The Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout the Cases without the DIP Facility and authorized use of Cash Collateral.

(iii)    As set forth in the DIP Declaration and the First Day Declaration, the Debtors are unable to obtain financing and other financial accommodations on more favorable terms from sources other than from the DIP Lender under the DIP Loan Documents and are unable

to obtain satisfactory unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents and the consensual use of Cash Collateral on more favorable terms without the Debtors granting to the DIP Lender, subject to the Carve Out as provided for herein and any other valid and preexisting liens but solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date ("Permitted Liens") (if any), the DIP Liens (defined below) and the DIP Superpriority Claims (defined below), under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iv)     Upon entry of this Interim Order, without any further action by the Debtors or any other party, the Prepetition Loan shall be converted into DIP Obligations as DIP Roll-Up Loans. Such conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Lender, which is also the DIP Lender, to fund the DIP New Money Loans and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations. The DIP Lender would not be willing to provide the DIP New Money Loans or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Loans in the DIP Obligations.

(v)     Based on the Motion, the First Day Declaration and the DIP Declaration, and the record presented to the Court at the Hearing, the extensions of credit under the terms and conditions of the DIP Facility and the terms of the adequate protection granted to the Prepetition Lender as provided in this Interim Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(vi)     As set forth in the DIP Declaration and the First Day Declaration, the DIP Facility and the use of Cash Collateral have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lender, and the Prepetition Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents, and any DIP Obligations shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and its successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

(vii)     The Prepetition Lender has acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral).  The granting of Adequate Protection Liens (defined below) in accordance with the terms hereof, and the Adequate Protection Claims (defined below), security interests and liens, and other rights, benefits and protections granted to the Prepetition Lender (and their successors and assigns) pursuant to this Interim Order and the DIP Loan Documents shall be deemed to have been agreed to by the Prepetition Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the Prepetition Lender (and its successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e).

J.     Permitted Liens.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not

limited to, any of the Debtors, the DIP Lender, or the Prepetition Lender to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Lien or security interest. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Lien and is expressly subject to the DIP Liens.

K.      <u>Sections 506(c) and 552(b)</u>. The Debtors have agreed as a condition to obtaining financing under the DIP Facility that as a material inducement to the DIP Lender to agree to provide the DIP Facility, and in exchange for (a) the DIP Lender's willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Lender's agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral consistent with the DIP Budget and the terms this Interim Order, and subject to entry of the Final Order, each of the DIP Lender and the Prepetition Lender has negotiated for, and the Debtors intend to seek (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

L.      <u>Immediate Entry</u>. Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Consummation of the DIP Facility and the use of Cash Collateral, in accordance with this Interim Order and the DIP Loan Documents, is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.     _Motion Granted._  The interim relief sought in the Motion is granted to the extent set forth herein, the financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection on an interim basis is authorized, in each case subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents.  Any and all objections to this Interim Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2.     _Authorization of the DIP Facility and the DIP Term Sheet._

(a)     The Debtors are hereby expressly authorized to execute and deliver, and, on such execution and delivery, directed to perform under the DIP Term Sheet, which is hereby approved and incorporated herein by reference.  The Debtors shall negotiate the DIP Loan Documents in good faith and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Lender.  Upon entry of this Interim Order and until execution and delivery of the DIP Loan Agreement and other DIP Loan Documents required or requested by the DIP Lender, the Debtors shall be bound by (x) the terms and conditions and other provisions set forth in the DIP Term Sheet, with the same force and effect as if duly executed and delivered to the DIP Lender, and (y) this Interim Order, and this Interim Order and the DIP Term Sheet shall govern and control the DIP Facility.  To the extent there exists any conflict among the terms and conditions of the DIP Motion, the DIP Term Sheet, and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  To the extent there is a conflict between the terms and conditions of the DIP Motion and the DIP Term Sheet, the terms and conditions of the DIP Term Sheet shall govern.

(b)     Upon entry of this Interim Order, the Debtors are hereby immediately authorized, subject to the terms and conditions of the DIP Term Sheet, to (i) borrow up to an aggregate principal amount of $22.5 million minus the amount of the DIP Roll-Up Loans (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Term Sheet) under the Interim DIP Loan, (ii) incur the DIP Roll-Up Loans and, without any further action by the Debtors or any other party, and as a condition to providing the DIP Loans, the DIP Roll-Up Loans shall be included in the DIP Obligations, and upon entry of the Final Order, to borrow up to an aggregate principal amount of $55 million (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Term Sheet), in each case subject to any limitations on availability or borrowing under the DIP Term Sheet, which shall be used for all purposes permitted under the DIP Term Sheet, including, without limitation, to provide working and investment capital for the Debtors and to pay interest, fees, and expenses, and other payments in accordance with this Interim Order and the DIP Term Sheet as set forth therein. Notwithstanding anything in this Interim Order to the contrary, the authorization herein to incur the DIP Roll-Up Loans is subject to any timely and successful Challenge (defined below) to (x) that portion of the Prepetition Obligations underlying such DIP Roll-Up Loans or (y) the Prepetition Liens securing that portion of the Prepetition Obligations.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all reasonable and actual fees and expenses in connection with or that may

be reasonably required, appropriate or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)      subject to the terms of this Interim Order, the execution and delivery of, and performance under the DIP Term Sheet and any collateral documents contemplated thereby;

(ii)      subject to the terms of this Interim Order, the execution and delivery of, and performance under, one or more non-material amendments, waivers, consents or other modifications to and under the DIP Term Sheet (in each case in accordance with the terms of the DIP Term Sheet and in such form as the Debtors and DIP Lender may agree), it being understood that no further approval of this Court shall be required for any non-material authorizations, amendments, waivers, consents or other non-material modifications to and under the DIP Term Sheet, as well as any fees and other expenses (including reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in connection therewith;

(iii)      the non-refundable and irrevocable payment to DIP Lender, as the case may be, of all reasonable and documented fees and expenses (which fees and expenses, in each case, were and were deemed to have been approved upon entry of this Interim Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Term Sheet, including (i) a closing fee of 2.00% of the total aggregate commitments in respect of the DIP Facility, which is deemed earned upon entry of this Interim

Order, (the "Commitment Fee"), which Commitment Fee shall be added to the outstanding principal amount of the DIP Loans and thereafter constitute principal for all purposes and accrue interest in accordance with the DIP Term Sheet, (ii) a termination fee of 4.0% of the Repaid Amount (as defined in the DIP Term Sheet) upon the DIP Termination Date (as defined in the DIP Term Sheet) (the "Termination Fee"), and (iii) all reasonable and documented costs and expenses as may become due from time to time under the DIP Term Sheet and this Interim Order, including, without limitation, fees and expenses of counsel, financial advisors, and other professionals retained by the DIP Lender, as provided for in the DIP Term Sheet and this Interim Order;

(iv)    and, the performance of all other acts necessary, appropriate, or desirable under or in connection with the DIP Term Sheet.

3.    DIP Obligations. The DIP Term Sheet shall, and upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall, constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order and the other DIP Loan Documents, against each Debtor and their estates and any successors thereto, including any trustee appointed in the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the Debtors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date or the occurrence of any event or condition set forth in paragraphs 18 and 19 of this Interim Order. Except as permitted by this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents to the DIP Lender shall be stayed, restrained,

voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.

4.    DIP Liens.  Subject to the below, effective immediately upon entry of this Interim Order, and without any further action under state law, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "DIP Liens"), all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Debtors wherever located, including, without limitation, all accounts, deposit accounts, cash and cash equivalents, inventory, equipment, capital stock in subsidiaries of the Debtors and the proceeds thereof, investment property, instruments, chattel paper, goods, real estate, leasehold rights and leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), but notwithstanding anything herein to the contrary, excluding any investment property, partnership, membership or other equity or similar interests in Enjoy (UK) Limited and Enjoy Technology Canada Ltd. (the "Non-Debtor Foreign Subsidiaries"), whether existing as of the Petition Date or after acquired, and all products and proceeds thereof, excluding Avoidance

Actions, but subject to entry of the Final Order, including the Avoidance Proceeds (all such property, the "DIP Collateral") as follows:

(a)     Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to any existing liens that under applicable law, are senior to, and have not been subordinated to, the DIP Liens, subject only to Permitted Liens and payment of the Carve Out;

(b)     Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully perfected first priority priming security interest and lien (the "Priming Liens") on all prepetition and postpetition property of the Debtors whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, but excluding any investment property, partnership, membership or other equity or similar interests in the Non-Debtor Foreign Subsidiaries, subject only to the Carve Out and any Permitted Liens.  The Priming Liens shall also be senior to the Adequate Protection Liens; and

(c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest and lien on all prepetition and postpetition property of the Debtors to the extent that such assets are subject to any Permitted Liens, which liens shall be junior and subordinate to any such Permitted Liens; provided that nothing in the foregoing shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent any such liens are not permitted thereunder.

5.     DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims

against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions") but including, subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise (collectively, the "Avoidance Proceeds") in accordance with the other DIP Loan Documents, subject only to payment of the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

6.      Reporting Requirements/Access to Records. The Debtors shall provide the DIP Lender with all reporting and other information required to be provided under the DIP Loan Documents. In addition to, and without limiting, whatever rights to access the DIP Lender has under the DIP Loan Documents, upon reasonable notice, at reasonable times during normal

business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender to: (i) have access to and inspect the Debtors' book and records; and (ii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, attorneys and financial advisors.

7.    Carve Out.

(a)    Carve Out. As used in this Interim Order, the "Carve Out" means (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); plus the sum of (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); and (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by any official committee of unsecured creditors pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the

amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee of unsecured creditors appointed in the Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the DIP Lender to the Debtors with a copy to any official committee of unsecured creditors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund an amount sufficient to pay the Allowed Professional Fees (whether or not such Allowed Professional Fees have been allowed by this Court prior to the Termination Declaration Date) and hold such amounts in a segregated account at the DIP Lender in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Interim Order as set forth above). The Debtors shall deposit and hold such amounts in a segregated account at the DIP Lender in trust to

pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the DIP Lender. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, to the extent such residual interest constitutes DIP Collateral, respectively, with any excess paid to the DIP Lender for application in accordance with the DIP Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the

DIP Facility have been terminated, in which case any such excess shall be paid to the Debtors. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations; provided, however, the DIP Obligations shall be increased to the extent new DIP Loans are funded and used to fund the Carve Out, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves or any of the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors, nor as a cap or limitation on the fees set forth in clause (i) of the definition of Carve Out set forth above, and (iv) only professional fees and expenses that constitute Allowed Professional Fees may be paid from the Carve Out Reserves. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Notwithstanding anything set forth herein, any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees (regardless of the date such Allowed Professional Fees are allowed by this Court) shall not reduce the Carve Out.

(d)     <u>No Direct Obligation to Pay Allowed Professional Fees</u>. Neither the DIP Lender nor the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals incurred in connection with the Cases or any

Successor Cases. Nothing in this Interim Order shall be construed to obligate the DIP Lender or the Prepetition Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date. Any indefeasible payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

8.     Limitation on Charging Expenses against Collateral. Upon entry of the Final Order and effective as of the Petition Date, in light of the agreement of the DIP Lender and the Prepetition Lender to allow (i) the Debtors to use Cash Collateral as provided for herein, and (ii) the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Prepetition Lender , and no such consent shall be implied from any other action, inaction, or acquiescence.

9.     No Marshaling/Application of Proceeds. Upon entry of the Final Order and effective as of the Petition Date, the DIP Lender shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of the Final Order and the DIP Loan

Documents, as applicable, and in no event shall the DIP Lender or the Prepetition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

10.     Equities of the Case.  Upon entry of the Final Order and effective as of the Petition Date, in light of, among other things, the agreement of the DIP Lender and the Prepetition Lender to allow the Debtors to use Cash Collateral on the terms set forth herein (i) the DIP Lender and the Prepetition Lender shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, if any, and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable

11.     Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order and any other DIP Loan Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of the Debtors.

12.     Use of Cash Collateral.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order and the DIP Loan Documents, to the extent set forth in the DIP Budget, including, for the avoidance of doubt, for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases.  Except on the terms and conditions of this Interim Order, or as otherwise agreed to by the DIP Lender, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13.     Prepetition Secured Lender Liens/Claims.  Upon entry of this Interim Order, (a) all liens and security interests granted pursuant to that *Security Agreement*, dated as of May 11, 2022, by and between Enjoy Technology, Inc., as grantor, and Ron Johnson, as secured party (the "Johnson Security Agreement"), unless previously terminated or released, are hereby, without further action, terminated, released, null and void, and (b) all rights to receive any payments under that *Secured Promissory Note*, dated as of May 11, 2022, by and between Enjoy Technology, Inc., as borrower, and Ron Johnson, as holder (the "Johnson Note," and together with the Johnson Security Agreement, the "Johnson Loan Documents") and the Johnson Security Agreement, including but not limited to payment of principal, interest, fees, expenses, or other obligations thereunder, are hereby subordinated to the DIP Obligations and the Prepetition Obligations.  The Debtors are hereby authorized to file or record any termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice the liens and security interests granted pursuant to the Johnson Security Agreement.  Ron Johnson shall enter into a subordination agreement or amendment to the Johnson Loan Documents, in the discretion of the DIP Lender and in form and substance satisfactory to the DIP Lender, subordinating in right of payment all principal, interest, fees, expenses, or other obligations owing under the Johnson Loan Documents in favor of the DIP Lender or the Prepetition Lender, as applicable.

14.     Adequate Protection for the Prepetition Lender.  Subject only to the Carve Out and the terms of this Interim Order, and specifically subject to paragraph 26 of this Interim Order and paragraph 14(c) below, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for the aggregate postpetition

diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Lender, is hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)     <u>Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected postpetition security interests in, and liens on, (the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all prepetition and postpetition property of the Debtors, including, for the avoidance of doubt, the DIP Collateral, whether existing on the Petition Date or thereafter created, acquired or arising, and wherever located, including, without limitation, property that (x) is of the same nature, scope, and type as the Prepetition Collateral that is subject to any of the Prepetition Liens securing the Prepetition Obligations, and (y) on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds).  The Adequate Protection Liens shall be subject and junior to the DIP Liens (including any liens to which the DIP Liens are junior) and the Carve Out, and otherwise be senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral, including the Prepetition Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(b)     <u>Adequate Protection Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in the Cases of each of the Debtors to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such cases, except the Carve Out and the DIP Superpriority Claims (the "<u>Adequate Protection Claims</u>").  The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Claims will not be junior or *pari passu* to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.  The Prepetition Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Loan Documents.

(c)     <u>Limitation on Adequate Protection Claims and Liens</u>.  Notwithstanding anything hereinto the contrary, the Prepetition Secured Lender shall only be entitled to an Adequate Protection Claim or Adequate Protection Lien in the event of a timely and successful Challenge to (i) that portion of the Prepetition Obligations underlying the DIP Roll-Up Loans or (ii) the Prepetition Liens securing that portion of the Prepetition Obligations.

15.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)     The DIP Lender and the Prepetition Lender are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Lender or the Prepetition Lender shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of this Interim Order; provided that the liens and security interests granted hereunder to the Prepetition Lender shall be subject to paragraph 26 of this Interim Order.  Upon the request of the DIP Lender or the Prepetition Lender, each of the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments to enable the DIP Lender or the Prepetition Lender to further validate, perfect, preserve and enforce the DIP Liens or the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A copy of this Interim Order may, in the discretion of the DIP Lender or the Prepetition Lender, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Subject to a Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto in connection with the granting of the DIP Liens and the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Loan Documents or this Interim Order.

16.     DIP Budget.

(a)     Attached to this Interim Order as **Exhibit 2** is a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Cases (including professional fees), and working capital and other general corporate needs (the "Initial DIP Budget"). By not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date (defined in the DIP Term Sheet) and by not later than 5:00 p.m. Eastern Time on the third business day of each week thereafter following the end of each Testing Period, an updated budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent

with the form of the Initial DIP Budget, and such updated budget shall become the "Budget" (collectively with the Interim Budget, the "DIP Budget") for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated budget is substantially in the form of the DIP Budget and in substance satisfactory to the DIP Lender (provided, that, until a new budget has been approved by the DIP Lender, the most recently approved DIP Budget shall govern).

(b)     Budget Reporting.  Beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business day of each week thereafter following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "Variance Report") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and cumulative rolling 2 and 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors).  The Debtors will promptly provide notice to the DIP Lender of any Material Adverse Change (as defined in the DIP Term Sheet).

(c)     Permitted Variances.  The term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than (x) the Applicable Variance (defined below) for

actual receipts under that contract between AT&T and the Debtors, (y) the Applicable Variance for actual operating disbursements (on an aggregate basis) or (z) 20% for actual professional fee disbursements (on an aggregate basis), in each case as compared to the budgeted receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; provided, further, that any disbursements in any Testing Period made from proceeds of favorable variances with respect to receipts in any Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances; notwithstanding the foregoing, the Carve Out shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "Applicable Rolling Period" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks. "Applicable Variance" means,

(i) for the first full week after the Closing Date, 30%, (ii) for the second full week after the Closing Date, 25%, (iii) for the third full week after the Closing Date, 20% and (iv) thereafter, 15%.

17.    <u>Section 507(b) Reservation</u>.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Lender is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Lender against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.    <u>DIP Termination Event</u>.  Subject to paragraph 19, the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments (as defined in the DIP Term Sheet) shall terminate, in each case, without further notice or action by the Court following the earliest to occur of any of the following (each a "<u>DIP Termination Event</u>"):  (i) the occurrence of any Event of Default (as defined in the DIP Term Sheet), which Events of Default are explicitly incorporated by reference into this Interim Order; (ii) the Debtors' failure to comply with any material provision of this Interim Order (provided that such failure is not the result of any action or inaction of the DIP Lender); (iii) the occurrence of the DIP Termination Date (as defined in the DIP Term Sheet); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lender on a non-consensual basis or financing under Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Loans or the filing by the Debtors of a motion seeking such authority; (v) dismissal or conversion of the Cases;  (vi) any suit, indictment, or similar action by the Department of Justice or a regulatory agency (or entry of any order granting relief from the automatic stay related to the foregoing) against or with respect to any Debtor, the business, operations or assets of any Debtor or any current or former employee of any Debtor, that the DIP

Lender determines (in its sole discretion) may be adverse in any material respect to the value of the business, operations or assets of any Debtor; provided, that the filing of a proof of claim on the Cases shall not constitute a DIP Termination Event; (vii) termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order); (viii) failure to satisfy any of the Milestones (as defined in the DIP Term Sheet) on the applicable date of such Milestone (subject to cure and grace periods set forth in the DIP Loan Documents); and (ix) the filing of a plan or disclosure statement that has not been approved by the DIP Lender which does not provide for the payment in full, in cash of the DIP Loans.

19.     Remedies Upon a DIP Termination Event.  The Debtors shall as soon as reasonably practicable provide notice to counsel to the DIP Lender and the Prepetition Lender of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence) and following the giving of not less than five (5) business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, counsel to any official committee of unsecured creditors (the "Notice Period"), (i) the DIP Lender may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Loan Documents and applicable non-bankruptcy law, and the DIP Lender may exercise such other rights available to them under the DIP Loan Documents or this Interim Order, as applicable, and (ii) the commitment of each DIP Lender to make DIP Loans will be terminated to the extent any such commitment remains under the DIP Facilities.  The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated with respect to the DIP Lender at the end of the Notice Period, without further notice or order of the Court, unless the DIP Lender elects otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the

automatic stay, the DIP Lender shall be permitted to exercise all rights and remedies set forth herein or in the DIP Loan Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Lender pursuant to the DIP Loan Documents; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a DIP Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Loan Documents and (ii) to fund the Carve Out Reserves; provided, further that during the Notice Period the Debtors and the DIP Lender consent to a hearing on an expedited basis at which the Debtors, any official committee of unsecured creditors, or any other party may be heard  with respect to the Enforcement Notice.

20.     <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

21.     <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Lender to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

22.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Subject to the Carve Out, other than as set forth in this Interim Order, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and the DIP Liens shall not be subject or junior

to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)     In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Lender or the DIP Lender hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Lender and the DIP Lender shall be entitled to the protections afforded in Bankruptcy Code section 364(e) to the extent provided therein with respect to all uses of the Prepetition Collateral or DIP Collateral (including Cash Collateral), subject to paragraph 26 of this Interim Order.

(c)     Subject to the Carve Out, unless and until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (i) except as permitted under the DIP Loan Documents or with the prior written consent of the DIP Lender (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Claims (or the liens and security interests secured such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents, any lien on any of the DIP Collateral with

priority equal or superior to the DIP Liens or the Adequate Protection Liens; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; or (iv) subject to entry of the Final Order, (a) an order converting or dismissing any of the Cases; (b) an order appointing a chapter 11 trustee in any of the Cases; or (c) an order appointing an examiner with expanded powers in any of the Cases.

(d)     Notwithstanding any order dismissing the Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and the other administrative claims granted pursuant to this Interim Order, shall notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of the Cases or

by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to Bankruptcy Code section 363(b), or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in the Cases, in any Successor Cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash or otherwise satisfied in a manner agreed to by the DIP Lender or the Prepetition Lender, respectively.  Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, nothing in this Interim Order or the DIP Loan Documents shall affect any right of any DIP Lender to object to any sale of the Debtors' assets or chapter 11 plan that does not pay the DIP Obligations and DIP Superpriority Claims in full, and all such rights are expressly preserved.

23.　　Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Interim Order.  Based upon the record made at the Hearing, the DIP Lender and the Prepetition Lender have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e).

24.　　Expenses and Indemnification.

(a)　　The Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses incurred by professionals or consultants retained

by the DIP Lender, including Gibson, Dunn & Crutcher LLP, Pachulski Stang Ziehl & Jones LLP, Bass, Berry & Sims PLC, and Evercore Group L.L.C. (collectively, the "DIP Professionals"), whether incurred before or after the Petition Date or in connection with the Cases (in any capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Lender, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby (collectively, the "DIP Professional Fees").  The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees, provided, however that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee and counsel to any official committee of unsecured creditors (collectively, the "Fee Notice Parties").  If no objection to payment of the requested DIP Professionals Fee is made, in writing, by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period.  For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  If within the Fee Objection Period, a Fee Notice Party sends to the affected professional

and files with the Court a written objection to such invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period.  Subject to the terms hereof, the Debtors are authorized, without further notice or hearing, to pay all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP to the extent otherwise payable in accordance with the terms of the DIP Loan Documents and/or this Interim Order; provided, however that parties shall not have to comply with the fee review provisions set forth above with respect to any fees or expenses incurred prior to the entry of this Interim Order.

(b)     As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lender and its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Loan Agreement and other DIP Loan Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Term Sheet or DIP Loan Agreement, as applicable; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or

in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's actual fraud, gross negligence, or willful misconduct.

25.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Except as provided herein, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, or the proceeds thereof, including Cash Collateral, or the Carve Out may be used:  (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against the DIP Lender or the Prepetition Lender (each in its capacity as such) under the DIP Loan Documents, this Interim Order, or the Prepetition Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender or the Prepetition Lender to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against the DIP Lender or the Prepetition Lender related to the DIP Obligations or the Prepetition Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Lender's liens or security interests in the DIP Collateral or the Prepetition Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against the DIP Lender or the Prepetition Lender (each in its capacity as such), or its liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority

Claims, that would impair the ability of the DIP Lender or the Prepetition Lender to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or Prepetition Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Lender related to the Prepetition Obligations or held by or on behalf of the DIP Lender related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Obligations, or the Prepetition Liens; and (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of the Prepetition Lender related to the Prepetition Obligations or the Prepetition Liens; provided that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any official committee of unsecured creditors or chapter 7 or 11 trustee to investigate the foregoing matters within the Challenge Period.

26.   Effect of Stipulations on Third Parties.

(a)   The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successor and assigns.  The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all

other parties in interest, including any official committee of unsecured creditors, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each such proceeding or contested matter, a "Challenge") against the Prepetition Lender in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Obligations by no later than the lesser of (x) seventy-five (75) calendar days following the Petition Date, and (y) two business days prior to a sale hearing approving the sale of the Acquired Assets (as defined in the DIP Term Sheet), subject to further extension by (i) written agreement of the Debtors and the Prepetition Lender or (ii) an order of this Court obtained on notice and after a hearing, such time, the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended for a period of 15 days solely with respect to any Trustee, and such Trustee shall be a "party" entitled to bring and maintain such timely Challenge, which such 15-day period shall commence on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding; provided, that the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Challenge Period, which attaches a draft complaint setting

forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court, provided, further that if standing is denied by the Court, the Challenge Period shall be deemed to have immediately expired with respect to such Challenge(s).  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court:  (x) the Prepetition Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraph F, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Lender (in its capacity as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed as provided above prior to the expiration of the Challenge

Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on any official committee of unsecured creditors and any other party in the Cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (ii) any Challenge not brought in such adversary proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Subject to paragraph 26(a), nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any official committee of unsecured creditors, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Loan and Security Agreement or the Prepetition Obligations

27.     Release.  Effective upon entry of this Interim Order and without prejudice to the rights of third parties under paragraph 26, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Lender, the Prepetition Lender, and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts,

accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Facility, the Prepetition Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order.

28.     Insurance.  At all times the Debtors shall maintain casualty and loss insurance coverage for the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Lender is, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

29.     Credit Bidding.  The DIP Lender, or any assignee or designee of the DIP Lender, shall have the right, subject to Bankruptcy Code section 363(k), to credit bid up to the full amount of any DIP Obligations in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.  The DIP Lender shall have the absolute right to assign, sell,

or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Lender, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

30.     No Obligation to Extend Credit.  The DIP Lender shall have no obligation to make any loan or advance under the relevant DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lender and in accordance with the terms of the relevant DIP Loan Documents.

31.     No Duty to Monitor Collateral.  Neither the DIP Lender nor the Prepetition Lender shall not have any obligation or responsibility to monitor any Debtors' use of DIP Collateral, Prepetition Collateral, or Cash Collateral, and the DIP Lender and the Prepetition Lender may rely upon each Debtors' representations that the use of the proceeds of the DIP Facility and the use of Cash Collateral is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

32.     No Waiver by Failure to Seek Relief.  The failure of the DIP Lender or the Prepetition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

33.     Binding Effect; Successors and Assigns.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Lender, the Prepetition Lender, and any official committee of unsecured creditors, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any

other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Prepetition Lender, provided that, except to the extent expressly set forth in this Interim Order, neither the Prepetition Lender nor the DIP Lender shall have any obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

34. <u>Limitation of Liability</u>. Solely in determining to make any loan under the DIP Loan Documents or permitting the use of Cash Collateral pursuant to this Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents, the DIP Lender and the Prepetition Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order, DIP Loan Documents, or the Prepetition Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

35. <u>Necessary Action</u>. The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

36. <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect as of the Petition Date immediately upon entry hereof. Notwithstanding

Bankruptcy Rules 4001(a)(3), 6004(g), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37.    <u>Interim Order Governs</u>.  In the event of any inconsistency between the provisions of the DIP Loan Documents and this Interim Order, the provisions of this Interim Order shall govern.

38.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on July 21, 2022, at 3:30, prevailing Eastern Time; provided that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the DIP Lender.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Hearing, and to any other party that has filed a request for notices with this Court.  Any objections or responses to entry of the Final Order shall be filed on or before 4:00, prevailing Eastern Time, on July 14, 2022.

39.    <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Interim Order and to enforce the same.

**Dated: July 1st, 2022**
**Wilmington, Delaware**

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**