# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENJOY TECHNOLOGY, INC., *et al.*,[1] | Case No. 22-10580 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: TBD** |
| | **Hearing Date: TBD** |

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (C) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING MANNER OF NOTICE THEREOF, AND (D) SCHEDULING A HEARING TO APPROVE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS; AND (II) AN ORDER (A) AUTHORIZING APPROVING THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT; AND (B) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; AND (III) AN ORDER APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

By this motion (the "<u>Motion</u>"), the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") seek, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), entry of:

(i)     an order (the "<u>Bidding Procedures Order</u>"), substantially in the form attached hereto as <u>Exhibit A</u>:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230).  The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

(a)     approving proposed auction and bidding procedures (the "Bidding Procedures") in connection with the sale (or series of sales) (collectively, the "Sale") of substantially all of the Debtors' assets (the "Assets") in the form attached to the Bidding Procedures Order as Exhibit 1, and approving the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 2;

(b)     subject to final Court approval at the Sale Hearing (defined below), authorizing and approving the Debtors to enter into and perform under a stalking horse asset purchase agreement consistent with the Bidding Procedures (the "Stalking Horse Agreement")[2] subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, and to grant certain Stalking Horse Bid Protections (as defined below) in the form of a break-up fee and expense reimbursement;

(c)     scheduling an auction (the "Auction") and a sale hearing (the "Sale Hearing") in connection with the Sale;

(d)     establishing procedures for the assumption and assignment (the "Assumption and Assignment Procedures") of certain executory contracts and unexpired leases (each, an "Assumed Contract," and collectively, the "Assumed Contracts") and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 3;

(e)     scheduling a hearing to authorize and approve assumption and assignment of the Assumed Contracts in connection with the Sale, including payment of cure (if any) (the "Assumption/Assignment Hearing"); and

(ii)     an order (the "Sale Order"):

(a)     authorizing and approving the Debtors' entry into an asset purchase agreement with the Successful Bidder(s) or Next-Highest Bidder(s), as applicable;

(b)     authorizing the Sale to the party or parties that are the successful bidders at the Auction, free and clear of all liens, claims and encumbrances (the "Encumbrances"), except for certain assumed liabilities; and

(iii)     an order (the "Assumption and Assignment Order") authorizing and approving the assumption and assignment of the Assumed Contracts in connection with the Sale, including proposed cure amounts (if any); and

---

[2] Consistent with the Milestones set forth in the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Administrative Expense Claims, (D) Granting Adequate Protection to the Prepetition Lender, and (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [Docket No. 83] (the "Interim DIP Order"), the Debtors intend to file a Stalking Horse Agreement for certain of the Assets with the DIP Lender within fourteen (14) calendar days after the Petition Date. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Interim DIP Order or First Day Declaration (as defined herein), as applicable.

2

(iv)    an order granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## BACKGROUND

4.    On June 30, 2022 (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

5.    The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    To date, no official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or examiner.

7.    The Debtors commenced these Chapter 11 Cases due to a rapidly declining cash position that has rendered them unable to pay operating expenses, including payroll.  The Debtors

have obtained interim approval of a debtor-in-possession financing facility provided by Asurion, LLC ("Asurion") necessary to fund the Debtors' operating expenses and pursue the consummation of a sale of substantially all of their U.S. assets.  The Debtors file this Motion to approve bidding procedures and reserve their right to designate Asurion as the stalking horse bidder for the sale of substantially all of their U.S. assets.  Pending the approval of the sale, the Debtors will continue to operate in the ordinary course of business and provide uninterrupted, top-quality service.

8.      A detailed description of the Debtors, including their business operations, their corporate and capital structure, the events leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting this Motion, is set forth in greater detail in the *Declaration of John Boken in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 4] (the "First Day Declaration"), which is incorporated by reference herein.

## RELEVANT BACKGROUND AND PROPOSED SALE PROCESS

9.      The Debtors provide a revolutionary commerce-at-home experience for consumers through the Debtors' network of mobile retail stores.  The Debtors experienced significant growth after they were founded in 2014.  In 2021, the Company became publicly-traded through a special purpose acquisition company transaction that enabled them to access the equity capital markets.  Although the Debtors were on a revenue growth trajectory, a variety of factors have constrained their ability to raise the capital necessary to fund their operations, including tightening capital markets and other contributing macroeconomic factors.  Since going public, the Debtors have been unable to achieve profitability due to the ongoing operating costs associated with the development and growth of their platform.

10.     As more fully explained in the First Day Declaration, in April 2022, the Debtors determined that strategic alternatives were necessary to preserve their liquidity and maintain

ongoing operations.  Starting in May 2022, the Debtors ran a targeted marketing process for a sale of substantially all of their assets.  With the assistance of Centerview Partners, LLC ("Centerview"), the Debtors prepared a list of approximately twenty-three (23) potential acquirers that were considered the most likely participants in a sale process.  Following the initial outreach to the identified twenty-three (23) parties, the Debtors provided certain information to these parties in order to gauge their interest prior to executing a non-disclosure agreement. Five (5) parties entered into non-disclosure agreements with the Debtors.  Those parties requested additional information and received access to a virtual data room containing due-diligence materials (the "Data Room") and/or conducted meetings with the Debtors' management and multiple telephonic diligence meetings with Centerview and management.

11.     Following the execution of non-disclosure agreements, the Debtors received two (2) letters of intent, from Asurion and one other counterparty.  On June 13, 2022, the Debtors executed a letter of intent with the non-Asurion counterparty to complete an out-of-court transaction.  However, on June 17, 2022, that counterparty informed the Debtors that it would not proceed with the transaction and withdrew its offer.  On June 19, 2022, the Debtors agreed to pursue a nonbinding proposal from Asurion for a sale of substantially all of the Debtors' U.S. assets through a sale pursuant to section 363 of the Bankruptcy Code, and signed a letter of intent with Asurion on June 19, 2022, which was later revised and superseded by a letter of intent dated as of June 29, 2022 (the "Asurion LOI").  Although the Asurion LOI is nonbinding and the transaction contemplated thereby remains subject to, among other things, due diligence, necessary counterparty consents, and negotiation of material terms and conditions, the Debtors nonetheless believe that the sale terms in the Asurion LOI represent a fair and compelling offer because, if consummated, (1) Asurion intends to continue operating the Debtors' core U.S. business as a going

5

271038090 v7
RLF1 27578064v.1

concern, retaining many of the Debtors' employees, and (2)  if consummated, a sale to Asurion could potentially provide significant consideration to the Debtors' other stakeholders.

12.    The Debtors file this Motion to approve the Bidding Procedures with the expectation that Asurion, LLC ("Asurion"), the Debtors' DIP Lender, will serve as the Stalking Horse Bidder for the sale of substantially all of the Debtors' U.S. assets.  Pursuant to the Interim DIP Order, the Debtors shall file a Stalking Horse Agreement with Asurion on or before July 14, 2022, in which case, the Debtors would seek approval of the Stalking Horse Bid Protections and authority to enter into the Stalking Horse Agreement subject to higher and better bids and the Sale Hearing pursuant to the proposed Bidding Procedures.  The Debtors expect that the postpetition sale and marketing process will build upon the prepetition marketing process overseen by Centerview.  Pending the approval of a sale, the Debtors will continue to operate in the ordinary course of business and provide uninterrupted service.

13.    The Debtors file this Motion to proceed with a bidding and auction process to consummate the Sale and generate maximum value for the Assets.  To facilitate the Sale, the Debtors, in consultation with its professional advisors, have developed certain customary bidding procedures (i.e., the Bidding Procedures) to preserve the flexibility of the sale process, generate the greatest level of interest in the Assets, and obtain the highest or otherwise best value for those Assets.  Among other things, these procedures, in the Debtors' business judgment, create an appropriate timeline for the sale process, consistent with the milestones established by the debtor-in-possession financing facility in these cases.

271038090 v7
RLF1 27578064v.1

## THE PROPOSED BIDDING PROCEDURES[3]

14.     The Debtors are requesting approval of the Bidding Procedures, which describe, among other things, (i) the assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, (vi) the selection and approval of the Successful Bidder and the selection of the Next-Highest Bidder, and (vii) certain Stalking Horse Bid Protections for Asurion if it is designated as the Stalking Horse Bidder.  The Bidding Procedures reflect the Debtors' objective of conducting the sale process in a controlled, but fair and open, manner while ensuring that the highest or best bid is generated for the Assets. The following is a summary of the Debtors' proposed Bidding Procedures[4] as required by Local Rule 6004-1.

15.     <u>Confidentiality Agreement.</u>  Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process, each person or entity must enter into (unless previously entered into) with the Debtors, on or before the Bid Deadline, an executed confidentiality agreement in form and substance satisfactory to the Debtors.  Each such person that enters into a Confidentiality Agreement with the Debtors on or before the Bid Deadline is hereinafter referred to as a "<u>Potential Bidder</u>."  After a Potential Bidder enters into a Confidentiality Agreement with the Debtors, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information

---

[3] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

[4] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in <u>Exhibit 1</u> to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures control.

(including, if applicable, financial data) with respect to the Assets.  The DIP Lender constitutes a Potential Bidder without any further action.

16.      Determination by the Debtors.    Following consultation with the Consultation Parties, the Debtors shall (a) coordinate with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluate bids from Potential Bidders on any or all of the Assets, (c) negotiate any bid made to acquire any or all of the Assets, and (d) make such other determinations as are provided in these Bidding Procedures.

17.      Due Diligence.    The Debtors established the Data Room into which substantial information about the Debtors and their business has been deposited.  Except to the extent a Confidentiality Agreement or other agreement provides otherwise, all Potential Bidders and the Consultation Parties will be granted full access to the Data Room.  The Debtors, with the assistance of Centerview, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the Consultation Parties.  In the event that any such due diligence material is in written form and has not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to (a) all Potential Bidders, and (b) all Consultation Parties.

18.      Bid Deadline.    On or before August 8, 2022, at 10:00 a.m. (prevailing Eastern Time) (the "Bid Deadline"), a Potential Bidder that desires to make a Bid is required to deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to Centerview, Attn: Marc Puntus, at mpuntus@centerview.com. [5]   As soon as reasonably

---

[5] The Debtors will also consider proposals to acquire any and all of the Assets through a plan of reorganization.  Should any such proposal be received prior to the Bid Deadline that the Debtor, in consultation with the Consultation Parties, concludes is in the best interest of the estate and its stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a plan.

practicable following the Bid Deadline, the Debtors will provide to the Consultation Parties copies

of all Qualified Bids (with such distribution permissible by electronic means).

19.    <u>Bid Requirements.</u>  All Bids must comply with the following Bid Requirements:

(a)    be accompanied by a letter or email:

(i)    fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or its advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

(ii)    setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price; <u>provided</u>, <u>that</u>, the proposed consideration must include and identify a cash component sufficient to pay the DIP Facility and DIP Obligations, including all amounts of the DIP Roll-Up, as well as the Stalking Horse Bid Protections; <u>provided</u> <u>further</u>, <u>that</u>, Asurion, LLC or an assignee thereof with respect to the DIP Facility shall be entitled to credit bid the full amount of the DIP Facility in connection with the sale of any DIP Collateral (as defined in the Interim DIP Order, or the final order approving the DIP Facility, as applicable);

(iii)    stating with specificity the Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(iv)    providing that the Bid is not subject to any bidding, break-up fee, termination fee, transaction fee, expense reimbursement or any similar type of reimbursement (the "<u>Bidding Fee</u>"), and including an express waiver of any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code related to bidding for the Assets; <u>provided</u>, <u>however</u>, that if Asurion, LLC is designated as the stalking horse bidder (the "<u>Stalking Horse Bidder</u>"), it shall be entitled to a break-up fee equal to 3% of the aggregate purchase price under the Stalking Horse Agreement[6] and to reimbursement of reasonable documented expenses in connection with the negotiations, preparation, and execution of the Stalking Horse Agreement in an amount no greater than 0.5% of the aggregate purchase price under the Stalking Horse Agreement, which together shall be no more

---

[6]    The "<u>Stalking Horse Agreement</u>" shall mean that stalking horse purchase agreement by and between the Debtors and Asurion, LLC or an affiliate or assignee thereof, in form and substance acceptable to either party in their sole and absolute discretion.

than 3.5% of the aggregate purchase price of the Assets (collectively, the "Stalking Horse Bid Protections");

(v)    providing, with respect to any Bid that includes Transferred Assets (as defined in the Stalking Horse Agreement), aggregate consideration that is in an amount greater than the sum of the Purchase Price (as defined in the Stalking Horse Agreement), the Stalking Horse Bid Protections, and $2,000,000;

(vi)    agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until two (2) business days after the closing of the Sale;

(vii)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than August 29, 2022;

(viii)    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(ix)    containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets and has relied solely upon its own independent review, investigation and/or inspection of any documents and any other information in making the Bid;

(x)    providing that the Potential Bidder agrees to serve as a backup bidder (the "Next-Highest Bidder") if the Potential Bidder's Qualified Bid (as defined below) is the next highest or best bid after the Successful Bid (as defined below) (the "Next-Highest Bid") with respect to the relevant Assets through the Closing Date; and

(b)    (b)    be accompanied by (i) an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "Qualified Bid Purchase Agreement"), and (ii) if the Stalking Horse Agreement has been entered into, a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse Agreement and the applicable schedules and exhibits;

(c)    be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iv) such additional information regarding the Potential Bidder as the Potential

10

Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale and the Consultation Parties in the event that the Debtors determines such bid to be a Qualified Bid (as defined below); and

(d)    be accompanied by (i) a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of ten percent (10%) of the cash consideration of the Bid, which funds will be deposited into an escrow account to be identified and established by the Debtors (a "Good Faith Deposit"), and (ii) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (provided, however, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtors).  The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in its sole discretion after consulting with the Consultation Parties.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to make a Good Faith Deposit.

20.    A bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."  The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) August 8, 2022, at 9:00 p.m. ET.  For the avoidance of doubt, any Stalking Horse Agreement will be deemed a Qualified Bid and the Stalking Horse Bidder will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.  The Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid (as defined below) no later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) August 8, 2022, at 9:00 p.m. ET.

11

21.    <u>Starting Bid(s).</u>  If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets, the Debtors will conduct an auction (the "<u>Auction</u>") with respect to such Assets and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "<u>Starting Bid(s)</u>").  The Starting Bid(s) will be communicated to Qualified Bidders prior to the commencement of the Auction.  The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type and nature of any changes to the Stalking Horse Agreement, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates (including after taking account of the Stalking Horse Bid Protections); (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations.  The Starting Bid(s) will be provided to Qualified Bidders on or before August 8, 2022, at 9:00 p.m. ET.

271038090 v7
RLF1 27578064v.1

22.     <u>Auction.</u>    The Auction shall be held virtually on August 9, 2022, starting at 10:00 a.m. (prevailing Eastern Time).  Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any creditor of the Debtors that has provided notice in writing of its intent to observe the Auction at least one (1) day prior to the start of the Auction shall be permitted to attend and observe the Auction, along with any other parties the Debtors deem appropriate, through a Zoom link to be provided to all such parties prior to the commencement of the Auction.  Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

23.     At the Auction, participants will be permitted to increase their bids and improve their terms in accordance with the Bidding Procedures; provided that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply).  Bidding for any part or all of the Assets will start at the applicable Starting Bid and will continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid is submitted by a Qualified Bidder.  Following consultation with the Consultation Parties, the Debtors may at any time adopt rules for the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the bidding process and not in conflict with the Bidding Procedures, the Bankruptcy Code, the documents governing the DIP Facility, or applicable orders of the Court.

24.     Prior to the conclusion of the Auction, the Debtors will: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction; (b) in the exercise of their good faith business judgment and

consistent with the Bidding Procedures, identify the highest or otherwise best offer or collection of offers in respect of the Assets (the "Successful Bid(s)"); (c) inform and consult with the Consultation Parties regarding the foregoing, so long as the Consultation Party is not also a Potential Bidder; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)") and the amount and other material terms of the Successful Bid(s).

25.     After determining the Successful Bid(s) for the Assets, the Debtors may determine, in their reasonable business judgment, in consultation with the Consultation Parties, which Qualified Bid(s) are the next best bids for the Assets (the "Next-Highest Bid(s)").

26.     Acceptance of Qualified Bids.  The Debtors' selection and submission to the Court of the selected bid as the Successful Bid will not constitute the Debtors' acceptance of the bid. The Debtors will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing.  If the Successful Bidder does not close the Sale by the date agreed upon by the Debtors and the Successful Bidder, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next-Highest Bid (the "Next-Highest Bidder") pursuant to further order of the Court.

27.     Modification of Bidding Procedures.  Following consultation with the Consultation Parties, and consistent with the documents governing the DIP Facility, the Debtors may amend the Bidding Procedures or the bidding process at any time and from time to time in any manner that it determines in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein.

28.     Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtors'

bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court. At the closing of a sale transaction contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposits of any Next-Highest Bidder shall be retained until three (3) business days after the applicable Closing Date. The Good Faith Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than seven (7) business days following the Auction.

**NOTICE PROCEDURES FOR THE SALE,**
**BIDDING PROCEDURES, AUCTION AND SALE HEARING**

29.     The Debtors also requests approval of the notice of the Auction, Sale Hearing and Bidding Procedures (the "Sale Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

30.     As soon as practicable after the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by regular mail and/or email upon: (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the United States Securities and Exchange Commission; (iii) the United States Department of Justice; (iv) counsel to the DIP Lender ; (v) counsel to any statutory committee; (vi) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located; (vii) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (viii) all parties who are known by the Debtors to assert liens against the Assets, if any; (ix) all non-Debtor parties to the Assumed Contracts; (x) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' assets; and (xi) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, "Sale Notice Parties").

31.     The Debtors will also cause the Sale Notice to be published once in the national edition of USA Today or the Wall Street Journal, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.  The Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

32.     To facilitate the Sale, the Debtors seek authority to assume and assign to any Successful Bidder, the Assumed Contracts in accordance with the Assumption and Assignment Procedures provided herein and the form and manner of notice thereof substantially in the form of the Assumption and Assignment Notice attached to the Bidding Procedures Order as Exhibit 3.

33.     By no later than three (3) business days after the entry of the Bidding Procedures Order, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for the Assumed Contracts.  The Cure Schedule will include a description of each Assumed Contract potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").  A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-Debtor parties listed on the Cure Schedule by first class mail and/or email on the date that the Cure Schedule is filed with the Court.

34.     The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, the Cure Costs set forth on such schedule, must be in writing, filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days from date of the service

16

of the Cure Schedule, and served on the following parties: (i) proposed counsel to the Debtors, Cooley LLP, 1299 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004 (Attn: Cullen D. Speckhart (cspeckhart@cooley.com) and Weiru Fang (wfang@cooley.com), and Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Michael A. Klein (mklein@cooley.com), Evan M. Lazerowitz (elazerowitz@cooley.com), and Joseph W. Brown (jbrown@cooley.com)); (ii) proposed co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Daniel J. DeFranceschi (defranceschi@RLF.com), Paul N. Heath (heath@rlf.com), and Brendan J. Schlauch (schlauch@rlf.com)); (iii) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Richard Schepacarter (richard.schepacarter@usdoj.gov)); (iv) Gibson Dunn & Crutcher LLP, as counsel to the DIP Lender (Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com), Matthew J. Williams (mjwilliams@gibsondunn.com), Michael S. Neumeister (mneumeister@gibsondunn.com)); (v) Pachulski Stang Ziehl & Jones LLP, as co-counsel to the DIP Lender (Attn: Laura Davis Jones (ljones@pszjlaw.com)); (vi) counsel to any statutory committee that has been appointed in these Chapter 11 Cases (collectively, the "Notice Parties"). Any such objections shall set forth a specific default by the Debtors in any Assumed Contracts and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

35.    If no objection is timely and properly received with respect to an Assumed Contract, then (i) the Cure Cost set forth in the Cure Schedule will be binding upon the non-Debtor party to such Assumed Contract for all purposes in this Case and will constitute a final determination of the total Cure Costs required to be paid by the Successful Bidder in connection with the assumption and assignment of the Assumed Contract; and (ii) the counterparty to the Assumed Contract will

271038090 v7
RLF1 27578064v.1

(a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed Contract, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (b) be deemed to have consented to the assumption and assignment of such Assumed Contract; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract or that there is any objection or defense to the assumption and assignment of such Assumed Contract.

36.     Where a non-Debtor counterparty to an Assumed Contract timely files an objection asserting a cure amount higher or different than the proposed Cure Costs (the "Disputed Cure Amount"), then (y) to the extent that the parties are able to consensually resolve the Disputed Cure Amount, the Cure Amount shall be as agreed between the parties, or (z) to the extent the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Assumption/Assignment Hearing to be scheduled by the Court.  All other objections to the proposed assumption and assignment of the Assumed Contracts will be heard at the Sale Hearing, unless adjourned by agreement of the parties.  The Debtors intend to reasonably cooperate with counterparties to Assumed Contracts to attempt to reconcile any differences with respect to a particular cure amount.

37.     Unless otherwise provided in the Successful Bidder(s)' asset purchase agreement, at any time but in no event later than three (3) calendar days prior to the date of closing of the Sale, the Debtors may (a) remove a contract or lease from the schedule of contracts and unexpired leases

to be assumed or assigned pursuant to the Sale, or (b) modify the previously-stated Cure Costs associated with any contract or lease.

## KEY SALE PROCESS DATES

38.    The following is a summary of the proposed key dates for the sale process:

| Date | Deadline/Event |
|---|---|
| July 15, 2022 at 4:00 p.m. (ET) | Bidding Procedures Hearing |
| Three (3) business days after the entry of the Bidding Procedures Order | Deadline for Debtors to file the Assumption and Assignment Notice and Cure Schedule |
| Fourteen (14) days after service of the Assumption and Assignment Notice at 4:00 p.m. (ET) | Deadline to object to the Debtors' proposed assumption and assignment of the Assumed Contracts and related Cure Costs |
| July 26, 2022, at 4:00 p.m. (ET) | Deadline to object to the Sale[7] of the Assets |
| August 8, 2022, at 10:00 a.m. (ET) | Bid Deadline |
| No later than the earlier of (i) twenty-four (24) hours after such Bids are received, or (ii) August 8, 2022, at 9:00 p.m. (ET) | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |
| August 9, 2022, starting at 10:00 a.m. (ET) | Auction (if necessary) |
| August 10, 2022 | Deadline to file and serve Notice of Successful Bidder |
| August 11, 2022, at 4:00 p.m. (ET) | Deadline to object to (i) conduct of the Auction, (ii) the proposed Sale to the Successful Bidder, and (iii) ability of the Successful Bidder to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance |
| August 12, 2022, at 10:00 a.m. (ET) | Sale Hearing |
| On or prior to August 29, 2022 | Closing |
| TBD | Assumption/Assignment Hearing (if necessary) |

---

[7] This objection deadline applies to all objections to the Motion and the Sale of the Assets to a Successful Bidder, with the exception of objections related solely to conduct of the Auction, identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder.

39.     The Debtors respectfully submit that the timeline set forth above is reasonable and necessary under the circumstances of these Chapter 11 Cases.  Such timeline provides an approximately five-week period between the filing of the Motion and the Bid Deadline.  This timeline, which will allow the Debtors to build off of the months' long marketing process conducted prepetition by the Debtors' investment banker, Centerview, will allow potential bidders sufficient time to formulate bids for the Assets.  In light of this prepetition marketing process, the Debtors believe that the most likely potential purchasers for the Assets have been contacted regarding the potential to purchase the Assets, some of which have already conducted due diligence.  Moreover, relevant information regarding the Debtors' business has been made available in the Data Room, allowing potential bidders (subject to the execution of a confidentiality agreement) to immediately conduct due diligence on the Assets.  Additionally, the Debtors and its advisors began marketing the Assets prior to the filing of this Motion.

## THE PROPOSED SALE ORDER

40.     The Debtors anticipate that the Sale Order will contain certain provisions that require disclosure under Local Rule 6004-1.  At this time, the Debtors make the following statements:

(a)     Local Rule 6004-1(b)(iv)(A).  To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

(b)     Local Rule 6004-1(b)(iv)(B).  The Debtors do not presently have any agreement between any interested bidder and the Debtors' management or key employees.  If any agreements are reached, the Debtors will make the necessary disclosures.

(c)     Local Rule 6004-1(b)(iv)(C).  To the extent that the Sale Order includes a release in favor of any entity, the Debtors will make the necessary disclosures.

(d)     Local Rule 6004-1(b)(iv)(E).  The contemplated Closing Date for the Sale is August 29, 2022.

21

(e)     <u>Local Rule 6004-1(b)(iv)(F)</u>.  The Debtors are requiring Qualified Bids to include a good faith deposit constituting ten percent (10%) of the total cash consideration of the bid.

(f)     <u>Local Rule 6004-1(b)(iv)(G)</u>.  The Debtors do not currently have any interim management or other agreement with any party.  If any agreements are reached, the Debtors will make the necessary disclosures.

(g)     <u>Local Rule 6004-1(b)(iv)(H)</u>.  Other than with respect to a potential credit bid under section 363(k) of the Bankruptcy Code, the Debtors are not seeking to release or allocate any sale proceeds without further order of the Court.

(h)     <u>Local Rule 6004-1(b)(iv)(I)</u>.  The Debtors are not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

(i)     <u>Local Rule 6004-1(b)(iv)(J)</u>.  The Debtors will retain necessary books and records, or copies thereof, to enable it to administer these Chapter 11 Cases in any Sale.

(j)     <u>Local Rule 6004-1(b)(iv)(K)</u>.  The Debtors may seek to sell avoidance actions.

(k)     <u>Local Rule 6004-1(b)(iv)(L)</u>.  The Debtors are seeking to sell the Assets free and clear of successor liability claims.  The Debtors will have material unpaid prepetition unsecured claims after the closing of the Sale.  No party would likely be willing to purchase the Debtors' assets if it were at risk of liability for those claims under principles of successor liability.

(l)     <u>Local Rule 6004-1(b)(iv)(M)</u>.  The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

(m)     <u>Local Rule 6004-1(b)(iv)(O)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale, as further described below.

## **RELIEF REQUESTED**

41.     By this Motion, the Debtors seek entry of (i) the Bidding Procedures Order, (a) scheduling a date for the Auction and Sale Hearing, (b) approving the Bidding Procedures, including but not limited to the Stalking Horse Bid Protections, and the form and manner of notice thereof, (c) establishing the Assumption and Assignment Procedures and manner and notice

thereof; (d) scheduling a hearing to authorize and approve assumption and assignment of the Assumed Contracts; and (ii) the Sale Order authorizing and approving the Sale, free and clear of all Encumbrances; (iii) an order authorizing and approving the assumption and assignment of the Assumed Contracts; and (iv) and order granting related relief.

## BASIS FOR RELIEF REQUESTED

### A. Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code

42.     Section 363(b) of the Bankruptcy Code provides that a Debtors "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

43.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

    a.      whether a sound business justification exists for the sale;

    b.      whether adequate and reasonable notice of the sale was given to interested parties;

    c.      whether the sale will produce a fair and reasonable price for the property; and

    d.      whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

44.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

45.     The Debtors submit that their decision to pursue a Sale on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under section 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder, and establish that the Debtors and the Successful Bidder proceeded in good faith.

46.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale, the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.  Contemporaneously herewith, the Debtors file the *Motion of the Debtors for Entry of an Order Shortening the Notice and Objection Periods*

*for the Debtors' Bidding Procedures Motion*, and for the reasons stated therein, believe that the proposed notice of this Motion is reasonably calculated to provide adequate notice of the Bidding Procedures.

47.    The Sale, conducted in accordance with the Bidding Procedures, will generate maximum value for the Debtors' estates, and represents the best path forward for maximizing recoveries.  The Debtors submit that ample business justification exists for the consummation of the Sale, and therefore request that the Court approve such Sale.

**B.    The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

48.    The Debtors request approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

271038090 v7
RLF1 27578064v.1

49.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtors' assets free and clear of any claims against the Debtors.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

50.     The Debtors submit that the Sale of its Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtors also believe that the service of the Auction and Hearing Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Sale and therefore provides additional justification for approval of the Sale free and clear of all Encumbrances.

**C.  The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

51.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).

52.     In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will

26

have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

### D. The Court Should Approve the Bidding Procedures

53.      The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtors "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtors' assets").

54.      The Debtors and their professional advisors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.   Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors to review, analyze, and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.

271038090 v7
RLF1 27578064v.1

55.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request that the Court approve the Bidding Procedures.

**E.  The Court Should Approve the Stalking Horse Bid Protections**

56.     As indicated above, the Debtors have agreed to the terms of the Asurion LOI, which contemplates the potential sale of substantially all of the Debtors' U.S. business to Asurion. Although the Asurion LOI is nonbinding and the transaction contemplated thereby remains subject to, among other things, due diligence, necessary counterparty consents, and negotiation of material terms and conditions, the Debtors intend to enter into the Stalking Horse Agreement with Asurion (as Stalking Horse Bidder) prior to the July 14, 2022 milestone under the Interim DIP Order.  To compensate the Stalking Horse Bidder whose bid will be subject to higher or better offers, the Debtors seek approval of the Stalking Horse Bid Protections in accordance with the terms of the Stalking Horse Agreement.

57.     The Debtors and the Stalking Horse Bidder believe that the amount of the Stalking Horse Bid Protections is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Stalking Horse Bidder, the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval of the Stalking Horse Bid Protections as described in the Bidding Procedures is necessary to preserve and enhance the value of the Debtors' estates.  In fact, Asurion only agreed to provide the DIP Financing necessary to run the Bidding Process contemplated under this Motion conditioned on the Debtors' acceptance of the Asurion LOI, which provides for the Stalking Horse Bid Protections.  The Debtors believe that the agreement to pay the Stalking Horse Bid Protections is necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse Agreement and thus to enable the Debtors to obtain the highest and best possible

28

price for the Assets.  Furthermore, the Debtors believe that the Stalking Horse Bid Protections are fair and reasonable provision under all the circumstances.

58.     The Stalking Horse Bid Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Stalking Horse Bid Protections will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

59.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *O'Brien*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

60.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  *First*, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  *Second*, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

61.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Stalking Horse Bid Protections are appropriate.  The

Debtors' agreement to pay the Stalking Horse Bid Protections pursuant to the Bidding Procedures and upon entry into a Stalking Horse Agreement is the product of good faith, arm's-length negotiations between the Debtors and Asurion.  The Stalking Horse Bid Protections are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Bidder of being used as a stalking-horse bidder.  Similarly, the Stalking Horse Agreement provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Assets will be] sold will reflect [its] true worth."  *Id.*  And in the absence of the Debtors' agreement to provide the Stalking Horse Bid Protections, the Debtors likely would not have had the funds necessary to conduct the auction process contemplated herein.

62.    Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Stalking Horse Bid Protections will permit the Debtors to insist that competing bids for the Assets, made in accordance with the Stalking Horse Bid Procedures, be materially higher or otherwise better than the Stalking Horse Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

63.    The Stalking Horse Bid Protections are well within the spectrum of break-up fees and expense reimbursement approved by bankruptcy courts in other chapter 11 cases in this district. *See, e.g.*, *In re Am. Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) (approving breakup fee of 3% of cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 0.5% of the cash consideration of the stalking horse bid); *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CS) (Bankr. D. Del. Jan. 28, 2022) (approving breakup fee equal

30

to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper & Tissue, LLC*, No. 20-12814 (KBO) (Bankr. D. Del. Nov. 19, 2020) (approving break-up fee in an amount equal to approximately 3.4% of cash purchase price and expense reimbursement up to an amount equal to approximately 1.1% of cash purchase price); *In re Valeritas Holdings, Inc*., No. 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) (approving 3% break-up fee and $1 million expense reimbursement totaling 7.3% of stalking horse bid); *In re Celadon Grp., Inc*., No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); *In re Promise Healthcare Grp., LLC*, No 18-12491 (CSS) (Bankr. D. Del. Feb. 1, 2019) (approving breakup fee and expense reimbursement of approximately 3.4% of stalking horse bid); *In re AtopTech, Inc.*, No. 17-10111 (MFW) (Bankr. D. Del. Apr. 21, 2017) (approving breakup fee and expense reimbursement of approximately 5.6% of stalking horse bid); *In re Am. Apparel, LLC*, No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016) (approving breakup fee and expense reimbursement fee of approximately 4.5% of stalking horse bid); *In re BPS US Holdings Inc*., No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (approving breakup fee and expense reimbursement of approximately 3.6% of stalking horse bid); *In re Hipcricket, Inc*., Case No. 15-10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) (approving break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse agreement).

## F.  The Assumption and Assignment of the Assumed Contracts Satisfies Section 365 of the Bankruptcy Code

64.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that Debtors' decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

65.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

66.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtors' estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the

trustee in realizing the full value of the dbtors' assets). Section 365(f)(2)(B) requires that the non-Debtors contract counterparty be given adequate assurance of future performance by an assignee. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

67.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

68.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment. Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the Assumed Contracts as proposed in this Motion are adequate to

protect the rights of counterparties to the Debtors' contracts and leases.  Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

## **WAIVER OF RULES 6004(h) AND 6006(d)**

69.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is necessary to permit the Sale to close expeditiously as required by the Debtors' post-petition financing.  The Debtors respectfully request that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

70.     Notice of this Motion will be provided to the following, or their counsel, if known: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the United States Department of Justice; (iv) counsel to the DIP Lender; (v) counsel to any statutory committee; (vi) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located; (vii) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (viii) all parties who are known by the Debtors to assert liens against the Assets; (ix) all non-Debtor parties to the Assumed Contracts; (x) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' assets; and (xi) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

71.     No prior request for the relief sought herein has been made to this or any other court.

271038090 v7
RLF1 27578064v.1

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) grant the relief requested herein and (ii) grant such other and further relief to the Debtors as the Court may deem proper and just.

Dated:  July 3, 2022
        Wilmington, Delaware

Respectfully submitted,

*/s/ Brendan J. Schlauch*
Daniel J. DeFranceschi, Esq. (No. 2732)
Paul N. Heath, Esq. (No. 3704)
Brendan J. Schlauch, Esq. (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:  defranceschi@rlf.com
       heath@rlf.com
       schlauch@rlf.com

-and-

Cullen Drescher Speckhart, Esq.
Weiru Fang, Esq.
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone:  (202) 842-7800
Facsimile:  (202) 842-7899
Email:  cspeckhart@cooley.com
       wfang@cooley.com

-and-

Michael A. Klein, Esq.
Evan Lazerowitz, Esq.
Joseph W. Brown, Esq.
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile:  (212) 479-6275
Email:  mklein@cooley.com
       elazerowitz@cooley.com
       jbrown@cooley.com

*Proposed Counsel for the Debtors*

35