## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                                           :    Chapter 11
In re:                                                     :
                                                           :    Case No. 22-10580 (JKS)
     ENJOY TECHNOLOGY, INC., et al.¹,                      :
                                                           :    (Jointly Administered)
     Debtors.                                              :
                                                           :    Hearing Date: 7/21/22 at 3:30 p.m.
                                                           :    Objections Due: 7/15/22 at 4:00 p.m.
----------------------------------------------------------- x
```

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (C) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING MANNER OF NOTICE THEREOF, AND (D) SCHEDULING A HEARING TO APPROVE <u>ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS</u> (D.I. 86)**

In support of his Objection to the *Motion of Debtors for Entry of an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of all or Substantially all of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Scheduling a Hearing to Approve Assumption and Assignment of the Assumed Contracts* (the "Motion") (D.I. 86)², Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, states:

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230).  The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

² Capitalized terms herein are ascribed the same meaning in the relevant or cited pleading or document.

## JURISDICTION, VENUE AND STANDING

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."  28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

## STATEMENT OF RELEVANT FACTS

4.      On June 30, 2022 (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  On July 11, 2022, the U.S. Trustee appointed an Official Committee of Unsecured Creditors. (D.I. 110).

5.      A description of the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of these Chapter 11 Cases is

set forth in the Declaration of John Boken in Support of Chapter 11 Petitions and First Day Motions

(the "Boken Declaration") (D.I. 4) which is incorporated by reference herein as may be applicable.

**A. Pre-Petition Negotiations with Asurion**

6.      The Boken Declaration states the following:

- Starting in May 2022, the Debtors ran a marketing process for the sale of substantially all of their assets.  Boken Decl. ¶ 8.

- On June 19, 2022, the Debtors received a proposal from Asurion, LLC[3] ("Asurion") for a sale of substantially all of the Debtors' U.S. assets through a chapter 11 proceeding and signed a letter of intent with Asurion (the "Asurion LOI").  Boken Decl. ¶ 9.

- The Asurion LOI requires, among other things, that the Debtors commence these cases as a precondition to an asset sale.  The Asurion LOI originally contemplated that Asurion would provide the Debtors with a substantial prepetition loan to provide liquidity for the Debtors' ongoing operations and potentially provide a longer runway to commence a chapter 11 case.   The Debtors were intent upon negotiating the terms of an asset purchase agreement and DIP financing with Asurion during that period, such that when the Debtors filed chapter 11, Asurion would serve as both a DIP lender and stalking-horse purchaser. Boken Decl. ¶ 43.

- Asurion subsequently determined that it was only willing to fund the Debtors' operations through DIP financing in a chapter 11 case and in connection therewith, Asurion agreed to provide a $55 million DIP facility, which included approximately $52.5 million of new money and a roll-up of a $2.5 million bridge loan provided by Asurion on the day prior to the Petition Date.  Boken Decl. ¶ 44.

- As the negotiations and diligence progressed with respect to the transaction contemplated under the Asurion LOI, the Debtors and Asurion ultimately agreed to complete the funding necessary to bridge the Debtors' operations through an organized bankruptcy sale process through a chapter 11 filing and a DIP financing. However, to allow the Debtors to cover necessary payments to protect their employees in advance of the Petition Date, Asurion agreed to provide a prepetition short-term bridge loan of $2.5 million.  Boken Decl. ¶ 10.

- Accordingly, on June 29, 2022, the Debtors, as borrowers, and Asurion, as the lender, executed a $2.5 million Senior Secured Credit, Guaranty and Security Agreement with a maturity date of July 8, 2022, which was secured by a first-

---

[3] Upon information and belief, Asurion, LLC is a privately-held company based in Nashville, Tennessee that provides insurance for smartphones, tablets, consumer electronics, appliances, satellite receivers and jewelry.

priority lien on substantially all the Debtors' assets.  As of the Petition Date, approximately $2.5 million remained outstanding thereunder.  Boken Decl. ¶¶ 25-26.

**B.  The Motion and the Requested Bid Protections**

7.     In the Motion, the Debtors seek the pre-approval certain Bidding Procedures and Bid Protections with the expectation that Asurion will serve as the Stalking Horse Bidder for a pre-confirmation sale of all or substantially all of the Debtors' U.S. assets.  Mot. ¶ 12.

8.     However, at the time of the filing of the Motion, Asurion has yet to serve as the Stalking Horse and no stalking horse asset purchase agreement has been signed with Asurion.

9.     The non-binding Asurion LOI remains subject to, among other things, due diligence, necessary counterparty consents, and negotiation of material terms and conditions and the milestones under the Interim DIP Order.  Mot. ¶ 56.

10.     In the Motion, the Debtors seek approval of prospective bid protections that reward Asurion with a break-up fee equal to 3% of the yet-to-be-determined aggregate purchase price and to the reimbursement of reasonable documented expenses in connection with the negotiations, preparation, and execution of the Stalking Horse Agreement in an amount no greater than 0.5% of the aggregate purchase price under the Stalking Horse Agreement, which together shall be no more than 3.5% of the aggregate purchase price of the Assets (collectively, the "Stalking Horse Bid Protections").  Mot. ¶ 19 (iv).

11.     Upon information and belief, no Stalking Horse Agreement with Asurion has been executed and no aggregate purchase price as called for under the Stalking Horse Agreement has been set.

## LAW, ANALYSIS AND ARGUMENT

12.    The Debtor should not be permitted to award bid protections to Asurion or any other potential stalking horse until a *bona fide* asset purchase agreement is finalized and signed and that fully-executed asset purchase agreement, memorializing the purchaser's bid, is filed with the Court and a hearing to consider allowance of any proposed bid protections with the opportunity for parties in interest to object to same is set.

13.    In addition, Asurion should not be awarded any bid protections or expense reimbursement for due diligence.  The record in this case clearly indicates that Asurion performed its due diligence pre-petition in connection with its negotiations with the Debtors concerning the purchase of the Debtors' assets.

14.    Bid protections must be sought pursuant to, and analyzed under, section 503(b) of the Bankruptcy Code.  *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *Calpine Corp. v. O'Brien Envt'l Energy (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)).  Section 105(a) is not a basis to award an administrative expense.  *See In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005).

15.    The analysis of bid protections under Section 503(b) "must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of bid protections, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535; *see In re Energy Future Holdings Corp. ("EFH I")*, 904 F.3d 298, 313 (3d Cir. 2018) ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]").

16.     An administrative expense's benefit to the estate "must be *actual*, not hypothetical." *In re Energy Future Holdings Corp.* ("*EFH II*"), No. 19-3492, 2021 WL 957301 at \*10 (3d Cir. Mar. 15, 2021) (emphasis in original) (citing *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992)).

17.     A break-up fee may provide a benefit to the estate where (1) assurance of the break-up fee promotes more competitive bidding, such as by inducing a bid that otherwise wouldn't have been made, (2) availability of the break-up fee induces a buyer to perform diligence and set a floor price.  *See EFH I*, 904 F.3d at 313-14 (citing *O'Brien*, 181 F.3d at 537).

18.     Even if a break-up fee would benefit the estate, the Court is not required to approve it.  *See EFH I*, 904 F.3d at 313-14 ("We have never held that bankruptcy courts must allow fees whenever they find that [a break-up fee confers a benefit on the estate.]").  The Court must determine, based on the totality of the circumstances of the case, "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate."  *Id.* (citing *O'Brien*, 181 F.3d at 535) (quotation marks omitted).

19.     The party requesting bid protections has the burden of showing that the fee is actually necessary to preserve the value of the estate.  *See O'Brien*, 181 F.3d at 535.

20.     In *EFH II*, the United States Court of Appeals for the Third Circuit considered, in the context of a motion to dismiss based upon the sufficiency of the pleading, an administrative expense application submitted by an unsuccessful bidder.  Initially, the unsuccessful bidder argued that the lower courts erred in measuring whether its bid had conferred a benefit using hindsight (as opposed to measuring the benefit at the time the bid was submitted).  *See EFH II* at \*12.  The Third Circuit rejected that argument and concluded that, consistent with the well-established Bankruptcy

Code policy of limiting administrative expenses, it was "entirely appropriate to consider" the asserted benefit "through the rearview mirror." *Id.*

21.    The unsuccessful bidder in *EFH II* also asserted two potential benefits to the process:  that it served as a stalking horse bidder, and that its unsuccessful efforts provided a "roadmap" for other viable bids that were later submitted, including the successful bid. *Id.*   The Third Circuit rejected the argument that the unsuccessful bidder had stated a plausible argument for allowance of an administrative expense on a theory that its bid served as a catalyst for the submission of other bids, as it was the only bid at the time it was submitted. *Id.*  While the bid did not technically establish a "floor" because the estates ultimately accepted a substantially lower offer after the unsuccessful bid fell through, the Third Circuit found that the argument that the bid had provided a "roadmap" for other bids post-termination was a plausible argument in favor of benefit to the estate. *Id.* at *12-13.  The Third Circuit remanded the matter in *EFH II* so that a sufficient record could be developed to enable the bankruptcy court to determine, in hindsight, the extent to which the unsuccessful bidder's participation had actually benefitted the estate more than it had harmed the estate. *Id.* at *15.

22.    In this case, there is no present stalking horse, so any benefit a stalking horse could provide to the Debtors' estates cannot be determined. Taking up bid protections (or the process for awarding them) before a bid is even in hand, is premature.  At this point, the Court cannot predict whether a future bid or bids containing unknown terms submitted by an unidentified bidder will help elicit qualified bids.  As a result, the Court does not have a basis to determine that bid protections will confer an "actual" benefit on the Debtors' estates that outweighs any potential harms.  In paragraph B of the proposed bid procedures order, the Debtors propose a finding that the Debtor "have offered good and sufficient reasons for, and the best interest of its estate will be

served by, this Court granting the Motion to the extent provided in this Order, including (i)

approving the Bidding Procedures, . . .".   This is the type of hypothetical benefit that the Third

Circuit rejected in *EHF II*.  Consistent with the Third Circuit's latest guidance, the Court should

not consider bid protections until there is a sufficient evidentiary record on which to make the legal

determinations outlined in *O'Brien* and subsequent Circuit cases.

23.     In sum, the Debtors' request for authority to award bid protections should be denied

as it undermines this Court's control of administrative expenses.

24.     Further, in the event the Motion is granted, the U.S. Trustee requests language be

added to the Bid Procedures Order providing that:

- With consent of the applicable Consent Parties and after consultation with the Committee, the Debtors shall disclose such Bid Protections in a corresponding notice designating any Stalking Horse Bidders (the "Stalking Horse Bidder Notice") to be filed pursuant to the Bid Procedures.

- Such filing shall also include a copy of the Stalking Horse Bidders' Stalking Horse Agreement(s)

- An appropriate declaration in support of the proposed Bid Protections (the "Bid Protections Declaration") and a proposed form of order approving of the Bid Protections (the "Bid Protections Order") shall be attached to the Stalking Horse Bidder Notice.

- The Stalking Horse Bidder Notice and Bid Protections Declaration shall set forth the reasons the Debtors believe the Bid Protections satisfy the requirements of section 503(b) of the Bankruptcy Code.

- Nothing in any Order shifts the Debtors' burden of proof that the Bid Protections are actually necessary to preserve the value of the estates pursuant to section 503(b) of the Bankruptcy Code.

- Objections to (i) the Bid Protections set forth in the Stalking Horse Bidder Notice and Bid Protections Declaration or (ii) the form of the Bid Protections Order (a "Bid Protections Objection") shall be permitted after an appropriate notice period.

- If a timely Bid Protections Objection is filed, the Debtors will schedule a hearing in consultation with any objecting parties, the Consultation Parties, and the Court.

## CONCLUSION

WHEREFORE, for all the above-stated reasons, the United States Trustee respectfully

requests that Court deny the Motion to the extent of this Objection and/or grant such other relief

as this Court deems fair, appropriate, and just.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

Dated: July 14, 2022          By:          /s/Richard L. Schepacarter
                                            Richard L. Schepacarter
                                            Trial Attorneys
                                            United States Department of Justice
                                            Office of the United States Trustee
                                            J. Caleb Boggs Federal Building
                                            844 N. King Street, Room 2207, Lockbox 35
                                            Wilmington, DE 19801
                                            (302) 573-6491
                                            (302) 573-6497 fax
                                            Richard.Schepacarter@usdoj.gov