**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | Chapter 11 |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 22-10580 (JKS) |
| ENJY TECHNOLOGY, INC., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: Docket No. 86** |
| | ) | |

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (C) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING MANNER OF NOTICE THEREOF, AND (D) SCHEDULING A HEARING TO APPROVE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS; AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT, AND (B) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (III) AN ORDER APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

I, Marc D. Puntus, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I submit this declaration (this "Declaration") in support of the *Motion of the Debtors for Entry of (I) An Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of all or Substantially all of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Scheduling a Hearing to Approve Assumption and Assignment of the Assumed Contracts; and (II) An Order (A) Authorizing and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Enjoy Technology, Inc. (6891); Enjoy Technology Operating Corp. (4543); Enjoy Technology LLC (0230). The location of the Debtors' service address in these chapter 11 cases is 3240 Hillview Avenue, Palo Alto, CA 94304.

*Approving the Debtors' Entry into an Asset Purchase Agreement, and (B) Authorizing the Sale of all or Substantially all of the Debtors' Assets Free and Clear of all Encumbrances; (III) An Order Approving the Assumption and Assignment of the Assumed Contracts; and (IV) Granting Related Relief* [Docket No. 86] (the "<u>Motion</u>")[2].

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management team and the Debtors' advisors, including my team at Centerview. If I were called to testify, I could and would testify competently to the facts set forth herein.

### Professional Qualifications

3. I am a Partner and Co-Head of the Debt Advisory and Restructuring Group at Centerview Partners LLC ("<u>Centerview</u>"), proposed investment banker to the Debtors in these Chapter 11 Cases. Centerview is a full-service independent investment banking firm providing financial advisory services, including mergers and acquisitions, debt financing, and restructuring advice, across a broad range of industries. Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

4. Prior to and since joining Centerview in 2011, I have advised companies, creditors, shareholders, and other stakeholders in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations. I am experienced in procuring, structuring, and negotiating merger and acquisition and asset sale transactions. Prior to joining Centerview, I was a Managing Director of Miller Buckfire & Co., an investment bank and advisory firm that provided financial

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

advisory services to constituents in a broad range of restructuring and corporate finance transactions. Prior to that, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW"), and prior to joining DrKW, I was a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP. I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

## Situation Overview

5. I understand that a number of factors, including tightening capital markets and other contributing macroeconomic trends, have constrained the Debtors' ability to raise the capital necessary to continue to fund their operations since going public in 2021. In April 2022, the Debtors determined that exploring strategic alternatives was necessary to preserve their liquidity and maintain ongoing operations. To that end, the Debtors retained Centerview pursuant to an engagement letter dated May 7, 2022.

6. Beginning in May 2022, the Debtors and their advisors began a targeted marketing process for a sale of substantially all of their assets. In connection with this prepetition marketing process, the Debtors contacted twenty-three (23) prospective strategic buyers, which the Debtors, in consultation with Centerview, determined were the most likely purchasers of the Debtors' assets. The Debtors executed non-disclosure agreements with five (5) parties and received two (2) letters of intent—one from Asurion and one from another counterparty. The Debtors executed a letter of intent with the other counterparty on June 13, 2022 to complete an out-of-court transaction. On June 17, 2022, this counterparty informed the Debtors that it would not proceed with the transaction and withdrew its offer.

7. The Debtors then pivoted to the proposal received from Asurion for a sale of substantially all of the Debtors' U.S. assets through a chapter 11 proceeding. On June 19, 2022, the Debtors signed a letter of intent with Asurion, which was later revised and superseded by the Asurion LOI dated as of June 29, 2022. Since the Debtors' entry into the Asurion LOI, Asurion continued due diligence activities and ultimately submitted a bid for substantially all of the Debtors' U.S. assets through the Stalking Horse Agreement. One critical component of Asurion's bid for the Debtors' assets is the fact that Asurion, consistent with the Asurion LOI, committed to provide up to $55 million in debtor-in-possession financing, which was necessary to allow the Debtors to continue operating as a going concern pending the Debtors' completion of an auction process in chapter 11, and to ultimately close a sale to Asurion or, as applicable, the highest or best bidder pursuant to the Bidding Procedures. The Debtors entered chapter 11 with less than $550,000 of cash on hand, with negative operating cash flow (prior to restructuring costs) in excess of $10 million per month. The Asurion LOI represented the only available bid for the Debtors' assets, and the only source of financing to allow the Debtors the opportunity to continue as a going concern pending completion of a sale process.

8. On July 25, 2022, the Debtors and Asurion entered into the Stalking Horse Agreement.[3] The Stalking Horse Agreement provides for a purchase price of $110,000,000, subject to certain adjustments, plus the assumption of meaningful post-closing unsecured contractual obligations of the Debtors. It consists of a full credit bid of the obligations under the DIP Facility, with the remainder of the purchase price, less certain adjustments, to be paid by Asurion in cash. The Stalking Horse Agreement is the result of substantial efforts on behalf of the Debtors and their advisors to negotiate and consummate a transaction that will maximize the value

---

[3] In the event of any inconsistency between this Declaration and the Stalking Horse Agreement, the Stalking Horse Agreement shall control. *See Notice of Filing of Executed Stalking Horse Agreement* (Docket No. 191).

of the Debtors' estates. Further, the Stalking Horse Agreement is the result of good faith, arms'-length negotiations between the Debtors and Asurion. I believe that the sale terms set forth in the Stalking Horse Agreement represent the highest and best transaction presently available for substantially all of the Debtors' U.S. assets. Importantly, in addition to the cash consideration to be paid, Asurion intends to service the Debtors' largest U.S. customer, will retain many of the Debtors' employees, and will assume obligations under and maintain a meaningful number of the Debtors' mobile stores and warehouses. Further, after extensive prepetition marketing efforts, the Stalking Horse Agreement is the only actionable bid the Debtors have received to date.

9. Importantly, the Debtors are committed to achieving the highest or otherwise best bid for all of their assets by continuing the marketing of their assets and conducting a competitive bidding process, as set forth in the Bidding Procedures, and, if necessary, by conducting an Auction.

**Sound Business Purpose for the Bidding Procedures**

10. In connection with negotiating the Stalking Horse Agreement, the Debtors and their advisors worked diligently to develop the Bidding Procedures. The Bidding Procedures account for the Debtors' severe negative cash flow and liquidity concerns and are designed to allow the Debtors the opportunity to further explore the market for the Debtors' assets, while also ensuring that the Debtors do not risk loss of the substantial value provided under the Stalking Horse Agreement negotiated with Asurion, all in the interest of maximizing recoveries. With these goals in mind, I believe that the Bidding Procedures set forth an appropriate process to continue to test the value of the Debtors' assets within the timeframe dictated by the Debtors' liquidity and cash flow situation, and ultimately negotiated with Asurion. The fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by the "market"

in an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. To that end, since July 18, 2022, the Debtors and their professionals have reached out to 32 parties, including all parties that previously signed non-disclosure agreements with Enjoy prepetition, all parties that previously declined to enter into non-disclosure agreements with Enjoy, certain additional parties that have reached out to Enjoy since the Petition Date, as well as certain additional parties suggested by FTI, the proposed financial advisor to the Committee.

11. I believe that the Bidding Procedures will (i) help ensure that the Debtors are maximizing creditor recoveries through these Chapter 11 Cases, while also ensuring the completion of these Chapter 11 Cases in a timely manner, and (ii) provide finality to the Debtors' prepetition marketing process that has continued postpetition. Importantly, the Bidding Procedures do not impact the Debtors' ability to exercise their fiduciary duties to pursue an alternative restructuring strategy.

12. The timeframe set forth in the Bidding Procedures was negotiated in good faith and at arms' length by the Debtors and Asurion, and allows the Debtors the opportunity to continue their marketing efforts and realize the highest and best value for their stakeholders. Asurion has conditioned its proposed purchase of substantially all of the Debtors' U.S. assets on the achievement of certain milestones, including a transaction closing date on or before August 29, 2022. In light of the Debtors' cash position and their meaningful cash burn rate, any closing deadline beyond this date would risk the Debtors' ability to operate as a going concern and could irreparably damage the Debtors' efforts to maximize recoveries for their stakeholders. Inasmuch as the Debtors' prepetition marketing process canvassed the most likely purchasers potentially interested in the Debtors' assets, and provided the Debtors with no other present option to sell their

assets, and considering the significant recoveries that the Stalking Horse Agreement would provide, the Debtors believe the timeline set forth in the Bidding Procedures represents the best alternative to closing a sale transaction and distributing maximum value to their stakeholders. In my opinion, the Debtors cannot risk losing Asurion as a stalking horse bidder in these Chapter 11 Cases. Should that happen, the risk of a liquidation and a significant reduction in creditor recoveries in these cases will increase substantially. The timeframe reflected in the Bidding Procedures also has the important benefit of allowing the Debtors to minimize operating and other costs associated with the Debtors business and their stay in chapter 11, thereby maximizing recoveries for the Debtors' estates and stakeholders.

13. In light of the foregoing, I believe that the Bidding Procedures increase the likelihood that the Debtors' marketing and sale process ultimately produces a Successful Bidder and allows the Debtors to enter into a transaction that maximizes recoveries for stakeholders within the confines of the Debtors' limited liquidity runway, while at the same time minimizing the risk that the Debtors are left without a stalking horse bidder for substantially all of their U.S. assets. Accordingly, I believe that the Debtors' determination to market their assets through the Bidding Procedures, including through a potential Auction, is a valid and sound exercise of the Debtors' business judgment.

**Sound Business Purpose for the Use of a Stalking Horse and Bid Protections**

14. The Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration received in exchange for substantially all of the Debtors' U.S. assets for the benefit of the Debtors' estates. I believe that the Stalking Horse Bid Protections are necessary for Asurion to consummate the transaction in the Stalking Horse Agreement. Accordingly, I

believe that the Stalking Horse Bid Protections will maximize the value of the Debtors' estates and are a valid and sound exercise of the Debtors' business judgment.

15. More specifically, the Stalking Horse Bid Protections were, and remain, a critical component of Asurion's commitment. Asurion has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by and in connection with the Stalking Horse Agreement, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. I believe the parties negotiated the requested Stalking Horse Bid Protections in good faith and at arm's length. I also believe that if the Court does not approve the Stalking Horse Bid Protections, Asurion may elect not to serve as the stalking horse purchaser to the detriment of the Debtors' estates.

16. The break-up fee contained in the Stalking Horse Bid Protections represents approximately 3.0% of the aggregate purchase price set forth in the Stalking Horse Agreement. In my experience, a break-up fee of this amount is in the range of break-up fees that I have seen and negotiated in prior sale transactions, including those conducted in chapter 11. The Stalking Horse Bid Protections further provide for an expense reimbursement of no more than $500,000, which represents less than 0.5% of the aggregate purchase price under the Stalking Horse Agreement. Prior to the Petition Date and since the filing of these Chapter 11 Cases, Asurion has spent considerable time on due diligence activities, including those related to the Debtors' historical performance, operations, cost structure, and employee base. To facilitate this due diligence, Asurion has access to an extensive data room containing information on the Debtors, including but not limited to their financials, contracts and leases, technology platforms, and intellectual property. In addition, I understand that Asurion and its advisors have had frequent calls with the Debtors' advisors postpetition to diligence the Debtors' business and operations. In my experience, an

expense reimbursement of this amount is reasonable under the circumstances. Accordingly, I believe that the Stalking Horse Bid Protections are a valid and sound exercise of the Debtors' business judgment and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Date: July 25, 2022                                             /s/ Marc D. Puntus

                                                                Marc D. Puntus
                                                                Partner, Centerview Partners LLC, proposed
                                                                investment banker to the Debtors